**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
*lking@kaplanfox.com*
Mario M. Choi (SBN 243409)
*mchoi@kaplanfox.com*
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)
*rkaplan@kaplanfox.com*
Frederic S. Fox (to be admitted *pro hac vice*)
*ffox@kaplanfox.com*
Donald R. Hall (to be admitted *pro hac vice*)
*dhall@kaplanfox.com*
Jeffrey P. Campisi (to be admitted *pro hac vice*)
*jcampisi@kaplanfox.com*
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Attorneys for Plaintiff Khan M. Hasan*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KHAN M. HASAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TWITTER, INC., JACK DORSEY, and NED SEGAL,<br><br>Defendants. | Case No. 19-cv-07149<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

COMPLAINT
Case No. 19-cv-07149

Plaintiff Khan M. Hasan ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Twitter, Inc. ("Twitter" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media, news and analyst reports about the Company, conference calls with Company executives and investors, and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Twitter common stock.

## I.     INTRODUCTION

1.     This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC brought by Plaintiff on behalf of all persons and entities who purchased the publicly traded common stock of Twitter from August 6, 2019 through October 23, 2019, inclusive (the "Class Period").

2.     Twitter describes itself as a global platform for public self-expression and conversation in real time. Twitter is available in more than 40 languages around the world. The service can be accessed via twitter.com, an array of mobile devices via Twitter owned and operated mobile applications (*e.g.*, Twitter for iPhone and Twitter for Android), and SMS (text messaging).

3.     Twitter generates the substantial majority of its revenue from advertising. Twitter enables its advertisers to target an audience based on a variety of factors, including a user's interests—called an "interest graph". The interest graph maps, among other things, interests based on users followed and actions taken on our platform, such as Tweets created and engagement with Tweets. In addition, when someone joins Twitter, it asks users for their permission to use their device settings and data—additional information which helps Twitter and its advertisers to target consumers.

4. On August 6, 2019, Twitter publicly disclosed through a tweet that it recently found issues where certain user settings choices designed to target advertising were not working as intended. Twitter represented that "**We recently discovered and fixed** issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners." (Emphasis added.)

5. However, unknown to investors, while Twitter represented that it "fixed" certain issues relating to user choice settings, Defendants (defined below) failed to disclose that the changes implemented to fix these issues adversely affected Twitter's ability to target advertising, including the targeting of advertising through its Mobile App Promotion ("MAP") product, which caused a material decline in advertising revenue.

6. On October 24, 2019, before the market opened, the Company disclosed its financial results for the quarter ended September 30, 2019 and conducted a conference call with investors. Twitter's revenue of $823.7 million was over 5% lower than analysts' estimate of $874.0 million. Weaker-than-expected advertising revenues caused this revenue shortfall.

7. During the conference call, Defendant Jack Dorsey ("Dorsey"), Twitter's Chief Executive Officer, disclosed that software defects caused by the changes implemented before the beginning of the Class Period had negatively affected the Company's third quarter financial results and that the negative effects on advertising revenue would continue through at least the fourth quarter of 2019:

> [U]nfortunately, we had some missteps and bugs in our map ads . . . In aggregate, issues relating to our revenue products reduced year-over-year growth by 3 or more points in Q3. We discovered and took steps to remediate bugs that largely affected our legacy map product. These bugs affected our ability to target ads and share data with measurement and partners. We also discovered that certain personalization and data sightings were not operating as expected. These issues were in our control and we will work to do better. . . . Looking ahead, while retaking steps to remediate the product issues we've described, **we expect them to continue to weigh on the overall performance of our ads business in the near term.** Specifically, we expect a moderated performance in MAP and issues discussed in our personalization and data settings will likely result in 4 or more points of reduced year-over-year growth for total revenue in Q4, from 3 or more points of impact in Q3, reflecting a full quarter impact in Q4 versus only a partial quarter impact in Q3. This is incorporated into our guidance.

(Emphasis added.)

8.     On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a decline of $8.10 per share, or over 20%, on heavier than average trading volume (over 105 million shares traded).

9.     Also on October 24, 2019, the *Wall Street Journal* published an article titled "Twitter Shares Plunge as Ad-Business Troubles Weigh on Growth."  The article stated, in part, the following:

> Technical glitches in Twitter Inc.'s advertising software roiled the social-media company in the third quarter, as a pullback in spending from some buyers and weaker pricing for ads cut into revenue and profit even though it added millions of new users. . .
>
> The company said malfunctions in ad-targeting software as well as weaker-than-expected spending in July and August hurt its performance.  The software problems meant that Twitter couldn't serve ads to users with the same level of precision as it normally does, prompting some advertisers to pause or reduce spending. For example, a burger restaurant's ads might have been delivered to a wide swath of users, including vegetarians and people who live long distances away, making them less effective than if they were sent to meat lovers who live near the restaurant, said Wedbush analyst Michael Pachter.
>
> Revenue rose 9% from a year ago to $824 million, marking the smallest annual increase since late 2017 and below the $873.9 million that analysts polled by FactSet were expecting.  Advertising revenue accounted for 85% of the company's total.  Twitter said it expects the negative impact on ad sales to persist in the current quarter. . .
>
> The snafus with Twitter's ad business came as a surprise to most analysts, said Cascend analyst Eric Ross. "No one was talking about this," he said.  "The results were much worse from a revenue-per-user standpoint than we were expecting. This is shocking given the growth in daily active users."
>
> The company said it anticipates the issues that plagued the ad business in the July through September period to continue in the current quarter.

10.    On October 25, 2019, Wedbush issued a research report titled "Baby Bird Falls from Nest, Goes Splat" that stated, in part, the following:

> Twitter's missteps in the quarter are unforgiveable.  The company discovered "bugs" in its ad delivery technology that interfered with its ability to effectively target users.  By effective targeting, ROI for advertisers is enhanced, as ads are

3

> delivered to a receptive audience; in contrast, ads that are ineffectively targeted are often delivered to consumers who simply don't care and who are not receptive to the ad delivered. Twitter discovered that its "personalization and data settings" were buggy, and its ad pricing ("CPM") declined during the quarter as the mix of high priced video ads declined. We label these missteps as "unforgiveable" because Twitter has been in business for more than a decade and has been delivering ads for the last nine years. It is reasonable for investors to expect that the company's ad delivery technology will perform flawlessly; Twitter's Q3 revenue shortfall is evidence that its technology did not work properly.
>
> We accept the company's assurance that it has "fixed" the "bugs", but we think there is some risk that it has lost the confidence of at least a portion of its advertisers. At the same time, we are skeptical that management is appropriately focused on driving new users to sign up, seeming (to us) complacent about driving its existing user base to sign onto Twitter more frequently. . .
>
> We are lowering our estimates to reflect lower than expected guidance and to reflect future growth rates that are similar to past rates . . . we are reducing our price target to $34.50 from $42. . . .

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

12. The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by Section 27 of the Exchange Act. Venue is proper in this district throughout the Class Period and Defendants made materially false and misleading representations to investors that were disseminated to investors in this District.

13. In connection with the facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

14. Plaintiff purchased Twitter common stock as detailed in the certification attached hereto and was damaged thereby.

4

15. Defendant Twitter is incorporated in Delaware and its principal executive offices are at 1355 Market Street, Suite 900, San Francisco, CA 94103. Twitter's common stock trades on the NYSE under the symbol "TWTR."

16. Defendant Dorsey was the Chief Executive Officer of Twitter at all relevant times.

17. Defendant Ned Segal ("Segal") was the Chief Financial Officer of Twitter at all relevant times.

18. Defendants Twitter, Dorsey and Segal are collectively referred to as "Defendants".

19. Defendants Dorsey and Segal are also referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Twitter's press releases, tweets, SEC filings and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's press releases and statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, the Individual Defendants knew, or ignored with deliberate reckless, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## IV.  CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the publicly traded common stock of Twitter during the Class Period.

21. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout the United States. As of July 27, 2019, Twitter reported over 773 million shares of common stock outstanding.

22.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

**V.    FALSE AND MISLEADING STATEMENTS**

23.     On August 6, 2019, Defendants caused Twitter to issue a statement through a tweet that stated "**We recently discovered and fixed** issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners." (Emphasis added.)  The tweet linked to a statement on Twitter's help center that further explained, as follows:

> At Twitter, we want to give you control over your data, including when we share that data.  Of course, those options are only good if we follow the choices you make, and we recently found issues where your settings choices may not have worked as intended.  This may have resulted in two things:
>
> If you clicked or viewed an advertisement for a mobile application and subsequently interacted with the mobile application since May 2018, we may have shared certain data (e.g., country code, if you engaged with the ad and when, information about the ad, etc) with trusted measurement and advertising partners, even if you didn't give us permission to do so.
>
> As part of a process we use to try and serve more relevant advertising on Twitter and other services since September 2018, we may have shown you ads based on inferences we made about the devices you use, even if you did not give us permission to do so.  The data involved stayed within Twitter and did not contain things like passwords, email accounts, etc.
>
> We fixed these issues on August 5, 2019.  We know you will want to know if you were personally affected, and how many people in total were involved.  We are still conducting our investigation to determine who may have been impacted and If we discover more information that is useful we will share it. . . .

24.     Defendants' representation that "[w]e recently discovered and fixed issues related to your settings choices" and "[w]e fixed these issues on August 5, 2019" were materially false and

6

1  misleading and failed to disclose material adverse facts because Defendants failed to disclose that
2  the "fix" Defendants caused Twitter to implement negatively affected Twitter's advertising
3  revenue.

4      25.      On September 4, 2019, Defendant Segal attended the Citi Global Technology
5  Conference in New York City, at which he made the following representations in response to an
6  analyst's questions:

> **Kevin Toomey, Citi - Analyst**
>
> And just -- you mentioned advertising earlier.  In terms of advertising spend, what are you doing to make Twitter more attractive to marketers and increase their spending on the platform?
>
> **Ned D. Segal, Twitter, Inc. – CFO**
>
> The first thing is to drive clarity around the best use cases for Twitter . . . we continue to work hard to deliver better ROI [return on investment] for them, that can be through better relevance. . . .

14      26.      Defendant Segal's representations were materially false and misleading and failed to
15 disclose material adverse facts because Defendant Segal failed to disclose that the as a result of the
16 "fix" Defendants caused Twitter to implement, Twitter's advertising became less "relevant" to
17 Twitter advertisers and users, which was adversely affecting Twitter's advertising revenue.

18      27.      Furthermore, Defendant Segal made the following representations concerning
19 Twitter's advertising revenue growth in response to an analyst's question:

> **Kevin Toomey, Citi - Analyst**
> Okay. Just shifting back to advertising for a second.  US advertising revenue grew 29% year-over-year in the second quarter.  What were the primary drivers of that strength and what's resonating well with US advertisers?
>
> **Ned D. Segal, Twitter, Inc. - CFO**
> Well, the topics -- when we talk about launching new products and services, and we talk about connecting with what's happening, it's really resonating with the largest advertisers all over the world, and the U.S. did come back to growth and later than the rest of the world did.  Remember our business recovery began in the first half of 2017 outside of the United States.  Then it came to United States in the second half of last year.
> And so the growth that you saw in the first half of this year was just the results of continuing that dialogue around launching new products and services, connecting

7

with what's happening, better relevance and great formats.  When you are about $3 billion of a $200 billion advertising market, $100 billion or more of which is online, there is a lot of market share to ask for and it's our job to go out and deliver great outcomes for advertisers in the U.S. and all over the world so that we can earn the right to ask for more.

28.     Defendant Segal's representations were materially false and misleading and failed to disclose material adverse facts because Defendant Segal failed to disclose that the as a result of the "fix" Defendants caused Twitter to implement, Twitter's advertising became less "relevant" to Twitter advertisers and users, which was adversely affecting Twitter's advertising revenue.

29.     Moreover, in response to an analyst's question, Defendant Segal discussed the next generation of Twitter's MAP product, while failing to disclose the material software defects then negatively affecting Twitter's MAP product and the negative affects those defects were having on Twitter's advertising revenue:

**Kevin Toomey, Citi – Analyst**

You mentioned the mobile app product earlier.  Why is it taking so long to roll it out and address the DR [direct response] community?  Where are you now in that initiative?

**Ned D. Segal, Twitter, Inc. – CFO**

So our MAP work is ongoing.  When you want to rebuild a product from the bottom up, and you want to make sure you get it right where you make it so that somebody can launch a campaign quickly, so that you're not giving them so many choices that it's a confusing experience, when you want to improve the relevance so that they can drive more downloads with fewer impressions.  You want to make sure you get it right.  You want to allow people to test it.  When the tests come back you want to learn from them and apply the learning, sometimes going back and iterating further on some of the improvements that you've done.  And it's just a process that takes time as you do it.  We've continued to sell the existing MAP product but people know that new one is coming, and we haven't really talked about a timeline around it.

30.     Defendant Segal's representations were materially false and misleading and failed to disclose material adverse facts because Defendant Segal failed to disclose that the "fix" Defendants caused Twitter to implement to Twitter's "existing MAP product" was then adversely affecting Twitter's advertising revenue.

## VI. THE TRUTH BEGINS TO EMERGE

31. On October 24, 2019, before the market opened, Twitter disclosed its financial results for the quarter ended September 30, 2019 and conducted a conference call with investors. Twitter's revenue of $823.7 million lagged analysts' estimate of $874.0 million.

32. During the conference call, Defendant Dorsey, disclosed that Twitter "had some missteps and bugs in our map ads . . . We discovered and took steps to remediate bugs that largely affected our legacy map product. These bugs affected our ability to target ads and share data with measurement and partners. We also discovered that certain personalization and data sightings were not operating as expected."

33. Defendant Segal disclosed the following in response to an analyst question:

**Douglas Till Anmuth JP Morgan Chase & Co, Research Division – MD**

I have two. First, just Ned, on MAP. Could just help us understand a little bit kind of when you learned of the issues around MAP around targeting and then sharing data? And then the degree to which they been fixed at this point and how that kind of informs the 4 points of impact that you're talking about for 4Q? . . . .

**Ned D. Segal Twitter, Inc. - CFO**

Okay. Thanks, Doug. I'll take both. Jack can add anything afterwards [i]f it make[s] sense. First of all, our other product-related issues, so this came up over the course of the quarter and it was 1 particular day, there were more than one of these things. Let me give you a couple of examples, which can help them come to life.

The first is, we asked people a series of questions when we put them -- me before we put you into a timeline when you're new to Twitter. Among the questions we asked are, if we can use your device settings to figure out best ads to show you. **It turns out there that setting wasn't working as expected and we were using device settings even if people had asked us not to do so.**

**So when we discovered that, the one we tweeted about, which we often do to try to be transparent with people when things aren't working as expected. And two, we turned off the setting so that it would work as expected. That has a negative impact [on] the revenue because it's one less input that you've got when you are figuring out which ads to show people.**

So instead of getting a partial quarter impact, you get a full quarter impact in Q4.

A second example is specific to MAP where we typically will share data with measurement partners who will then share it with advertisers so they can see the

9

effectiveness of their campaigns not just on Twitter but across platforms.  And another one of the questions that we asked people before we put them into a timeline is if we can share their data with measurement partners?  **That setting also was not working as expected and we were passing on data, which we had not intended to.**

**So we stopped doing that and although we're working on remediation, there isn't remediation yet in place and so the effects of that will continue into Q4**.  As you can imagine, the remediation would be sharing aggregated data as opposed to personalized data when people have asked us not to share their data.

So those are 2 good examples.  Hopefully help the issues come to life a little bit, that this wasn't one thing, there were things that we found out over the course of the quarter and that when you get a full quarter's impact even if you're working to remediate, there can be negative impact to revenue. . . .

(Emphasis added.)

34. On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a decline of $8.10 per share, or over 20%, on heavier than average trading volume.

**VII.   ADDITIONAL SCIENTER ALLEGATIONS**

35. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Twitter, their control over, and/or receipt and/or modification of Twitter's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Twitter, participated in the fraudulent scheme alleged herein.

36. Defendants knew, or at least deliberately recklessly disregarded, the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a

10

1  substantial period of time, as has occurred, without the knowledge and complicity of the personnel
2  at the highest level of the Company, including the Individual Defendants.

3        37.    Defendants had the motive and opportunity to perpetrate the fraudulent scheme and
4  course of business described herein because the Individual Defendants were the most senior
5  officers of Twitter, issued statements and press releases on behalf of Twitter and had the
6  opportunity to commit the fraud alleged herein.

7        38.    During the Class Period, Defendant Segal sold 22,000 shares of Twitter common
8  stock at prices per share between $40.37 and $43.88 for proceeds of approximately $917,900.

9  **VIII.   LOSS CAUSATION/ECONOMIC LOSS**

10       39.    During the Class Period, as detailed herein, Defendants engaged in a scheme to
11 deceive the market and a course of conduct that artificially inflated Twitter's common share price
12 and operated as a fraud or deceit on Class Period purchasers of Twitter common stock by
13 misrepresenting the Company's operating condition and future business prospects.  Defendants
14 achieved this by making positive statements about Twitter's business while they knew, or
15 disregarded with deliberate recklessness, the adverse facts alleged above.

16       40.    Later, however, when Defendants' prior misrepresentations were disclosed and
17 became apparent to the market, the price of Twitter's common stock fell precipitously as the prior
18 artificial inflation came out of Twitter's share price.

19       41.    As a result of their purchases of Twitter common stock during the Class Period,
20 Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal
21 securities laws.

22       42.    As a direct result of the public revelations regarding the truth about the condition of
23 Twitter's business and the negative adverse factors that had been impacting Twitter's advertising
24 revenue during the Class Period, the price of Twitter's common stock materially declined.  This
25 drop removed the inflation from Twitter's share price, causing real economic loss to investors who
26 purchased Twitter common stock during the Class Period.

27
28

11

43. The decline in Twitter's share price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Twitter's share price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## IX. FRAUD-ON-THE-MARKET DOCTRINE

44. At all relevant times, the market for Twitter's common stock was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for public listing and were listed and actively traded on the NYSE, a highly efficient market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c) The Company regularly issued press releases and tweets which were carried by national news wires, including *Reuters*. Each of these releases was publicly available and entered the public marketplace.

45. As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to Twitter from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of Twitter at artificially inflated prices and a presumption of reliance applies.

## X. NO SAFE HARBOR

46. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made.

47. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

48. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Twitter who knew that those statements were false when made.

**XI.    RELIEF REQUESTED**

**FIRST CLAIM FOR RELIEF**
**For Violation of Section 10(b) of the 1934 Act**
**and Rule 10b-5 Against All Defendants**

49. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or deliberately recklessly disregarded, were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51. Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

   (a) Employed devices, schemes and artifices to defraud;

   (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

   (c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Twitter's publicly traded common stock during the Class Period.

13

52. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Twitter's publicly traded common stock. Plaintiff and the Class would not have purchased Twitter's common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

53. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Twitter's common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**
**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

54. Plaintiff repeats and re-alleges each and every allegation contained above as if full set forth herein.

55. The Individual Defendants each acted as a controlling person of Twitter within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements or tweets that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, tweets and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57. As set forth above, Twitter and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Twitter's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action;

B. Awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and

C. Such equitable/injunctive relief as the Court may deem proper.

## XIII.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 29, 2019   **KAPLAN FOX & KILSHEIMER LLP**

By:  _/s/ Laurence D. King_____
     Laurence D. King

Laurence D. King (SBN 206423)
*lking@kaplanfox.com*
Mario M. Choi (SBN 243409)
*mchoi@kaplanfox.com*
350 Sansome Street, Suite 400
San Francisco, CA  94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)
*rkaplan@kaplanfox.com*
Frederic S. Fox (to be admitted *pro hac vice*)
*ffox@kaplanfox.com*
Donald R. Hall (to be admitted *pro hac vice*)
*dhall@kaplanfox.com*
Jeffrey P. Campisi (to be admitted *pro hac vice*)
*jcampisi@kaplanfox.com*
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Attorneys for Plaintiff Khan M. Hasan*

16