**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

*Counsel for the Twitter Investor Group and*
*Co-Lead Counsel for the Proposed Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Tamar Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
*jalieberman@pomlaw.com*
*taweinrib@pomlaw.com*

*Counsel for the Weston Family Partnership*
*LLLP and Co-Lead Counsel for the*
*Proposed Class*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)
Donald R. Hall (to be admitted *pro hac vice*)
Jeffrey P. Campisi (to be admitted *pro hac vice*)
Jason A. Uris (to be admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714
*Rkaplan@kaplanfox.com*
*dhall@kaplanfox.com*
*jcampisi@kaplanfox.com*
*juris@kaplanfox.com*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
(to be admitted *pro hac vice*)
Sebastian Tornatore
(to be admitted *pro hac vice*)
Michael Keating
(to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Telephone:  (203) 992-4523
Facsimile:  (213) 363-7171
*shopkins@zlk.com*
*stornatore@zlk.com*
*mkeating@zlk.com*

*Counsel for the Twitter Investor Group and*
*Additional Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE TWITTER, INC. SECURITIES LITIGATION | Civil Action No. 4:19-cv-07149-YGR |
| This Document Relates To:<br><br>ALL ACTIONS. | CLASS ACTION<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Courtroom: 1 – 4th Floor |

**TABLE OF CONTENTS**

Page

I.     SUMMARY OF THE ACTION ................................................................ 1

II.    INTRODUCTION ................................................................................... 2

III.   JURISDICTION AND VENUE .............................................................. 7

IV.    THE PARTIES ....................................................................................... 8

       A.   Plaintiffs ...................................................................................... 8

       B.   Defendants ................................................................................... 8

V.     FACTUAL ALLEGATIONS ................................................................ 10

       A.   Background ................................................................................ 10

            1.   Twitter's Platform and Advertising Revenue Products ........... 10

            2.   Twitter's Advertisement Auctions ......................................... 11

            3.   Twitter's Advertising Revenue Relies on its Ability to Access User
                 Preferences through Personalization and Data Settings to Provide
                 Targeted and Relevant Information to End Users .................... 12

            4.   Advertisers Use Measurement Companies to Plan Marketing
                 Campaigns and Monitor their Efficacy .................................. 14

            5.   Twitter Provides Users the Ability to Protect their Non-Public Data ....... 14

       B.   Twitter Introduces Its Mobile App Promotion ("MAP") Product .......... 15

       C.   Twitter Changes Its Data Controls and Privacy Policy ....................... 17

            1.   Twitter Permits Users to Opt-Out of Data Sharing .................. 17

            2.   Twitter's Updated Privacy Policy ......................................... 18

            3.   Unknown to Twitter Users and Investors, Twitter Ignores User
                 Preferences to Not Share Data in Violation of Twitter's Privacy
                 Policy ................................................................................. 19

            4.   While Purporting to Improve MAP and Other Direct-Response
                 Products, Defendants Reveal "Bugs" Compromising User Privacy .......... 19

       D.   Defendants' "Bug Fixes" Prevented Twitter from Effectively Targeting
            Users with Relevant Advertising, Causing Advertisers to Pause or Reduce
            Spending on Advertising ........................................................... 21

       E.   Defendants Disclose That "Bugs" Primarily Affecting MAP Negatively
            Affected Third Quarter 2019 Results and Reveal That this Material
            Negative Trend Would Continue ................................................. 22

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 27

VII.   THE TRUTH IS REVEALED ............................................................... 33

**TABLE OF CONTENTS – (cont.)**

Page

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ..................................................... 34

  A.   Defendants' Continuous Monitoring of Key Metrics Supports a Strong
       Inference of Scienter ......................................................................................... 35

  B.   Defendants' MAP Work Was an Important Focus of Management Before
       and During the Class Period and Defendants Regularly Reported Progress
       on MAP Development to Investors, but Defendants Did Not Disclose the
       Adverse Effect on Advertising and Revenue ..................................................... 36

  C.   The Software Bugs That Negatively Affected Twitter's Revenue Hampered
       Defendants Ability to Target Users with Relevant Advertising and
       Negatively Affected Multiple Ad Products ......................................................... 37

  D.   The State of Mind of Defendants' Senior Executives and Officers is Imputed
       to Defendant Twitter .......................................................................................... 37

  E.   Defendants' Violations of Twitter's Privacy Policies and the FTC Settlement
       Support and Inference of Scienter ..................................................................... 38

IX.    LOSS CAUSATION ............................................................................................ 38

X.     PRESUMPTION OF RELIANCE ...................................................................... 40

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
       CAUTION DOCTRINE ...................................................................................... 41

XII.   CLASS ACTION ALLEGATIONS .................................................................... 42

XIII.  CLAIMS FOR RELIEF ....................................................................................... 43

       COUNT I For Violations of Section 10(b) of the Exchange Act and Rule
       10b-5 Against All Defendants .............................................................................. 43

       COUNT II For Violations of Section 20(a) of the Exchange Act Against
       Twitter and the Individual Defendants ............................................................... 45

XIV.   PRAYER FOR RELIEF ....................................................................................... 46

XV.    JURY DEMAND .................................................................................................. 46

Lead Plaintiffs the Weston Family Partnership LLLP and the Twitter Investor Group[1] (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned Counsel, which included, among other things, review and analysis of: (i) Twitter, Inc.'s ("Twitter" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); (ii) Defendants' other public statements, including press releases, investor conference calls and analyst conferences; (iii) information obtained from confidential informants; and (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Twitter and the industry in which it operates. Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  SUMMARY OF THE ACTION

1.  This is a federal securities class action on behalf of all persons who purchased the publicly traded common stock of Twitter from July 26, 2019 through October 23, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class"). This action is brought against Twitter; Jack Dorsey ("Dorsey"), Twitter's Co-Founder, Chief Executive Officer and a member of the Company's board of directors; and Ned Segal ("Segal"), the Company's Chief Financial Officer, (collectively, the "Defendants"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.  Twitter's appeal to advertisers was its ability to provide advertisers with detailed information about users' preferences and interests and the type of device that users employed, which permitted advertisers to target users with specific advertisements which users were likely to

---

[1] The "Twitter Investor Group" collectively refers to plaintiffs Thomas Do, Michael J. Conroy, and Richard Slepko.

access and act upon. However, Twitter provided users with an option to decide that the user did not want Twitter to provide this personal confidential information to advertisers.

3.      By no later than the beginning of the Class Period, Twitter discovered that its software had been malfunctioning since May 2018, and that personal confidential information of users who had opted out was being harvested and provided to advertisers. To correct this malfunction, Twitter stopped providing users' personal non-public information to advertisers which negatively affected its ability to target Twitter users, which was one of the principal reasons advertisers utilized Twitter. As a result, when Twitter stopped providing users' personal non-public information to advertisers, Twitter experienced a material decline in demand for its advertising products, which resulted in a material decline in Twitter's revenue. This material decline was known to Twitter and Defendants Dorsey and Segal who monitored the key Twitter metrics, including its advertising demand and revenue, on a daily basis. Yet, Defendants did not disclose these facts until the end of the Class Period, which disclosure caused a 20% decline in the price of Twitter stock causing injury to plaintiffs and members of the Class.  Twitter stock has not recovered.

## II.    INTRODUCTION

4.      Twitter describes itself as a global platform for public self-expression and conversation in real time.  Twitter is available in more than 40 languages around the world.  The service can be accessed via twitter.com, an array of mobile devices via Twitter owned and operated mobile applications (*e.g.*, Twitter for iPhone and Twitter for Android), and SMS (text messaging).

5.      Twitter generates most of its revenue from advertising.  The lifeblood of Twitter's advertising business is accessing its users' interests, device settings, and data, which it then shares with advertising customers and business partners, enabling them to target users with focused relevant advertisements.  Toward that end, Twitter asks users for permission to use their device settings and data when they join.

6.      Twitter's technology enables advertisers to target an audience based on a variety of factors, including a user's interests—called an "interest graph." The interest graph maps, among

other things, users' interests based on actions taken on Twitter's platform, such as tweets created, and responses to and engagement with tweets.

7.     While Twitter's advertising revenue is dependent on sharing users' interests, data and device settings with advertisers, since at least 2017 Twitter has permitted its users to opt-out of Twitter's data sharing program to promote and protect user privacy and control over user data. Twitter assured its users that it implemented tools and settings enabling them to opt out of Twitter's sharing certain non-public data with Twitter's business partners and to opt out of users' receiving targeted advertising based on users' personal, non-public data and device settings.

8.     One of Twitter's advertising products is called Mobile Application Promotion ("MAP"). MAP is a form of "direct-response," or "DR," advertising. This type of advertisement seeks a specific response or call to action by the Twitter user, namely, to download an advertiser's mobile app for use on Android or iOS devices, or reengage with a mobile app the user has already downloaded.[2] MAP is most effective when an advertiser knows information about the user's device settings, including the user's mobile device operating system (iOS or Android), date of purchase, and which apps the user has already downloaded.

9.     In or around early 2019, Defendants represented that they would introduce an improved version of MAP in 2019. For example, during Defendants' April 23, 2019 conference call with investors to discuss the Company's financial results for the quarter ended March 31, 2019, Defendant Segal stated:

> As you know, we have a successful mobile application promotion product, but we feel that we can do better there, and we think we can do better across direct response over time. And so 1 of the 2 biggest endeavors for our revenue product team this year is continuing to improve mobile application promotion so that, when a car service or a game company is launching an app in a new country or a new app somewhere in the world, they come to Twitter to launch it . . . We know we can do more to drive better relevance for them to help them target the right audience.

---

[2] The most popular mobile devices have one of two operating systems that control the functioning of the phone. For Apple mobile devices, it is iPhone Operating System ("iOS") and for Google mobile devices and many other mobile device manufacturers, it is Android. It is important for Twitter and MAP advertisers to know which operating system the user's device runs on in order to direct the download link to the correct app store.

10.    On July 26, 2019, the beginning of the Class Period, Defendants disclosed Twitter's financial results for the quarter ended June 30, 2019 and conducted a conference call with investors. During the conference call, in response to analysts' questions about Twitter's progress on an improved MAP product, Defendants Dorsey and Segal falsely represented that improvements to MAP's stability, performance and scale were ongoing and would have a positive "gradual impact on revenue." In fact, due to the software bugs, which permitted confidential personal user data of users who had opted out to be shared with advertisers, Twitter had to remove software engineers who were working on the new MAP product or other projects to have them attempt to fix the software bugs, which was delaying the new MAP product.

11.    Unknown to investors, however, no later than the beginning of the Class Period, Defendants discovered that software bugs had been plaguing Twitter's MAP product since at least May 2018. These software bugs had caused Defendants to both violate and ignore user preferences to opt out of receiving targeted ads, and share user data, including device settings, with advertisers, even if users had elected not to do so. To "fix" the software bugs, Defendants stopped sharing certain user data with MAP advertisers entirely.

12.    Moreover, unknown to investors, Defendants' fixes to these software bugs negatively, and dramatically, impacted MAP advertising. The lack of access to users' data and device settings significantly hampered Twitter's advertising customers' ability to target specific users through MAP. As a result, Twitter's advertising customers reduced spending on MAP advertising, lowered their bids for MAP ads, or abandoned Twitter's MAP advertising product altogether—thus negatively affecting Twitter's MAP revenue. Defendants' knew, or disregarded with at least deliberate recklessness, and failed to disclose to investors the material decline in MAP revenue.

13.    The material decline in MAP revenue was reflected in decreases in the number and price of bids that advertisers placed for MAP ads on Defendants' continuous and automated Real Time Bidding ("RTB") auction platform. The output of Defendants' RTB auctions—a metric called Cost Per Ad Engagement ("CPE")—precipitously declined after Defendants stopped sharing user data and device settings, reflecting reduced advertiser demand for MAP ads.

14.    Defendants Dorsey and Segal followed CPE, which is identified as a "Key Metric" in Twitter's SEC filings.  Indeed, Defendants Dorsey and Segal received daily reports about Key Metrics, including CPE, and therefore contemporaneously knew about, or disregarded with at least deliberate recklessness, the negative consequences to Twitter's revenue from ceasing to share non-public user data and device settings with MAP advertisers.

15.    Then, on August 6, 2019, Defendants caused Twitter to disclose via tweet that the settings enabling users to opt out of Twitter's data sharing program had not been working as intended.  Defendants admitted that Twitter shared user data with business partners and subjected users to targeted advertising, even if those users had opted out of data sharing and targeted advertising in their settings.  Twitter represented that, "We recently discovered and fixed issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners."

16.    However, while Defendants falsely represented  that they had "fixed" the software bugs that caused Defendants to violate user privacy settings, Defendants hid the material negative risk to and impact on Twitter's revenue that resulted from these software "fixes."  Unknown to investors, unable to actually fix the software bugs, Defendants turned off the setting that had caused the Company to access and share user data in contravention of user preferences that Twitter not do so.

17.    After observing the deterioration of Twitter's Key Metrics for several weeks and the material negative effects on Twitter's revenue as advertiser demand for MAP materially declined, Defendant Segal appeared at an investor conference on September 4, 2019.  At this conference, although analysts repeatedly asked Defendant Segal about Defendants' ongoing work to improve MAP and the timing of its release, Defendant Segal said nothing about the decline in demand for MAP advertising and the decline in revenue from MAP as a result of the software "fixes" made to comply with user's privacy preferences.  Instead, Defendant Segal misleadingly represented that "our MAP work is ongoing;" "the work we're doing around MAP hopefully will lead to more direct response-related advertising opportunities for us;" and that MAP advertising monetization was strong in Asia.

18.     In truth, stopping the flow of information regarding user data and device settings caused demand for, and revenue from, MAP to decline, especially in Japan, the Company's most important international market.  Moreover, Defendants' need to remediate the damage from the software bugs effectively derailed their work on an improved MAP product. Instead of working on developing an improved MAP product, Defendants reassigned engineers to work on remediations to stanch the bleeding of MAP revenue.

19.     On October 24, 2019, before the market opened, Defendants conducted an investor conference call regarding Twitter's financial results for the quarter ended September 30, 2019. During the conference call, Defendants Dorsey and Segal disclosed that software defects caused by the changes implemented to fix the privacy violations had negatively affected third quarter financial results and that these negative effects would continue through at least the fourth quarter of 2019:

> [Defendant Dorsey:] unfortunately, we had some missteps and bugs in our MAP ads . . .
>
> [Defendant Segal:] In aggregate, issues relating to our revenue products reduced year-over-year growth by 3 or more points [approximately $25 million] in Q3. We discovered and took steps to remediate bugs that largely affected our legacy MAP product.  These bugs affected our ability to target ads and share data with measurement and partners.   We also discovered that certain personalization and data sightings were not operating as expected. These issues were in our control and we will work to do better. . . .
>
> Looking ahead, while we're taking steps to remediate the product issues we've described, we expect them to continue to weigh on the overall performance of our ads business in the near term. Specifically, we expect a moderated performance in MAP and the issues discussed in our personalization and data settings will likely result in 4 or more points of reduced year-over-year growth for total revenue in Q4 [approximately $40 million], from 3 or more points of impacting Q3, reflecting a full quarter impact in Q4 versus only a partial quarter impact in Q3. This is incorporated into our guidance.

20.     On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a decline of $8.10 per share, or over 20%, on heavier than average trading volume (over 105 million shares traded).

21.     Analysts called Defendants' "missteps…unforgiveable" and downgraded Twitter stock.  Furthermore, analysts placed the blame for Twitter's poor performance on Twitter's loss of both access to user data and ability to target users with relevant advertisements due to changes that

Defendants made to MAP to address software bugs no later than the start of the Class Period. *See infra* paragraph 122.  Moreover, an analyst at Barclays concluded that Defendants "clearly knew" of MAP "headwinds" by the beginning of the Class Period:

> Twitter clearly knew of some of the headwinds around MAP when it guided last quarter [on July 26, 2019] . . .  TWTR has been selling ads for a decade, so these kinds of execution and technical issues are obviously disappointing (and the data pass issues are happening a year after GDPR, which is surprising).  Ad revenue missed consensus by the widest margin in a long time, from a 3-point (~$25m) hit from MAP and data settings issues . . . .

22.     In Twitter's 10-K for the year ended December 31, 2019, filed on February 19, 2020, and on the related earnings conference call, Defendants confirmed that the negative revenue trend relating to MAP revenue had continued during the quarter ended December 31, 2019 and would continue throughout 2020.

23.     Twitter shares have not recovered, closing at $27.21 per share on April 13, 2020.

24.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

25.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Twitter trades in an efficient market on the New York Stock Exchange ("NYSE").

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in

this District.   Additionally, Defendant Twitter maintains its principal executive offices in this District at 1355 Market Street, Suite 900, San Francisco, California 94103.

**IV.    THE PARTIES**

**A.    Plaintiffs**

28.    Lead Plaintiff the Weston Family Partnership purchased Twitter common stock during the Class Period at artificially inflated prices and was damaged thereby, as set forth in the annexed PSLRA certification.

29.    Lead Plaintiff the Twitter Investor Group purchased Twitter common stock during the Class Period at artificially inflated prices and was damaged thereby, as set forth in the annexed PSLRA certifications.

**B.    Defendants**

30.    Defendant Twitter, incorporated in Delaware, maintain its principal executive offices at 1355 Market Street, Suite 900, San Francisco, CA 94103.  Twitter's common stock trades on the NYSE under the symbol "TWTR."

31.    Defendant Dorsey was the Chief Executive Officer, and a Director of Twitter, at all relevant times.  Defendant Dorsey: (a) signed Twitter's Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 filed with the SEC on July 31, 2019 ("Q2 2019 10-Q"); (b) signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") filed with the Q2 2019 10-Q; and (c) made, or caused Twitter to make, representations to investors in press releases, Company tweets and on conference calls with investors on July 26, and August 6, 2019.

32.    Defendant Segal was the Chief Financial Officer of Twitter at all relevant times.  As CFO, Defendant Segal oversees accounting, business development, corporate development, corporate security, financial planning and analysis, investor relations, internal audit, real estate and workplace, and tax and treasury for Twitter.  Defendant Segal: (a) signed the Q2 2019 10-Q; (b) signed a SOX certification filed with the Q2 2019 10-Q; and (c) made, or caused Twitter to make, representations to investors in press releases, Company tweets, investor conferences, and on conference calls with investors on July 26, August 6, and September 4, 2019. During the Class Period, Defendant Segal, while in possession of material nonpublic information concerning the

negative problems then affecting MAP advertising and revenue, engaged in sales of Twitter stock that were suspicious in timing and amounts and at artificially inflated prices, as follows: on August 13, 2019, he sold 6,000 shares at approximately $40.65 per share; on September 10, 2019, he sold 8,000 shares at approximately $43.88 per share; and on October 10, 2019, he sold 8,000 shares at approximately $40.37 per share, for total proceeds $917,900, representing the sale of approximately 10% of his Twitter holdings (excluding restricted stock).  During the Class Period, Defendant Segal did not purchase any Twitter shares on the open market.

33.     Defendants Dorsey and Segal are referred to herein as the "Individual Defendants."

34.     Both of the Individual Defendants, by virtue of his high-level position with Twitter, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during their respective tenures with the Company, as alleged herein.  As alleged below, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants.  Both of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew that these statements were being issued regarding the Company.

35.     As the most senior executive officers of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by federal securities laws, both of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information.  Both of the Individual Defendants violated these requirements and obligations during the Class Period.

36.     Both of the Individual Defendants, because their respective positions of control and authority as executive officers of Twitter, were able to and did control the content of the SEC

filings, press releases, Company tweets and other public statements that Twitter issued during the Class Period, were provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, both of the Individual Defendants are responsible for the accuracy of the materially false or misleading public statements alleged herein.

37. Both of the Individual Defendants, because of their respective positions of control and authority as executive officers of Twitter, had access to the adverse undisclosed information about Twitter's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Twitter officers and employees, attendance at Twitter management meetings, and via reports and other information received in connection therewith, including regular reports reflecting Twitter's key metrics, and knew, or disregarded with at least deliberate recklessness, that these adverse undisclosed facts rendered the representations made by or about Twitter materially false or misleading.

38. Both of the Individual Defendants are liable as participants in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Twitter common stock by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Twitter's products, business, operations, and management, and the intrinsic value of Twitter common stock; and (ii) caused Plaintiffs and members of the Class to acquire Twitter common stock at artificially inflated prices.

## V.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.   Twitter's Platform and Advertising Revenue Products

39. Created in 2006, Twitter is a self-described "global platform for public self-expression and conversation in real time" where users can "tweet" thoughts that other users can reply to, "like," or "retweet" (*i.e.,* post to their own timeline). Twitter is available in more than 40 languages around the world. Users can access the service via twitter.com, on an array of mobile devices via Twitter-owned and operated mobile applications (*e.g.*, Twitter for iPhone and Twitter for Android), and through text messages.

40.     Since going public in 2013, Twitter reportedly has grown to over 152 million average monetizable daily active users ("mDAU").[3]

41.     Twitter is a conversational platform centered around short-form text, image, and video content.  Its users can access real-time information regarding a wide array of topics or news events.   They can also share information and content, interact with content, or express their reactions to other Twitter users.

42.     These types of interactions allow Twitter to compile data about its users, including their interests and their behavior, which is then either licensed or utilized by Twitter and its advertising customers to launch targeted advertisements.   Indeed, at its core, Twitter is an advertising medium, leveraging its audience and advanced analytics to purportedly better target advertisements on behalf of its customers.

43.     Twitter "generate[s] the substantial majority of [its] revenue from the sale of advertising services."  According to its 2019 Annual Report, Twitter received 86.4% of its revenue from advertising in 2019, of which between 90% and 94% stemmed from advertisements to users accessing the platform through their mobile device.  The Company's Annual Report on Form 10-K for the period ending December 31, 2018, filed with the SEC on February 21, 2019 ("2018 10-K") similarly stated that Twitter "generated approximately 86% of our revenue from advertising in each of the years ended December 31, 2017 and 2018." During 2017 and 2018, Twitter generated approximately 93% of its advertising revenue from advertisements to users accessing the platform through a mobile device.

## 2.      Twitter's Advertisement Auctions

44.     Twitter runs auctions, where advertisers bid against each other to have their ads shown to their target audience. Twitter uses RTB auctions to place advertisements in front of users

---

[3] According to Twitter's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 19, 2020 (the "2019 Annual Report"), Twitter "define[s] mDAU as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com or Twitter applications that are able to show ads."

1    at the exact moment that they are relevant.  RTB technology provides an online ad-bidding process

2    that facilitates the placement of advertisements on ad space anytime and anywhere.

3         45.     The RTB process starts when a user visits Twitter on a desktop or mobile device.

4    This triggers a bid request that sends data, such as the user's demographic information, browsing

5    history, location, device type, IP address, the page being loaded and other information.  The bid

6    request goes from Twitter to an ad exchange, which submits it and the accompanying data to

7    multiple advertisers.  Advertisers that have a matching ad send their bid response and are entered

8    into the auction.  The auction takes place.  The ad impression goes to the highest bidder and the

9    personalized ad is shown to the user. This process happens in 200 milliseconds.

10        46.     Defendants closely monitor the auction process through a metric called Cost per ad

11   Engagement" ("CPE").  Defendants have described CPE as a "Key Metric" in Twitter's SEC

12   filings.  CPE is an output of Twitter's RTB auction process, and Defendants follow changes in CPE

13   as a way to measure demand for Twitter's advertising products.  For example, the 2018 10-K states:

**Key Metrics**

> We review a number of metrics, including the following key
> metrics, to evaluate our business, measure our performance, identify
> trends affecting our business, formulate business plans and make
> strategic decisions. . . *Cost per Ad Engagement*. . . We believe
> changes in cost per ad engagement is one way to measure demand.

**3.     Twitter's Advertising Revenue Relies on its Ability to Access User
Preferences through Personalization and Data Settings to Provide
Targeted and Relevant Information to End Users**

20        47.     Twitter's ability to generate advertising revenue relies heavily on reaching the

21   correct audience—individuals most likely to engage with its promoted tweets.  If the tweets are not

22   reaching a target audience likely to engage in some manner (*e.g.,* watching a video, clicking through

23   to a website, or downloading an app), Twitter will not receive any payments for running the

24   advertisements.

25        48.     Unlike other social media companies, Twitter collects little data from its users when

26   they first join the platform.  Instead, Twitter tracks user data and behavior on the platform *after the*

27   *user joins* in order to make inferences about their interests.  This occurs primarily in two ways.

28

49.     The first is through actions taken by the users with their tweets, Likes, Retweets, and which accounts the user follows.  Twitter uses this content "to determine what topics [the user is] interested in, [the user's] age, the languages [the user] speak[s] and other signals." From this information the Company compiles a set of "inferences" about the user in an interest graph that it then uses to better target ads.  For example, below is a user profile based on interests inferred from a user's activity:



50.     Twitter's second method of tracking user data is based on accessing users' data and device settings.  For example, most people access Twitter through a Twitter app on their mobile phone.  When users access Twitter through their mobile phone, Twitter can harvest information such as whether the phone is an iPhone or an Android, the device's IP address, WiFi connectivity, and whether the phone is a new device or otherwise recently set up.

51.     The tracking of device settings and user data provides Twitter critical insight regarding other websites that the device visits.  Twitter can use the IP address of the device to see if the user has visited any other websites that integrate Twitter content, or which are run by Twitter's business partners.  This information can then be used to tailor specific ads to the user.  For example,

if a user visits a website for a professional sports team, Twitter can then recommend following the official team Twitter account and show ads for that team's apparel.

### 4. Advertisers Use Measurement Companies to Plan Marketing Campaigns and Monitor their Efficacy

52.    Twitter works with measurement partners, or business partners, to plan advertising campaigns and track the efficacy of advertising campaigns.  The measurement partners send information to Twitter including "a list of browser cookies IDs and/or unreadable scrambled (hashed) email addresses, mobile device IDs, and phone numbers, along with corresponding ID numbers." Twitter uses this data to match the information to corresponding Twitter accounts.  If Twitter identifies a match, they share "the matched ID number and information about [the account's] activity on Twitter" with the measurement partners.  Measurement partners use this information to work with advertisers to "create and manage high-quality ads" and help advertisers "predict future trends and engage [the] most valuable audiences."

53.    All of this information combined provides Twitter, and subsequently, the advertisers, the ability to pinpoint exactly which user to target with an advertisement, and to determine whether ad campaigns succeeded in reaching the intended audience.  In stark contrast to a television or radio advertisement that is generally broadcast into the world in the hopes of reaching the target demographic, a Twitter advertiser can specify exactly who it wants to receive the targeted advertisement based on user interests, device settings and data, and only pays Twitter when it registers desired action by the user.  The ability to harness advanced user information to narrowly tailor advertisements is extremely valuable to advertisers and drives Twitter's auction process.

### 5. Twitter Provides Users the Ability to Protect their Non-Public Data

54.    When users join Twitter, they are asked several questions related to their account. One question is whether Twitter can access the user's device settings and internal data to target advertisements (*i.e.,* type of phone, operating system, IP address, as described above).  Another question is whether Twitter can share users' personal non-public device data with its business partners.  This information includes device data and "which ads a particular browser or device saw, watched, or otherwise interacted with" through Twitter.

55.     Purportedly, if a user opts out of sharing data with third party business partners, neither Twitter nor its service providers may share that user's non-public information.  Pursuant to Twitter's privacy policy during the Class Period, users could supposedly adjust their settings to opt out of sharing their data with Twitter's business partners and advertisers, including RTB partners and conversion tracking or measurement partners.[4]

**B.     Twitter Introduces Its Mobile App Promotion ("MAP") Product**

56.     In April 2014 Twitter introduced a direct-response advertising product called MAP, with the product becoming generally available by June 2014.[5]  MAP is a type of Promoted Tweet with direct links to install or open mobile applications on the target user's device.

57.     According to the Company's website, MAP is a "suite of products that enable advertisers to promote mobile apps via Twitter" including through "app installs, conversions and re-engagement."  Further, MAP has been described by Twitter's analytics partners AppsFlyer as follows:

> Twitter's Mobile App Promotion is a great way to represent mobile applications on Twitter and to drive installs.  It enables Twitter advertisers to effectively promote their mobile apps with a great App card design driving installs, app engagement and deep linking.

58.     MAP has a very specific draw to advertisers: its focus is not to generate normal advertisement impressions with users on Twitter (*i.e.,* brand awareness through the viewing of a relevant post), but rather to drive specific calls to actions such as initial installations of a mobile app or spur reengagement with an app a user has not recently used:

---

[4] Conversion tracking partners work with advertisers to track whether Twitter users engage with an advertisement, such as installing or reopening a mobile app.

[5] Products included under the MAP umbrella have also been referred to as an "App install ad;" "Video App Card;" "App Download Card;" "Mobile Application Download;" "Image App Download Card;" "Video App Download Card."

1
2
3
4
5
6
7
8
9
10



11    59.    With this goal in mind, advertisers are not charged for certain engagements with

12  their MAP-based ads such as likes or retweets, but instead pay for each click on the "install" or

13  "open" buttons in the advertisement.   This presents a key distinction because a MAP-based

14  advertisement necessarily requires greater interest and engagement on the part of the

15  advertisement's recipient so that the recipient will take the affirmative steps of either downloading

16  or opening the app.  Accordingly, if there is a decline in user engagement with MAP, Twitter's

17  MAP revenue declines.

18    60.    Twitter tracks the following metrics related to its MAP advertisements: install

19  conversion events, login conversion events, re-engagement conversion events, sign-up conversion

20  events, purchase conversion events, install attempts within the Twitter app, open attempts within

21  the Twitter app, search card engagements, and timeline card engagements.

22    61.    These various metrics purportedly provide the Company's advertising customers

23  with access to a host of analytical information to gauge the success or deficiencies in their

24  advertisements.   More importantly for Twitter, when viewed holistically, these metrics provide

25  greater insight into the effectiveness of MAP as a whole.

26    62.    Per the Declaration of Michael Nierenberg ("Nierenberg"), dated September 12,

27  2019 (the "Nierenberg Declaration"), filed in the litigation captioned *In re Twitter, Inc. Securities*

28

*Litigation*, Case No. 4:16-cv-05314-JST (SK) (N.D. Cal.), ECF No. 340-1, in 2015, new direct-response products like MAP were the primary source of expected revenue growth for Twitter.[6]

63.     According to Confidential Informant 1 ("CI 1"), a former AdOps Specialist for Twitter from 2014 through 2018 who worked with Twitter's advertising customers, during 2014-16, MAP accounted for approximately 20% of the Company's global revenue.  MAP was popular with gaming companies seeking to advertise their mobile app.  For example, the Company's most important MAP customer was King Digital Entertainment's "Candy Crush."

64.     Before and during the Class Period, Defendants consistently confirmed MAP's importance to Twitter's revenue growth.[7]

**C.     Twitter Changes Its Data Controls and Privacy Policy**

**1.     Twitter Permits Users to Opt-Out of Data Sharing**

65.     On May 17, 2017, Twitter announced "a suite of industry-leading tools to give you more access to your information and greater, more granular control over how it's used.  We've also updated our Privacy Policy to reflect the improvements that we've made to Twitter."

66.     Among the new tools, Twitter disclosed new "Personalization and Data settings that offer even more granular control over how we use your data, including how we personalize your Twitter experience and whether information may be shared through certain partnerships.  You can use these controls to better personalize your experience on Twitter and opt out of various types of data usage and sharing with a single switch."

---

[6] Nierenberg was a Manager of Twitter's Sales Finance Team and focused on building direct-response products like MAP.

[7] For example, during the Company's earnings conference call for the quarter and year ended December 31, 2017, Defendants Dorsey and Segal identified an improved MAP product and other direct-response products as revenue drivers in the fourth quarter of 2017.  On April 25, 2018, when speaking about earnings results for the first quarter ended March 31, 2018, Defendants Dorsey and Segal emphasized continued direct-response strength in Twitter's international markets, particularly in Japan.  Defendant Segal identified Japan as Twitter's second largest market for direct-response and further stated, among other things, that these products "are driving incremental revenue to Twitter as engaging ways to get people to click through to apps and to websites.  So we feel good about that.  We feel like there's lots more opportunity for us to drive video higher as a percentage of revenue because it's just a more engaging way for advertisers to get in front of their customers on Twitter."  Defendant Dorsey also confirmed, among other things, that "direct response had another strong quarter."

67.     Among the new policies, Twitter updated "how we share non-personal, aggregated, and device-level data, including through some select partnership agreements . . . that allow the data to be linked to your name, email, or other personal information—***but only when you give your consent to those partners***."  (Emphasis added).

### 2.     Twitter's Updated Privacy Policy

68.     Twitter amended its Privacy Policy, effective May 25, 2018.  Unlike prior versions, the updated Privacy Policy explains how Twitter collects personal data, but strongly emphasizes the right of its users to have control over their own data and how or whether it is used.  Specifically, Twitter's Privacy Policy states:

> We believe you should always know what data we collect from you and ***how we use it***, and that you should have ***meaningful control*** over both.  We want to empower you to make the best decisions about the information that you share with us.

(Emphasis added.)

69.     Regarding data collection, the Privacy Policy explains:

> When you use Twitter, even if you're just looking at Tweets, we receive some personal information from you like the type of device you're using and your IP address.  You can choose to share additional information with us like your email address, phone number, address book contacts, and a public profile.  ***We use this information for things like*** keeping your account secure and ***showing you more relevant Tweets, people to follow, events, and ads***.

(Emphasis added.)

70.     However, Twitter makes clear that it is up to each user to determine what personal data the Company can collect and how that data can or cannot be used:

> We give you control through your settings to limit the data we collect from you and how we use it, and to control things like account security, marketing preferences, apps that can access your account, and address book contacts you've uploaded to Twitter.  You can also download information you have shared on Twitter.

71.     To maximize advertising revenue, which depends on its ability to send targeted ads to users, Twitter also tracks the content of users' tweets and other activity on Twitter.  Once again, Twitter made clear in its Privacy Policy that users can control that information:

In addition to information you share with us, we use your Tweets, content you've read, Liked, or Retweeted, and other information to determine what topics you're interested in, your age, the languages you speak, and other signals to show you more relevant content. ***We give you transparency into that information, and you can modify or correct it at any time***.

3.    **Unknown to Twitter Users and Investors, Twitter Ignores User Preferences to Not Share Data in Violation of Twitter's Privacy Policy**

72.    As the Company later admitted (*see* ¶ 79), starting in May 2018, if a Twitter user clicked or viewed an advertisement for a mobile application and subsequently interacted with the mobile application, Twitter shared certain data (*e.g.*, country code, if a user engaged with the ad and when, information about the ad, etc.) with its measurement and advertising partners, even if that user instructed Twitter in its settings not to do so.

73.    In addition, starting in September 2018, Twitter showed users ads based on inferences Twitter made about the devices used, even if a user did not give Twitter permission to do so.

4.    **While Purporting to Improve MAP and Other Direct-Response Products, Defendants Reveal "Bugs" Compromising User Privacy**

74.    In or around the beginning of 2019, Defendants Segal and Dorsey issued a series of statements acknowledging the significance of MAP to Twitter's advertising revenue and announcing that Twitter would therefore prioritize investing in and improving upon MAP in 2019.[8]

75.    Nevertheless, despite having promised not only to improve MAP, but to uphold the dictates of its Privacy Policy, and FTC settlement agreement, Twitter announced in a blog post on May 13, 2019 that it had discovered two separate violations of user privacy, which it collectively called a "bug impacting collection and sharing of location data on iOS devices."  Specifically, Twitter explained that it was "inadvertently collecting and sharing iOS location data with one of

---

[8] Defendants made such statements during Twitter's Q4 and FY 2018 Earnings Report on February 7, 2019 (Defendant Segal: "We also think about the MAP business; I mentioned that earlier as an important area of investment for us"); at the Morgan Stanley Technology, Media and Telecom Conference on February 26, 2019 (Defendant Segal: "This will be a year where we invest in MAP"); during Twitter's Q1 2019 earnings conference call on April 23, 2019 (*see supra* paragraph 9); and on May 15, 2019 at the JP Morgan Global Technology, Media and Communications Conference (Defendant Segal: "we want to do more work around MAP").

1    our trusted partners in certain circumstances."   Despite its purported commitment to

2    "transparency," Twitter did not identify the "trusted partner," the time frame during which this

3    inadvertent collection and sharing of location data took place, or how long it lasted.

4         76.    The first user privacy violation occurred when a Twitter user had more than one

5    account for iOS and opted into using the precise location feature for one of those accounts but had

6    not opted in on other accounts.   Twitter collected and shared location data during the customer's

7    usage of the other account(s) on the same device for which the user had not turned on the location

8    feature.

9         77.    The second identified user privacy violation occurred during Twitter's RTB auction.

10   Specifically, Twitter failed to remove location data from fields sent to a trusted partner.   In other

11   words, Twitter shared location data of users who had not consented to location sharing.

12        78.    Twitter promised in the May 13, 2019 blog post that, "[w]e have fixed this problem

13   and are working hard to make sure it does not happen again."

14        79.    Despite its promises, on August 6, 2019, Twitter disclosed that problems persisted.

15   Specifically, bugs caused the Company to share user data with advertising partners *even when that*

16   *user had expressly opted not to share such data*.   In a blog post titled, "An issue with your settings

17   choices related to ads on Twitter," Defendants caused Twitter to disclose that it identified issues

18   with two troubling results:

19          (a)   If you clicked or viewed an advertisement for a mobile
20                application and subsequently interacted with the mobile
                  application since May 2018, we may have shared certain data
21                (e.g., country code, if you engaged with the ad and when,
                  information about the ad, etc.) with trusted measurement and
22                advertising partners, even if you didn't give us permission to
                  do so.

23          (b)   As part of a process we use to try and serve more relevant
24                advertising on Twitter and other services since September
                  2018, we may have shown you ads based on inferences we
25                made about the devices you use, even if you did not give us
                  permission to do so.   The data involved stayed within Twitter
26                and did not contain things like passwords, email accounts,
                  etc.

27        80.    Defendants' admission came with reassurances of remediation, representing Twitter

28   "fixed these issues on August 5, 2019."   Twitter conceded that, "you trust us to follow your choices

- 20 -

and we failed here." Twitter, again, hid from users and investors the identity of the "trusted" partners with whom it shared unauthorized user data, and failed to identify precisely when it discovered the bugs or which users were affected.

81.     Unknown to investors, unable to actually fix the software bugs, Defendants turned off the setting that had caused the Company to access and share user data in contravention of user preferences that Twitter not do so. Furthermore, Defendants stopped sharing user data with measurement partners in connection with advertising campaigns using MAP.

82.     According to CI 1, these were fundamental bugs that would have taken at least 3 to 6 months to isolate and fix.

**D.      Defendants' "Bug Fixes" Prevented Twitter from Effectively Targeting Users with Relevant Advertising, Causing Advertisers to Pause or Reduce Spending on Advertising**

83.     Unbeknownst to investors, the purported fixes to the various software bugs that Defendants implemented (turning off the settings wholesale) had a material negative impact on revenue from Twitter's advertising products, and primarily negatively affected demand for MAP advertising and advertising revenue.

84.     Before the "fix," Defendants shared data with measurement partners who then shared it with advertisers so that they could see the effectiveness of their campaigns. By sharing user data with measurement partners, MAP advertisers could gauge the success of their campaigns.

85.     These changes had an immediate negative impact on Twitter's revenue, as reflected in the material decline in bidding prices in the RTB auctions. Without the benefit of such shared personal data, MAP advertisers could no longer mount (and track) successful campaigns that effectively target users with relevant ads.

86.     Demand for MAP advertising therefore materially declined as MAP advertisers reduced the amount of their RTB bids for MAP ads, shifted from MAP ads to other, lower cost advertising products like video, or abandoned Twitter altogether. The changes Defendants implemented caused a precipitous and material decline in CPE—a key financial output of Twitter's RTB auction for MAP.

87.     In response to the software bugs, Defendants redirected Twitter software engineers from projects to work on remediation of the software bugs and to try to develop a proxy for the user information they now could not share with advertisers.

88.     Defendants Dorsey and Segal had access to and were informed of the Company's Key Metrics, including CPE, on a daily basis throughout the Class Period, and knew of, or disregarded with at least deliberate recklessness, the material negative impact on revenue as a result of Defendants' fixes to software bugs.  Key Metrics Summary emails were disseminated at least once a day to senior Twitter executives, including Defendants Dorsey and Segal, throughout the Class Period.[9]  The Key Metrics Summary was taken directly from data in a "CFO dashboard" and updated daily.

### E.     Defendants Disclose That "Bugs" Primarily Affecting MAP Negatively Affected Third Quarter 2019 Results and Reveal That this Material Negative Trend Would Continue

89.     On October 24, 2019, Defendants reported Twitter's financial results for the quarter ended September 30, 2019, and disclosed that the software bugs had negatively impacted revenue and would continue to do so:

> In Q3 we discovered, and took steps to remediate, bugs that primarily affected our legacy Mobile Application Promotion (MAP) product, impacting our ability to target ads and share data with measurement and ad partners.  We also discovered that certain personalization and data settings were not operating as expected.  We believe that, in aggregate, these issues reduced year-over-year revenue growth by 3 or more points in Q3. . .

> Japan remains our second largest market, contributing $129 million or 16% of total revenue.  The 1% decline in Japanese revenue was due to a meaningful drop in MAP, related to bugs in our legacy product as described above . . .

> International ad revenue totaled $318 million . . . reflecting a disproportionate impact from legacy MAP bugs . . .

---

[9] According to evidence (sworn interrogatory answers) produced in *In re Twitter, Inc. Securities Litigation*, Case No. 4:16-cv-05314-JST (SK) (N.D. Cal.), ECF No. 413-6, Key Metrics Summary emails, as well as other key financial information, were disseminated at least once a day to senior Twitter executives, including Defendant Dorsey and the Company's CFO.  Given the importance of this information to Twitter's business, operation and prospects, and that Twitter's SEC filings state that the Company tracked Key Metrics during the Class Period, including changes in CPE, it is a reasonable inference that Defendants continued to closely follow Key Metrics during the Class Period.

1
2
Cost per ad engagement (CPE) was down 12%, reflecting a mix shift from MAP to video ad formats (which have lower CPEs) and like-for-like price decreases across most ad formats. . . .

3       90.    Defendants further disclosed that the negative impact from the "bugs" would

4    continue through at least the fourth quarter of 2019:

5
6
7
8
[W]e expect that, on a combined basis, moderated performance in MAP and the previously discussed issues in our personalization and data settings will likely result in 4 or more points of reduced year-over-year growth for total revenue in Q4, up from 3 or more points of impact in the third quarter.  The increase reflects a full quarter impact in Q4 vs. only a partial-quarter impact in Q3.  These headwinds are incorporated in our outlook.

9       91.    During the earnings conference call, Defendants Dorsey and Segal, further

10   discussed the software defects or "bugs" that had negatively affected the Company's advertising

11   revenue:

12
13
**Defendant Segal**:. . . There were more than one of these things.  Let me give you a couple of examples which can help them come to life.

14
15
16
17
18
19
The first is, we asked people a series of questions when we put them—before we put you into a timeline when you're new to Twitter.  Among the questions we ask are if we can use your device settings to figure out the best ads to show you.  It turns out there that, that setting wasn't working as expected, and we were using device settings even if people had asked us not to do so.  So when we discovered that, one, we Tweeted about it, which we often do to try to be transparent with people when things aren't working as expected.  And two, *we turned off the setting so that it would work as expected.  That has a negative impact to revenue because it's one less input that you've got when you are figuring out which ads to show people.*  . . . .

20
21
22
23
24
25
26
27
A second example is specific to MAP, where we typically will share data with measurement partners who will then share it with advertisers so that they can see the effectiveness of their campaigns, not just on Twitter but across platforms.  And another one of the questions that we ask people before we put them into a timeline is if we can share their data with measurement partners.  That setting also was not working as expected, and we were passing on data which we had not intended to.  *So we stopped doing that.  And although we are working on remediation, there isn't remediation yet in place, and so the effects of that will continue into Q4.*  As you can imagine, the remediation would be sharing aggregated data as opposed to personalized data when people have asked us not to share their data.  So those are 2 good examples, which hopefully help the issues come to life a little bit, that this wasn't one thing.  *They were things that we found out over the course of the quarter.  And that when you*

28

1

> *get a full quarter's impact of them, even if you're working to*
> *remediate, there can be negative impact to revenue. . .*

2

3    (Emphasis added).

4        92.    Defendants further disclosed that the negative impact on the Company's revenue

5    would continue into 2020, and explained how Defendants' ongoing problems with MAP had

6    negatively affected revenue in Japan:

7        **Defendant Segal**: . . . So on the 4 points of impact to Q4, the 4 or
         more points that we talked about, there will be some bleed over from
8        those into future periods.  It's too early to quantify it, both because
         we're working harder on remediation and also because we're not
9        giving guidance for 2020 yet.  But there will be some continued
         impact from these things. . .
10
         Now MAP is a bigger part of our business there [in Japan] than it is
11       in other geographies, so it was more impacted by these MAP issues
         than other geographies were. . . .
12

13       93.    Moreover, Defendants Segal explained how in response to the MAP bugs,

14   Defendants had to redirect engineers to work on remediating the negative consequences of their

15   decision to stop sharing user data and device settings:

16       **Defendant Segal**: . . . Okay. So the first question, around cost from
         the bugs, there—I wouldn't say there were more cost from the bugs.
17       The biggest impact from a resourcing perspective when things like
         this come up is that we—people, we end up shifting, or people are
18       spending their time sometimes where we work on remediation when
         we may have preferred to work on other things.  So that can have a
19       different kind of impact. . .

20       94.    Defendant Segal further stated, while Defendants do not disclose MAP revenue as

21   a percentage of total revenue, the negative revenue impact during the quarter—three percentage

22   points or approximately $25 million—all related to the negative impact caused by MAP bugs

23       95.    Also on October 24, 2019, Defendant Segal participated in an interview on CNBC

24   in which he admitted that the fixes implemented to address the software bugs impacted revenue at

25   the time they were implemented:

26       **Defendant Segal**: . . .  One of the questions we asked is: can we use
         your device settings to personalize your experience?  The setting was
27       not working as expected.  We were using the device setting to show
         ads to them. ***When we realized it, we both tweeted about it so people***
28

> ***were aware in the effort to continue to be transparent, and we also stopped using that setting.  There's some revenue impact when things like that happen***, and that caused three or more points of negative impact to revenue in Q3, and we think it will impact Q4 by four or more points.

(Emphasis added).

96.     Defendant Segal further explained during the CNBC interview how the loss of access to user's data and device settings made MAP advertising less effective in targeting users with relevant ads and negatively affected demand for MAP advertising:

> **Defendant Segal**: . . .There are lots of inputs that we have when we figure out how to give people a good experience on the service. Whether it's the tweets they see in their timeline, the accounts that we recommend that they follow, or the ads that they see.  And so ***we'll have to adjust how we assess which ads to show people, and how to best give them an experience where if they asked us not to use their device settings, just as an example, that we won't be able to incorporate that anymore.***  So that takes some time for us to adjust and learn from and that's why there's ongoing impact from it. . .
>
> . . . So we run an auction and so advertisers decide how much to pay for the audience that they want to target with their ads.  And the more that you know about what somebody might want to see the more compelling an ad or the more relevant an ad you can often show them.  ***And so when you have to change the inputs that an advertiser can use to assess how much they might pay in an auction, sometimes they will hold back on the advertising. Sometimes they will choose to pay less.  Sometimes they will choose to target different people***.  And we also will do the work to remediate these things. . . .

97.     On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share on October 24, 2019, a decline of $8.10 per share, or over 20%, on heavier than average trading volume (over 105 million shares traded).

98.     On October 30, 2019, Defendants filed Twitter's third quarter report Form 10-Q with the SEC for the quarter ended September 30, 2019 ("Q3 2019 10-Q").  The Q3 2019 10-Q, which was signed by Defendants Dorsey and Segal, repeated the disclosures made on October 24, 2019 concerning the negative affects the changes to MAP caused to the Company's reported revenue, and further disclosed that the software bugs affected MAP as well as other advertising products:

1

> In the third quarter of 2019, we discovered, and took steps to remediate, ***bugs that primarily affected our legacy MAP product***, impacting our ability to target ads and share data with our measurement and ad partners.  We also discovered that certain personalization and data settings were not operating as expected. . .

2

3

4

(Emphasis added).

5

99.    On December 11, 2019, Defendant Segal participated in the Barclays Global

6

Technology, Media and Telecommunications Conference and further explained how and why

7

Defendants' fixes to software bugs, whereby they stopped accessing and sharing its users' data and

8

device settings, negatively affected Defendants' ability to target relevant advertisements:

9

> **Defendant Segal**: . . .  where we're showing them an ad to download an app, it helps a lot to know what kind of phone they're on to show them—which ad to show them.  ***And so when you pull back the data that you—the person that had asked you not to use, you're not able to show as relevant ads***. Now you work hard for fixes . . . .

10

11

12

(Emphasis added).

13

100.    On February 6, 2020, Defendants issued Twitter's Shareholder Letter reporting the

14

Company's financial results for the quarter and year ended December 31, 2019.  The Shareholder

15

Letter stated, in relevant part, that the negative affect on MAP revenue had continued through the

16

fourth quarter, with MAP revenue down 25% in Asia:

17

> We believe that moderated performance in MAP and previously discussed issues in our personalization and data settings resulted in four or more points of reduced year-over-year growth in total global revenue in Q4, in line with our previous outlook. . .   International ad revenue grew 3% to $375 million, reflecting overall steady growth in brand offset by MAP headwinds and previously discussed issues in our personalization and data settings.  In APAC, for example, MAP revenue was down more than 25% in Q4. . . .

18

19

20

21

22

101.    As of the filing of the Company's 2019 10-K on February 19, 2020, the issues with

23

MAP had not yet been fully remediated.  Specifically, Twitter stated, "We also made progress on

24

our next-generation Mobile Application Promotion (MAP) product (expected to launch in 2020)

25

and shipped remediations designed to help address the third-party measurement issues we

26

encountered in Q3."  The Company confirmed that MAP issues and issues with the personalization

27

and data settings "resulted in four or more points of reduced year-over-year growth in total global

28

1    revenue in Q4" and that "MAP headwinds" negatively impacted international ad revenue and MAP

2    revenue.

3        102.    The 2019 10-K further disclosed that ". . . the resulting impact continues to affect

4    our ability to target advertising and share data with our measurement and ad partners and, therefore,

5    will continue to negatively impact our revenue growth.  Furthermore, we may see a decline in the

6    number of advertisers on a year-over-year basis, which may also impact overall demand for our ads

7    products."

8    **VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

9        103.    During the Class Period, Defendants made untrue statements of material facts or

10   omitted to state material facts necessary in order to make the statements made, in light of the

11   circumstances under which they were made, not misleading, and Defendants knew, or disregarded

12   with at least deliberate recklessness, that their representations were false and misleading at the time

13   they made their representations, for the following reasons: (i) by no later than the beginning of the

14   Class Period, Defendants learned that, since 2018, software "bugs" and "issues" caused Defendants

15   to share certain user data with advertisers and measurement partners, and to access user device

16   settings without user authorization in violation of the Company's privacy policy and user

17   preferences; (ii) that the "bugs" and "issues" primarily affected MAP; (iii) that the software bugs

18   and issues delayed Defendants' work on an improved MAP product; (iv) that in response to the

19   software bugs and issues, while Defendants represented they "fixed" the software bugs, they failed

20   to disclose that they stopped sharing user data and device settings with advertisers and measurement

21   partners; (v) that, in light of the importance of access to user data and device settings to MAP

22   advertisers and measurement partners, Defendants' undisclosed decision to stop unauthorized

23   sharing of certain user data and device settings with MAP advertisers and measurement partners

24   created a material risk to Defendants' business, revenues and operating results; and (vi) Defendants'

25   undisclosed decision to stop unauthorized sharing of user data and device settings with MAP

26

27

28

advertisers and measurement partners negatively materially affected both demand for advertising and Twitter's revenue.[10]

104.    On July 26, 2019, Defendants caused Twitter to disclose its Letter to Shareholders for the quarter ended June 30, 2019 (the "Q2 2019 Shareholder Letter").[11]   In the Q2 2019 Shareholder Letter, Defendants represented that "**We are also continuing our work to increase the stability, performance, and flexibility of our ads platform and mobile application download product**" and that "**Increasing the stability, performance, and scale of our ads platform in general and our mobile application download product in particular will take place over multiple quarters, with a gradual impact on revenue**."   Defendant Segal repeated these representations on a conference call with investors and analysts the same day.   Moreover, regarding the progress of MAP improvements, Defendant Segal stated:

> . . . **We're still in the middle of that work** and as we move forward with it, there may be a point where you can see the benefit from it ramp quickly as you described because it's a direct response related product.  **But we're still at the stage where we believe that you would see its impact be gradual in nature**.  And so we'll talk more about it when we get there and the gradual nature starts, but we're not there yet.  We're still working hard to make it happen.

105.    Defendants' representations that their work on MAP was continuing and that such work was "increasing the stability, performance, and scale" of MAP were materially false and misleading because Defendants' representations created the misimpression that Defendants' work to improve MAP was on track, and would lead to increased revenue.  In reality, Defendants knew, or disregarded with at least deliberate recklessness, and failed to disclose that: (i) by no later than the beginning of the Class Period, Defendants learned that, since 2018, software "bugs" and "issues" caused Defendants to share certain user data with advertisers and measurement partners, and to access user device settings without user authorization in violation of the Company's privacy

---

[10] The statements quoted in this section in **underlined, bolded** text are materially false and misleading for the reasons set forth herein. Additionally, as specifically indicated below, many of the identified statements are alleged to have been false and misleading by omission. Thus, additional text is provided for context and in support of these statements' allegedly omissive nature.

[11] The Q2 2019 Shareholder Letter was additionally filed as an exhibit to a Form 8-K with the SEC on July 26, 2019.  That Form 8-K was signed by Defendant Segal.

policy and user preferences; (ii) that the "bugs" and "issues" primarily affected MAP; and (iii) that the software bugs and issues delayed Defendants' work on an improved MAP product; and (iv) as a result of these material negative problems plaguing Defendants' MAP product, Defendants had no reasonable basis to represent that MAP revenue would increase.

106.    Unaware of the problems then plaguing Defendants' MAP product, analysts reacted positively to Defendants' false representations.  For example, in a July 26, 2019 analyst report, Guggenheim Securities LLC stated that the Company sees "MAP as a key future driver for scaling direct response ads and delivering better relevance."  Also on July 26, 2019, Macquarie Research stated that "the bottom line is that [management] continues to execute well.  We like that both the core and ad products are improving (a focus on improving MAP is a positive)."

107.    On July 31, 2019, Defendants filed Twitter's Q2 2019 10-Q, signed by Defendants Dorsey and Segal, which represented that Defendants are "**continuing our work to increase the stability, performance and scale of our ads platform and our mobile application download product, and such work will take place over multiple quarters, and any positive revenue impact will be gradual in its impact**."

108.    Defendants' representation that their work on MAP was continuing and that it would lead to "positive revenue impact" was materially false and misleading and failed to disclose material adverse facts because Defendants' representations created the misimpression that Defendants' work on an improved MAP product progressed uninterrupted.  The true state of affairs differed dramatically.  Indeed, Defendants knew of, or disregarded with at least deliberate recklessness, and failed to disclose that: (i) by no later than the beginning of the Class Period, Defendants learned that, since 2018, software "bugs" and "issues" caused Defendants to share certain user data with advertisers and measurement partners, and to access user device settings without user authorization in violation of the Company's privacy policy and user preferences; (ii) that the "bugs" and "issues" primarily affected MAP; (iii) that the software bugs and issues delayed Defendants' work on an improved MAP product; and (iv) as a result of these material negative problems plaguing Defendants' MAP product, Defendants had no reasonable basis to represent that MAP revenue would increase.

109.     The Q2 2019 10-Q additionally contained generic warnings of potential risks stating that "Our products and services **may contain undetected software errors, which could harm our business and operating results**"; "If new or enhanced products, product features or services fail to engage users, content partners and advertisers, **we *may* fail** to attract or retain users or to generate sufficient revenue or operating profit to justify our investments, and our business and operating results could be adversely affected" and that "**changes to existing products**, services and initiatives ***could* fail** to attract users, content partners, advertisers and platform partners or generate revenue." (Emphasis added).

110.     Defendants' inadequate warnings failed to reveal that the risks with respect to MAP had already materialized.   At the time Defendants warned of these potential, future risks, Defendants knew, or disregarded with at least deliberate recklessness, of the material negative problems then plaguing its MAP product and failed to disclose: (i) by no later than the beginning of the Class Period, Defendants learned that, since 2018, software "bugs" and "issues" caused Defendants to share certain user data with advertisers and measurement partners, and to access user device settings without user authorization in violation of the Company's privacy policy, and user preferences; (ii) that the "bugs" and "issues" primarily affected MAP; (iii) that the software bugs and issues delayed Defendants' work on an improved MAP product.

111.     The Q2 2019 10-Q also contained SOX certifications signed by Defendants Dorsey and Segal, that represented, in part, the following:

> 2. Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading** with respect to the period covered by this report; . . . .

112.     Defendants' representation as to their SOX Compliance was materially false and misleading because, as alleged in paragraphs 107-10, the Q2 2019 10-Q did, in fact, contain materially false and misleading statements.

113.     On August 6, 2019, Defendants caused Twitter to issue a tweet stating, "We **recently discovered and fixed** issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising

1   partners" while also linking to a statement on Twitter's help center that claimed "**We fixed these**
2   **issues on August 5, 2019**."

3       114.    Defendants' representations that they "fixed issues" relating to user choice settings
4   were materially false and misleading because, while they purportedly fixed or repaired user choice
5   settings, Defendants failed to disclose that, unable to actually fix the software bugs, Defendants
6   turned off the setting that had caused the Company to access and share user data in contravention
7   of user preferences that Twitter not do so.  Furthermore, Defendants failed to disclose the material
8   negative problems plaguing MAP and the material risks to Twitter's business and operations caused
9   by these "fixes." Specifically, Defendants failed to disclose that: (i) the software bugs and issues
10  delayed Defendants' work on an improved MAP product; (ii) that in response to the software bugs
11  and issues, Defendants stopped sharing certain user data with advertisers and measurement
12  partners; (iii) that, in light of the importance of access to user data and device settings to MAP
13  advertisers and measurement partners, Defendants' decision to stop unauthorized sharing of certain
14  user data and device settings with MAP advertisers and measurement partners created a material
15  risk to Defendants' business and operating results; and (iv) that Defendants' decision to stop
16  unauthorized sharing of user data and device settings with MAP advertisers and measurement
17  partners negatively affected Defendants' ability to target advertising, causing a material reduction
18  in demand for MAP advertising that negatively impacted the Company's MAP revenue and revenue
19  growth.

20      115.    On September 4, 2019, Defendant Segal attended the Citi Global Technology
21  Conference in New York City ("9/4/19 Citi Conference"). Defendant Segal represented that "**our**
22  **MAP work is ongoing**"; Twitter "**continued to sell the existing MAP product;**" and that Twitter
23  had made improvements to MAP.

24      116.    Defendant Segal's representations were materially false and misleading at the time
25  he made them and created the misimpression that Defendants' work on an improved MAP product
26  progressed uninterrupted.  In stark contrast, MAP revenue was, in fact, lagging, Key Metrics (CPE)
27  and advertiser demand for MAP were materially declining, and Defendants were reallocating
28  engineers to stanch the bleeding and remediate the negative effects of their undisclosed fixes to

software bugs.  Indeed, after observing the deterioration of Twitter's Key Metrics (CPE) for several weeks and the material negative affect on Twitter's revenue as advertiser demand for MAP materially declined, Defendant Segal failed to disclose the decline in demand for advertising and revenue from MAP as a result of the "fixes" made to comply with user's privacy preferences and that Defendants' work on an improved MAP product was off track.

117.    Moreover, Defendant Segal knew of, or disregarded with at least deliberate recklessness, the following material negative facts: (i) the software bugs and issues delayed Defendants' work on an improved MAP product; (ii) that in response to the software bugs and issues that caused Defendants to share certain user data and device settings without user permission, Defendants stopped sharing such user data with advertisers and measurement partners; (iii) that, in light of the importance of access to user data and device settings to MAP advertisers and measurement partners, Defendants' decision to stop unauthorized sharing of certain user data and device settings with MAP advertisers and measurement partners created a material risk to Defendants' business and operating results; (iv) that Defendants' decision to stop unauthorized sharing of user data and device settings with MAP advertisers and measurement partners negatively affected Defendants' ability to target advertising, causing a material reduction in demand for MAP advertising that negatively impacted the Company's MAP revenue and revenue growth.

118.    Also at the 9/4/19 Citi Conference, in response to an analyst's question about the Company's international "monetization," or revenue, Defendant Segal stated:

> . . . So **our strength just varies** from one period to another and **one geography to another based on our success in doing that**.  The ad formats that have worked in the United States have worked in the United States have tended to be the ones that have worked in other parts of the world as well.  **But we do have some markets that have been more MAP-focused.  Asia, for example, has tended to be more MAP-focused historically.**  But the hope and the intent is that we're coming out with compelling ad formats that work all over the world, not just in certain geographies.

119.    Defendant Segal's representation that MAP was an ad format with monetization strength in Asia was materially false and misleading because at the time Defendant Segal made this representation, Defendants' MAP product was struggling in Asia, and in particular, in Japan, as demand for advertising and revenue from MAP had been materially declining because: (i) in

response to the software bugs and issues, Defendants stopped sharing certain user data with advertisers and measurement partners; and (ii) Defendants' decision to stop unauthorized sharing of user data and device settings with MAP advertisers and measurement partners negatively affected Defendants' ability to target advertising, causing a material reduction in demand for MAP advertising that negatively impacted the Company's MAP revenue and revenue growth.

**VII.    THE TRUTH IS REVEALED**

120.    As alleged above in paragraphs 89-96, on October 24, 2019, before the market opened, the Company disclosed its financial results for the third quarter ended September 30, 2019 and conducted a conference call with investors during which they disclosed the material negative problems that had been affecting MAP since at least the beginning of the Class Period.

121.    On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a decline of $8.10 per share, or over 20%, on heavier than average trading volume (over 105 million shares traded).

122.    Shocked by Defendants' disclosures and calling their "missteps…unforgiveable," analysts downgraded Twitter stock.  Analysts expressed skepticism that Defendants did not know about the bugs sooner given their "significant work into MAP" and noted damage to the credibility and reputation of Twitter management:

> ***Twitter clearly knew of some of the headwinds around MAP when it guided last quarter*** [on July 26, 2019] . . .  TWTR has been selling ads for a decade, so these kinds of execution and technical issues are obviously disappointing . . . .
>
> (October 24, 2019, Barclays research report titled "Bluebird flies South for the Winter") (Emphasis added).
>
> ***
>
> It's surprising to us that the company—while putting significant work into MAP—would not know that it was leveraging some of the data that (1) violated user privacy preferences . . . .
>
> (October 24, 2019, Deutsch Bank research report titled "Twitter first blush: 2 of 3 bull cases in 2020 appear intact") (emphasis in original).
>
> ***
>
> The revenue shortfall was driven by misexecution related to TWTR's Mobile Application Promotion (MAP) product and data capture/use

1

2

3

(as TWTR was using/sharing certain user data in some instances where people had not opted in). TWTR is taking steps to fix these issues, but in the near-term, the adjustments are leading to lower ad unit performance, lower ad demand in the auction market…and ultimately slower ad revenue growth.

4

5

(October 24, 2019, Morgan Stanley research report titled "Clipped; Lower PT to $32") (emphasis in original).

6

***

7

8

9

[T]echnical issues related to Twitter's Mobile Application Promotion, or MAP, offering and the data that it gathers from users lowered advertisers' and agencies' bids on its ad inventory, which drove our estimated revenue generated per user down 7% sequentially and 8% year over year. . . .

10

11

(October 24, 2019 Morningstar analyst report titled "Product Bugs Hinder Twitter's Q3 Growth and More Than Offset Impressive User Count; Fairly Valued")

12

***

13

14

15

16

17

18

19

20

Twitter's missteps in the quarter are unforgiveable. The company discovered "bugs" in its ad delivery technology that interfered with its ability to effectively target users. By effective targeting, [return on investment] for advertisers is enhanced, as ads are delivered to a receptive audience; in contrast, ads that are ineffectively targeted are often delivered to consumers who simply don't care and who are not receptive to the ad delivered. Twitter discovered that its "personalization and data settings" were buggy, and its ad pricing ("CPM") declined during the quarter as the mix of high priced video ads declined. We label these missteps as "unforgiveable" because Twitter has been in business for more than a decade and has been delivering ads for the last nine years. It is reasonable for investors to expect that the company's ad delivery technology will perform flawlessly; Twitter's Q3 revenue shortfall is evidence that its technology did not work properly. . . .

21

(October 25, 2019, Wedbush research report titled "Baby Bird Falls from Nest, Goes Splat.")

22

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

23

24

25

26

27

123.   During the Class Period, as alleged herein, Defendants acted with scienter in that the Individual Defendants knew, or were at least deliberately reckless, as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew, or were at least reckless, as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly

28

and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

**A.    Defendants' Continuous Monitoring of Key Metrics Supports a Strong Inference of Scienter**

124.    Defendants at all relevant times closely monitored the auction process and demand for MAP ads through CPE, a key metric.  They reported CPE as a "Key Metric" in Twitter's SEC filings before and throughout the Class Period.

125.    Defendants Dorsey and Segal, and other senior Twitter executives received Key Metrics Summary emails that included CPE at least once per day, taken directly from data in a "CFO dashboard" and updated daily.

126.    Thus, Defendants Dorsey and Segal received constant updates regarding the Company's Key Metrics and had access to the Company's Key Metrics, including CPE, on a daily basis throughout the Class Period that showed these demand for MAP ads was materially declining which meant Twitter was receiving materially less MAP advertising revenue.  As such, they knew of, or disregarded with deliberate recklessness, the material negative impact on revenue caused by Defendants' purported fixes to software bugs that stopped the critical flow of user's data and device settings.

127.    Furthermore, Defendants admitted that they knew eliminating inputs (user data and device settings) would make advertising less relevant and, thus, negatively impact revenue. As Defendant Segal stated to CNBC: "***When we realized it***, we both tweeted about it so people were aware in the effort to continue to be transparent, and we also stopped using that setting*.  **There's some revenue impact when things like that happen** . . . .*". (Emphasis added).   However, Defendants did not disclose the negative impact on MAP revenue at that time.

128.    As Defendants belatedly disclosed, Twitter's decision to stop sharing user data and device settings resulted in reduced advertiser demand for MAP ads, and other ad products, and caused a precipitous and material decline in CPE, as demand for MAP advertising plummeted.

129.    Defendants finally disclosed the decline in CPE to investors in October 2019— months later—when they reported a material decline in MAP revenue due to decreases in the

number and price of bids that advertisers placed for MAP ads on Twitter's continuous and automated, RTB auction platform and a 12% decline in CPE in the third quarter.

130.     Defendants' real-time access to CPE  undermining their public statements creates a strong inference of scienter.

**B.      Defendants' MAP Work Was an Important Focus of Management Before and During the Class Period and Defendants Regularly Reported Progress on MAP Development to Investors, but Defendants Did Not Disclose the Adverse Effect on Advertising and Revenue**

131.     As alleged in paragraphs 74, 104, 107, 115, and 118, both before and during the Class Period, Defendants made representations concerning Twitter's MAP product, their progress in increasing its performance and scale, and the expected resulting positive future impact on revenue and earnings.

132.     Defendants' regular reporting on the progress, performance and revenue-generation of MAP creates a strong inference that they had knowledge of the declines in revenue and the reasons for such declines (*i.e.*, Twitter stopped sharing users' personal data to advertisers, resulting lower demand and revenue). Furthermore, analysts concluded that through Defendants' work on an improved MAP product before and during the Class Period, Defendants had reason to know that MAP revenue depended on leveraging user data for which it did not have permission to access or share. Indeed, according to an October 24, 2019 Deutsch Bank research report, "[i]t's surprising to us that the company—while putting significant work into MAP—would not know that it was leveraging some of the data that (1) violated user privacy preferences . . . ."

133.     Given Defendants' regular reporting to investors about progress on launching an improved MAP product, and analysts frequent questions about Defendants' MAP product, Defendants' MAP product's importance and prominence gives rise to a strong inference that Defendants and Twitter's senior management knew of, or disregarded with at least deliberate recklessness, the undisclosed material negative problems that were plaguing MAP during the Class Period.

C.   **The Software Bugs That Negatively Affected Twitter's Revenue Hampered Defendants Ability to Target Users with Relevant Advertising and Negatively Affected Multiple Ad Products**

134.   As alleged in paragraphs 39-53, Twitter's core advertising business and nearly all of its revenue depends on its ability to access information and make inferences about its users, and share this information with advertisers in order to enable advertisers to target relevant advertising across all of Twitter's advertising products.   Any impediment to Defendants' ability to access and share user data would have a negative impact on Defendants' advertising business.

135.   The software bugs that caused Defendants to stop sharing user data and settings, while affecting MAP in particular, also negatively affected Twitter's ad platform in general.

136.   While Defendants identified MAP as a product that was primarily affected by Defendants' decision to stop sharing user data and interests, the negative consequences were not limited to Defendants' MAP product.   After the Class Period, Defendants explained in the Q3 2019 10-Q that the problems that were undisclosed during the Class Period were not limited to MAP: "in the third quarter of 2019, we announced that we had discovered, and took steps to remediate, bugs *that primarily* affected our legacy MAP product, impacting our ability to target ads and share data with our measurement and ad partners.   We *also* discovered that certain personalization and data settings were not operating as expected."

137.   The facts that Twitter derives nearly all of its revenue from advertising and that the software bugs affected multiple advertising products, and that Defendants' ability to target users with relevant ads was so important and prominent to Defendants' core business, give rise to a strong inference that Defendants and Twitter's senior management knew or, or disregarded with at least deliberate recklessness, the undisclosed material negative problems that were plaguing MAP and other ad products during the Class Period.

D.   **The State of Mind of Defendants' Senior Executives and Officers is Imputed to Defendant Twitter**

138.   Defendants' representations that their MAP work was on track and that they expected to gradual increase in revenue from MAP was in such stark contrast to what was actually occurring—MAP revenue was, in fact, flagging, Key Metrics and advertiser demand for MAP were

declining, and Defendants were reallocating engineers to stanch the bleeding—that there is a strong inference that at last some corporate officials knew, or disregarded with at least deliberate recklessness, that Defendants' representations were false at the time they were made.

139.    As alleged in paragraphs 85-89, 91, 93, 95-96 and 99, Defendants Dorsey and Segal knew of, or disregarded with at least deliberate recklessness, the undisclosed facts alleged herein and acted as agents of Twitter.  Accordingly, the state of mind of each of them is imputed to Defendant Twitter.

140.    Further, the scienter of numerous senior executives and officers of Twitter who acted within the scope of their authority and as agents of Twitter during the Class Period, is imputed to Defendant Twitter.

**E.    Defendants' Violations of Twitter's Privacy Policies and the FTC Settlement Support and Inference of Scienter**

141.    As alleged in paragraphs 65-73, Twitter's privacy policies, required Twitter to safeguard personal data and uphold the privacy rights of its users. This includes user consent to positively opt-in and allow Twitter to share their personal data and user preferences.

142.    Twitter emphasized that, "[p]rotecting and defending user privacy is at the heart of our work.  From protecting user anonymity, to offering meaningful privacy and security controls, and our overall commitment to transparency, these are foundational principles and built into the core DNA of our company."

143.    Unbeknownst to users and investors, Twitter had been sharing user personal data and preferences for more than a year, in violation of Company policy and the FTC settlement.

144.    Defendants' violations of the Company's privacy policies, as well as FTC settlement, while contemporaneously representing their awareness regarding the status of compliance, supports their scienter.

**IX.    LOSS CAUSATION**

145.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Twitter common stock and operated as a fraud or deceit on Class Period

purchasers of Twitter common stock by misrepresenting the value of the Company's business and prospects as detailed herein. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Twitter common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Twitter common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

146. On October 24, 2019, before the market opened, the Company disclosed its financial results for the quarter ended September 30, 2019 and conducted a conference call with investors.

147. As alleged above in paragraphs 89-96, Defendants Dorsey and Segal, disclosed the material negative problems affecting MAP and that software defects caused by the changes implemented to fix the bugs had negatively affected the Company's third quarter financial results and that the negative effects on advertising revenue would continue through at least the fourth quarter of 2019.

148. On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a decline of $8.10 per share, or over 20%, on heavier than average trading volume (over 105 million shares traded).

149. Also on October 24, 2019, the *Wall Street Journal* published an article titled "Twitter Shares Plunge as Ad-Business Troubles Weigh on Growth." The article stated, in part, the following:

> Technical glitches in Twitter Inc.'s advertising software roiled the social-media company in the third quarter, as a pullback in spending from some buyers and weaker pricing for ads cut into revenue and profit even though it added millions of new users. . .
>
> The company said malfunctions in ad-targeting software as well as weaker-than-expected spending in July and August hurt its performance. The software problems meant that Twitter couldn't serve ads to users with the same level of precision as it normally does, prompting some advertisers to pause or reduce spending. For example, a burger restaurant's ads might have been delivered to a wide swath of users, including vegetarians and people who live long distances away, making them less effective than if they were sent to meat lovers who live near the restaurant, said Wedbush analyst Michael Pachter.

Revenue rose 9% from a year ago to $824 million, marking the smallest annual increase since late 2017 and below the $873.9 million that analysts polled by FactSet were expecting. Advertising revenue accounted for 85% of the company's total. Twitter said it expects the negative impact on ad sales to persist in the current quarter. . .

The snafus with Twitter's ad business came as a surprise to most analysts, said Cascend analyst Eric Ross. "No one was talking about this," he said. "The results were much worse from a revenue-per-user standpoint than we were expecting. This is shocking given the growth in daily active users."

The company said it anticipates the issues that plagued the ad business in the July through September period to continue in the current quarter.

150. As alleged in paragraph 122, numerous analysts were shocked by Defendants' disclosures on October 24, 2019.

## X. PRESUMPTION OF RELIANCE

151. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

    (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the omissions and misrepresentations were material;

    (b)    Twitter common stock traded in an efficient market;

    (c)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Twitter common stock; and

    (d)    Plaintiffs and other members of the Class purchased Twitter common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

152. At all relevant times, the market for Twitter common stock was efficient for the following reasons, among others:

    (a)    As a regulated issuer, Twitter filed periodic public reports with the SEC;

    (b)    Twitter regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major

1

2

news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

3

4

5

6

7

8

9

10

(c)     Twitter was followed by several securities analysts employed by major brokerage firms, including Aegis Capital; Argus Research Corporation; Barclays; BMO Capital Markets; BTIG; Cantor Fitzgerald; CFRA Equity; Cowen and Company; CRT Capital; Deutsche Bank; Evercore ISI; FBN Securities; Guggenheim Securities LLC; J.P. Morgan, Jefferies; Macquaries Research; MKM Partners; Morgan Stanley; Morningstar, Inc.; Oppenheimer & Co., Inc.; Pivotal Research Group; RBC Capital Markets; Sterne Agee; SunTrust Robinson Humphry Capital Markets; Susquehanna Financial Group LLLP; UBS Equities; Wedbush Securities Inc.; Wells Fargo Securities, LLC; William O'Neil + Co.; and Zacks Equity Research; who wrote reports that were distributed to their respective sales forces and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

11

12

(d)     Twitter common stock is actively traded in an efficient market, namely the NYSE, under the ticker symbol "TWTR."

13     153.     As a result of the foregoing, the market for Twitter common stock promptly digested

14     current information regarding Twitter from publicly available sources and reflected such

15     information in Twitter's stock price.  Under these circumstances, all purchasers of Twitter common

16     stock during the Class Period suffered similar injury through their purchase of Twitter common

17     stock at artificially inflated prices and the presumption of reliance applies.

18     154.     Further, to the extent that the Defendants concealed or improperly failed to disclose

19     material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in

20     accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

21     **XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE**

22

23     155.     The statutory safe harbor provided for forward-looking statements under certain

24     circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

25     The statements alleged to be false and misleading herein all relate to then-existing facts and

26     conditions.

27     156.     In addition, to the extent certain of the statements alleged to be false may be

28     characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

157.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Twitter who knew that the statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

158.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Class, seeking to pursue remedies under the Exchange Act.

159.    Excluded from the Class are Twitter and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

160.    Because Twitter reported, as of July 27, 2019, over 773 million shares of common stock outstanding, and because its securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are, at a minimum, thousands of Class members.  Members of the Class may be identified from records maintained by Twitter or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

161.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

162.    Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.

163.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  These common questions include:

PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

(a) Whether Defendants violated the federal securities laws as alleged herein;

(b) Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Twitter's business and operations;

(c) Whether the price of Twitter's securities was artificially inflated during the Class Period; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

164. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF

<u>**COUNT I**</u>
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

165. Plaintiffs reallege each allegation as if fully set forth herein.

166. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Twitter and the Individual Defendants.

167. Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168. Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

169.     Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with at least deliberate reckless disregard for the truth, by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately recklessly refrained from taking steps necessary to discover whether the material facts were false or misleading.

170.     As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

171.     Twitter is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, or agents of Twitter in taking the actions alleged herein.

172.     Plaintiffs and the Class purchased Twitter stock, without knowing that Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by Defendants, or an absence of material adverse information that was known to the Defendants or disregarded with at least deliberate recklessness by them, but not disclosed in Defendants' public statements.  Plaintiffs and the Class were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

173.     At the time of Defendants' false statements, misrepresentations and omissions, Plaintiffs and the Class were unaware of their falsity and believed them to be true.  Plaintiffs and the Class would not otherwise have purchased Twitter common stock had they known the truth about the matters discussed above.

174.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of Twitter common stock.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against Twitter and the Individual Defendants

176.   Plaintiffs reallege each allegation as if fully set forth herein.

177.   This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Twitter and the Individual Defendants.

178.   Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of Twitter, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs and the Class' investments in Twitter common stock within the meaning of Section 20(a) of the Exchange Act.

179.   Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

180.   The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

181.   The Individual Defendants knew or disregarded with at least deliberate recklessness the fact that Twitter's representations were materially false and misleading or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

182.   By virtue of their high-level positions and their participation in and awareness of Twitter's operations and public statements, the Individual Defendants were able to and did influence and control Twitter's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class allege contained materially false and misleading information and on which Plaintiffs and the Class relied.

183.   The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

184.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to Section 20(a) of the Exchange Act.

185.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Twitter common stock.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as representatives of the Class, and Plaintiffs' counsel as Class Counsel;

B.      Awarding Plaintiffs and the members of the Class damages, including interest;

C.      Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.      Awarding such other relief as the Court may deem just and proper.

## XV.    JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: April 13, 2020                Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By: */s/       Laurence D. King*
           Laurence D. King

Laurence D. King (SBN 206423)
Mario M. Choi (243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

- 46 -                                Case No. 4:19-cv-07149-YGR

1

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)
Donald R. Hall (to be admitted *pro hac vice*)
Jeffrey P. Campisi (to be admitted *pro hac vice*)
Jason A. Uris (to be admitted *pro hac vice*)
850 Third Avenue; 14th Floor
New York, New York 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714
*rkaplan@kaplanfox.com*
*dhall@kaplanfox.com*
*jcampisi@kaplanfox.com*
*juris@kaplanfox.com*

*Counsel for the Twitter Investor Group and Co-Lead Counsel for the Proposed Class*

2

3

4

5

6

7

8

9

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Tamar Weinrib (to be admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
*jalieberman@pomlaw.com*
*taweinrib@pomlaw.com*

*Counsel for the Weston Family Partnership LLLP and Co-Lead Counsel for the Proposed Class*

10

11

12

13

14

15

16

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (to be admitted *pro hac vice*)
Sebastian Tornatore (to be admitted *pro hac vice*)
Michael Keating (to be admitted *pro hac vice*)
111 Summer Street, Suite 403
Stamford, Connecticut 06905
Telephone:  (203) 992-4523
Facsimile:  (213) 363-7171
*shopkins@zlk.com*
*stornatore@zlk.com*
*mkeating@zlk.com*

*Counsel for the Twitter Investor Group and Additional Counsel for the Proposed Class*

17

18

19

20

21

22

23

24

25

26

27

28