**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

*Counsel for the Twitter Investor Group and*
*Co-Lead Counsel for the Proposed Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Tamar Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
*jalieberman@pomlaw.com*
*taweinrib@pomlaw.com*

*Counsel for the Weston Family Partnership*
*LLLP and Co-Lead Counsel for the*
*Proposed Class*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)
Jeffrey P. Campisi (to be admitted *pro hac vice*)
Jason A. Uris (to be admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*rkaplan@kaplanfox.com*
*jcampisi@kaplanfox.com*
*juris@kaplanfox.com*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
(to be admitted *pro hac vice*)
Sebastian Tornatore
(to be admitted *pro hac vice*)
Michael Keating
(to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  (203) 992-4523
Facsimile:  (213) 363-7171
*shopkins@zlk.com*
*stornatore@zlk.com*
*mkeating@zlk.com*

*Counsel for the Twitter Investor Group and*
*Additional Counsel for the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE TWITTER, INC. SECURITIES LITIGATION | Case No. 4:19-cv-07149-YGR |
| This Document Relates To: | <u>CLASS ACTION</u> |
| ALL ACTIONS. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| | Judge: Hon. Yvonne Gonzalez Rogers<br>Courtroom: 1 – 4th Floor<br>Date: October 13, 2020<br>Time: 2:00 p.m. |

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    STATEMENT OF FACTS ............................................................................... 2

     A.    Twitter Sells Advertising Through a Real-Time Continuous Auction ................... 3

     B.    Twitter's MAP Advertising Product .................................................................. 3

     C.    Twitter Purportedly Protected User Privacy and Provided Users with Tools to Protect Their Non-Public Data and is Subject to an FTC Consent Decree Which It Was Violating ................................................................................... 4

     D.    While Working on an Improved MAP Product, Defendants Learned of Material Violations of the Company's Promise to Protect Private User Information .................................................................................................. 5

     E.    The Truth is Revealed .................................................................................... 7

III.   ARGUMENT .................................................................................................. 7

     A.    The Complaint Adequately Alleges Falsity ....................................................... 8

         1.    The Complaint Adequately Alleges Falsity as to Defendants' July 26 and July 31 Statements Concerning Work on an Improved MAP Product ............................................................................................. 8

         2.    The Complaint Adequately Alleges Falsity as to Defendants' Risk Disclosures in Q2 2019 10-Q Signed by Defendants Dorsey and Segal and Filed On 7/31 ........................................................................ 11

         3.    The Complaint Adequately Alleges the Falsity of Defendants' 8/6/19 Tweet ............................................................................... 12

         4.    The Complaint Adequately Alleges Falsity as to Defendant Segal's Representations at the 9/4 Citi Conference ................................. 14

     B.    The Complaint Adequately Alleges a Cogent and Compelling Inference of Defendants' Scienter ...................................................................................... 16

         1.    Defendants' Close Review, Evaluation and Monitoring of Key Metrics on a Daily Basis Supports an Inference of Scienter.................... 16

         2.    Defendants Dorsey and Segal's Focus on MAP, and Similar Software Bugs, Supports Scienter ........................................................... 20

         3.    Defendants' Admission that Software Bugs and Issues Affected MAP and Multiple Ad Products Supports an Inference of Scienter ......... 22

         4.    Defendant Segal's Suspicious Stock Sales Support an Inference of Scienter ....................................................................................... 23

         5.    Defendants' Purported Commitment to User Privacy and Monitoring Requirements under the FTC Consent Decree Support Scienter ....................................................................................... 23

6.     The Complaint Alleges Facts Showing Twitter's Corporate Scienter ...... 24

C.     The Complaint Adequately Alleges Loss Causation ............................................. 24

IV.     CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Azar v. Yelp, Inc.*,
   No. 18-CV-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .......................... 9, 18

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................... 13

*Batwin v. Occam Networks, Inc.*,
   No. CV 07-2750 CAS (SHX), 2008 WL 2676364 (C.D. Cal. July 1, 2008) .................... 13, 24

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................... 8

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .............................................................................. 2, 12, 22

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019) .......................................................................... 20

*Brodsky v. Yahoo! Inc.*,
   592 F. Supp. 2d 1192 (N.D. Cal. 2008) ....................................................................... 19

*City of Miami Gen. Emps. & Sanit. Emps. Ret. Tr. v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) .................................................................. 17, 25

*DeMarco v. DepoTech Corp.*,
   149 F. Supp. 2d 1212 (S.D. Cal. 2001) ........................................................................ 21

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ..................................................................................... 25

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ......................................................................................... 8

*Flynn v. Sientra, Inc.*,
   No. CV 15-07548 SJO (RAOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016) ..... 11, 14, 17, 18

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................................... 17, 21

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ....................................................................... 14

*In re Amgen Inc. Sec. Litig.*,
   No. CV072536PSGPLAX, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................... 16

*In re Apple Inc. Sec. Litig.*,
   No. 19-CV-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020) .......................... 21

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................... 17, 25

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) .......................................................................... 19

# TABLE OF AUTHORITIES – (cont.)

Page

*In re Fusion-io, Inc. Securities Litigation*,
No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) .................................. 21

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................................................ 24

*In re Hienergy Techs., Inc.*,
No. SACV04-1226DOC(JTLX), 2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) .................... 24

*In re Intuitive Surgical Sec. Litig.*,
No. 5:13-CV-01920-EJD, 2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) .............................. 20

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009) .......................................................................................... 16

*In re Marsh & Mclennan Cos. Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................................................... 9

*In re Quality Sys. Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ............................................................................. 10, 11, 17, 18

*In re Tesla, Inc. Sec. Litig.*,
No. 18-CV-04865-EMC, 2020 WL 1873441 (N.D. Cal. Apr. 15, 2020) .............................. 14

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................................... 23

*In re Zynga Inc. Sec. Litig.*,
No. C 12-04407 JSW, 2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ................................... 17

*Institut'l Inv. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) .................................................................................................. 21

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................................... 8

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ............................................................................................... 20

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................................. 25

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................................................................... 2, 11

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ......................................................................................... 24, 25

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ................................................................................................. 15

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ................................................................................................. 24

## TABLE OF AUTHORITIES – (cont.)

Page

*Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008) ............................................................................... 9

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ............................................................................ 19

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ..................................................................... 16, 23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) .......................................................................... 25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ..................................................................... 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .......................................................................... 20

*Prodanova v. H.C. Wainwright & Co., LLC*,
   No. LA-CV-1707926-JAK-ASX, 2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) ................. 10

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ..................................................................... 13, 15

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ............................................................................ 10

*Rihn v. Acadia Pharm. Inc.*,
   No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ................. 19

*Robb v. Fitbit Inc.*,
   No. 16-CV-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................ 20

*Roberti v. OSI Sys., Inc.*,
   No. CV 13-9174-MWF VBKX, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ................. 11

*S.E.C. v. Talbot*,
   530 F.3d 1085 (9th Cir. 2008) .......................................................................... 13

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ................................................................... 9, 12, 15

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................... 17, 22

*Smilovits v. First Solar, Inc.*,
   No. CV12-0555-PHX-DGC, 2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ................. 23

*South Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................................ 21

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ............................................................................ 16

**TABLE OF AUTHORITIES – (cont.)**

Page

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .......................................................................................... 8, 13, 16

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................... 18

*Turocy v. El Pollo Loco Holdings, Inc.*,
   No. SACV 15-1343-DOC (KESx), 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ................. 17

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ...................................................................... 19

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ............................................................................... 19, 20

**STATUTES**

15 U.S.C.
   §78j(b) .......................................................................................................... 24
   §78j(b)-5-1 ..................................................................................................... 23
   §78t(a) .......................................................................................................... 24
   §§78u-4, *et seq.* (Private Securities Litigation Reform Act ["PSLRA"]) ........................... 2, 10
   §78u-4(b)(1) ...................................................................................................... 8

**REGULATIONS**

17 C.F.R.
   § 240.10b-5(b) .................................................................................................... 2

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Lead Plaintiffs the Weston Family Partnership LLLP and the Twitter Investor Group (Thomas Do, Michael J. Conroy, and Richard Slepko) (collectively, "Plaintiffs"), respectfully submit their opposition to Defendants' motion to dismiss, ECF No. 53 ("Motion").[1]

## I.   PRELIMINARY STATEMENT

The Complaint alleges a straightforward case of securities fraud.  By the beginning of the Class Period (July 26 through October 23, 2019), Twitter discovered that its software had been malfunctioning since May 2018, and that consequently, Twitter had been harvesting and providing its users' confidential personal data and device settings to advertisers and measurement companies, even if users opted out of sharing this information, in violation of the Company's commitment to protect private user data under its privacy policies and a 2011 settlement with the Federal Trade Commission ("FTC").  The software malfunction primarily affected Twitter's Mobile Application Promotion ("MAP") ad product, a major source of ad revenue that requires access to user data and device settings to enable advertisers to effectively target specific users.

Unable to fix the software malfunction, Defendants stopped providing users' personal non-public information to advertisers and measurement partners.  Defendants' decision to completely stop the flow of user data and device settings impaired advertisers' ability to accurately target Twitter users, making Twitter a less effective and less desirable advertising medium.  As a result, Twitter experienced an immediate, material decline in demand for its advertising products, but primarily MAP, and a material decline in revenue.  Defendants Dorsey and Segal monitored the key Twitter metrics, including advertising demand and revenue, *on a daily basis*, and thus knew about the material decline. Yet, Defendants did not disclose these facts and the loss of millions of dollars in ad revenue until the end of the Class Period.  That belated disclosure caused a 20% decline in the price of Twitter stock, injuring investors.

In their Motion, Defendants claim they were transparent about the software malfunction in

---

[1] Twitter, Inc. ("Twitter" or the "Company"), Jack Dorsey, Twitter's CEO ("Dorsey"), and Ned Segal, Twitter's CFO ("Segal"), are collectively referred to as "Defendants." "Mot. at __" refers to pages of Defendants' Motion.  Citations to "¶__" refer to paragraphs of the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 50 ("Complaint"). Internal citations and quotations are omitted herein, unless stated otherwise.

a disclosure to users on August 6, 2019.  However, that disclosure falsely claimed that the software malfunction had been "fixed."  In reality, Defendants had not been able to fix the software malfunctions, and thus had to stop sharing user data and device settings with advertisers and measurement partners.  Even assuming, *arguendo*, Defendants had communicated transparently with Twitter *users* about the software bugs, Defendants misled investors by failing to disclose the material, negative impact on revenue resulting from their undisclosed decision to stop sharing the very information that made Twitter's ad platform useful to advertisers.  Nothing in Defendants' argument changes the basic tenet of the federal securities laws, which they violated, that they had a duty to speak truthfully about material issues and not mislead investors when making representations to investors.  17 C.F.R. § 240.10b-5(b); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

As shown below, the Complaint alleges falsity with the particularity the Private Securities Litigation Reform Act requires, by alleging, *inter alia*, who made the misleading statements as well as how and why Defendants' misrepresentations were false when made.  The Complaint further alleges facts that give rise to a cogent and compelling inference of Defendants' scienter.  Moreover, the Complaint alleges that the very facts that Defendants failed to disclose during the Class Period, when disclosed at the end of the Class Period, caused Twitter's stock price to decline over 20%, thus satisfying the pleading standard for loss causation.  In arguing that the Complaint fails to allege these elements, Defendants improperly ask the Court to draw inferences in their favor rather than Plaintiffs, while ignoring key facts alleged in the Complaint, mischaracterizing other facts alleged, and raising questions of fact that are inappropriate for resolution on a motion to dismiss.  The Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

Twitter is a social media platform that generates nearly all of its revenue from advertisers seeking to target users who access the platform through their mobile devices.  ¶¶3, 41-42.  Twitter's ability to generate advertising revenue relies heavily on the ability to target the right subset of Twitter users with relevant advertising.  ¶47.  Twitter's value as an advertising medium stemmed from its ability to provide advertisers with detailed information about its users' preferences,

interests, and the type of device they employed, permitting advertisers to target Twitter users with specific and relevant advertisements those users would likely read and act upon. ¶¶2, 51.[2] Thus, the lifeblood of Twitter's advertising business is the user data it collects and shares with advertisers and measurement partners. ¶¶5, 47-50.

### A.    Twitter Sells Advertising Through a Real-Time Continuous Auction

Advertisers compete for ad placement on Twitter's platform by accessing Twitter's automated and continuous Real Time Bidding ("RTB") auction. ¶¶44-46. The more information an advertiser knows about a user's interests and device settings, the more the advertiser is willing to pay in the RTB auction because they can better target these Twitter users with relevant ads. ¶¶47, 96. Conversely, if information, or inputs, about a user, such as user data and device settings, are reduced or eliminated, the advertising cannot target those users most likely to interact with the ads. Without the ability to target the right users, advertisers place lower bids, access other formats or platforms, or do not advertise at all. ¶¶12, 96, 127. Thus, any impediment to Twitter's ability to access and share user data, immediately and negatively impacts its advertising business and revenue, and is contemporaneously known to Twitter. ¶¶134-37. The output of Twitter's RTB auction is a key performance metric—Cost Per Engagement or CPE—which measures demand for advertising. ¶¶124-30. Before and during the Class Period, Defendants Segal and Dorsey followed this key metric on a daily basis. ¶¶13-14, 46, 88, 124-30.

### B.    Twitter's MAP Advertising Product

One of Twitter's key advertising products is MAP, which targets mobile phone users. ¶¶56-64. MAP seeks to cause users to install a mobile app or to spur reengagement with an app a user has already installed. ¶¶8, 57-59. MAP is most effective, relevant, and therefore most valuable to Twitter's advertising customers, when advertisers and measurement partners have access to users' data and device settings, such as users' mobile device operating system (iOS or Android), date of purchase of the users' device, and which apps those users have already downloaded, as this enables targeted advertising. ¶8.

---

[2] Twitter also shared its users' preferences and interests with measurement partners who help advertisers plan and monitor the effectiveness of ad campaigns. ¶¶52-53.

1
2
3
4
5
6

Since MAP was introduced in 2014, it has been a significant source of revenue growth and has accounted for a material part of Twitter's revenue.  ¶¶63-64, n.7.  Accordingly, before and during the Class Period, Defendants tracked numerous metrics to gauge MAP's effectiveness. ¶¶60-61.  Capitalizing on past revenue growth from MAP, Defendants began representing to analysts and investors around the beginning of 2019 that the Company was working on an improved version of MAP to further increase revenue.  ¶¶9, 74, n.8.

### C.   Twitter Purportedly Protected User Privacy and Provided Users with Tools to Protect Their Non-Public Data and is Subject to an FTC Consent Decree Which It Was Violating

Though Twitter's lifeblood depends on its access to user data and device settings, the Company purports to respect user privacy.  Users joining Twitter are given the option to opt out of sharing information, like data and device settings, with Twitter's advertisers and business partners. ¶¶54-55.  In May 2017, Twitter announced a series of tools purportedly offering users greater control over their non-public information, and updated its privacy policy in May 2018 to provide its users "transparency" and "meaningful control" over the data Twitter collects as well as how or whether it could be used by third parties.  ¶¶65-71.  Further, a 2011 FTC settlement barred Twitter for 20 years from misleading consumers about the extent to which it protects the security, privacy, and confidentiality of nonpublic information, and honors consumer's privacy choices.  ¶143.[3]

Despite Twitter's publicly stated commitment to providing users meaningful control over their non-public information, it failed to do so.  Starting in May 2018, if a Twitter user clicked or viewed a MAP advertisement and subsequently interacted with the mobile application, Twitter

---

[3] Defendants ask the Court to take judicial notice of documents referenced in the Complaint (ECF No. 55), but ignore Twitter's FTC settlement, while attacking the Complaint's related allegations as "lacking in specifics." Mot. at 20.  The Court may take judicial notice of the FTC settlement, which is available on the FTC's website.  https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110311twitterdo.pdf (last visited July 29, 2020); *see Rupert v. Bond*, 68 F. Supp. 3d 1142, 1155 (N.D. Cal. 2014) (taking judicial notice of government website when neither party disputed the website's authenticity or accuracy of the information displayed therein).

In Twitter's most recent quarterly report, filed with the SEC on Form 10-Q on August 3, 2020— of which the Court may also take judicial notice—Defendants disclosed that the FTC sent Twitter a draft complaint alleging violations of the Company's 2011 consent order with the FTC, and the FTC Act, relating to the Company's use of phone number and/or email address data provided for safety and security purposes for targeted advertising during periods between 2013 and 2019. According to that 10-Q, the Company estimates that the range of probable loss in this matter is $150 million to $250 million and has recorded an accrual of $150 million.

shared certain non-public data with advertisers and measurement partners, even if that user had instructed Twitter in its settings not to do so.  ¶72.  Then, beginning in September 2018, Twitter showed users ads based on inferences Twitter made about their devices, even if a user did not give Twitter permission to do so.  ¶73.

D. **While Working on an Improved MAP Product, Defendants Learned of Material Violations of the Company's Promise to Protect Private User Information**

In or around the beginning of 2019, Defendants announced they would invest in and improve MAP in 2019.  ¶74, n.8.  By May 2019, Defendants discovered and disclosed two violations of the Company's privacy policy.  In contravention of Twitter's promise to provide meaningful control over user data, Twitter admitted that it had been collecting and sharing iOS location data without user permission in connection with the sale of advertising.  ¶¶75-77.  Despite Twitter's representation that the Company had "fixed" this privacy violation, its disregard for user preferences to opt out of sharing personal information persisted.  ¶¶78-79.

By the beginning of the Class Period, July 26, 2019, Defendants discovered that software defects had been causing malfunctions in MAP and other advertising products since May 2018.  ¶¶3, 89.  Specifically, Defendants had been sharing personal, confidential user data and device information of users who had opted out of sharing their personal information—a defect that Defendants admitted after the Class Period affected multiple advertising products, but primarily MAP.  ¶¶3, 79, 89, 98.  Unbeknownst to investors, the discovery of the privacy violations and software "bugs" materially hampered Defendants progress on improving MAP as software engineers had to be reassigned to remediate the software malfunctions.  ¶¶10, 87.  However, Defendants failed to disclose this material negative development and the attendant material risks to investors, and falsely represented that they were "continuing our work to increase the stability, performance, and flexibility of our ads platform and mobile application download product" and that this work would have a positive "gradual impact on revenue."  ¶¶104-05, 107.  Defendants' false representations reassured research analysts that improvements to MAP continued without hindrance and would increase revenue.  ¶106.

On August 6, 2019—after violating user privacy for over a year—Twitter publicly

announced that software bugs had caused it to share user data with advertisers, even when users had expressly opted not to share such data.  ¶¶80, 113 ("We **recently discovered and fixed** issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners….").  However, Defendants misleadingly claimed to have "fixed these issues."  *Id.*  Unbeknownst to investors, in fact, Twitter could not fix "these issues."  Instead, Defendants took the drastic step of stopping the flow of user data and device information to advertisers and measurement partners.  ¶¶3, 11, 81, 83, 114.  Within a few days of the misleading August 6 representation, Defendant Segal sold 6,000 artificially inflated Twitter shares at $40.65 per share for proceeds of $243,900.  ¶32.

Defendants' decision to stop sharing user data and device settings with advertisers or measurement partners had a dramatic negative impact on Twitter's ability to offer advertisers targeted and relevant advertising.  ¶¶12, 84-88.  Before the "fix," Defendants shared data with measurement partners who then shared it with advertisers so that they could see the effectiveness of their advertising campaigns and target relevant advertising.  ¶84.  When Defendants stopped the flow of users' personal information, advertisers, including those using MAP, could no longer effectively target users with relevant ads.  ¶85.  As a result, Twitter's advertising customers reduced spending on MAP advertising, lowered their RTB auction bids for MAP ads, or abandoned Twitter's MAP ads altogether, negatively affecting Twitter's MAP revenue.  ¶12.

As Defendant Segal later admitted, the change had a negative impact on revenue as advertisers lowered bids in the RTB auctions or stopped advertising on Twitter.  ¶¶85, 86, 91, 95, 96, 99.  Because the RTB auction is automated, continuous, and produces winning auction bids within milliseconds, Defendants knew about the decline in RTB bidding demand for Twitter's advertising products immediately, as it was reflected in a precipitous decline in CPE—a key financial output of Twitter's RTB that they monitored on a daily basis, and a material decline in MAP-specific metrics that Defendants also monitored regularly.  ¶¶44-46; 60, 61, 85, 86, 88.

By September 4, 2019, after observing the deterioration of Twitter's Key Metrics since at least August 6, 2019, and the material negative impact on Twitter's revenue as advertiser demand for MAP and other ad products declined, Defendant Segal attended an investor conference where

analysts repeatedly asked him about Defendants' ongoing work to improve MAP and the timing of its release.  ¶¶17, 115.  Defendant Segal misleadingly represented that Twitter "continued to sell the existing MAP product," "our MAP work is ongoing," and "MAP advertising monetization was strong in Asia," but failed to disclose the known, material, negative conditions that were then affecting MAP.  ¶¶17-18, 116-17.  Within a few days of Defendant Segal's false representations, he sold 8,000 artificially inflated Twitter shares at $43.88 per share, for proceeds of $351,040.  ¶32.  On October 10, 2019, just days before the end of the Class Period, Segal sold an additional 8,000 artificially inflated Twitter shares at $40.37 per share for $322,960.  *Id.*

### E.    The Truth is Revealed

On October 24, 2019, before the market opened, Defendants reported Twitter's financial results for the quarter ended September 30, 2019 and held an investor conference call.  ¶19, 89.  Defendants disclosed that: i) "during the quarter" they discovered and took steps to remediate bugs "primarily" affecting MAP that negatively impacted Twitter's ability to target ads and share data with advertisers and measurement partners; ii) such "bugs" caused an approximately $25 million loss of revenue and would continue to adversely impact revenue; iii) MAP revenue experienced a "meaningful" decline in Japan and a negative impact in international revenue; and iv) CPE, a key metric of demand for Twitter's ad products, was down 12% due to advertisers shifting from MAP to other formats and pricing declines.  *Id.*  On this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a decline of $8.10 per share, or over 20%, on unusually heavy trading volume (over 105 million shares traded), damaging Twitter investors.  ¶¶20, 24, 97.

In February 2020, Defendants confirmed that the material, negative issues with MAP and personalization and data setting had continued throughout the quarter ended December 31, 2019, resulting in approximately $40 million in lost revenue and a 25% decline in MAP revenue in Asia, and that the drag on revenue would continue through 2020.  ¶¶100-02.  At the time the Complaint was filed in April 2020, Twitter's stock price had not recovered.  ¶23.

### III.    ARGUMENT

Courts must accept as true all well-pleaded factual allegations and draw all reasonable

1    inferences in the plaintiff's favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A

2    motion to dismiss must be denied where the complaint plausibly articulates the circumstances

3    constituting fraud. *Id.* at 570. When "faced with a … motion to dismiss a § 10(b) action, courts

4    must … consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

5    U.S. 308, 322 (2007).[4] As discussed below, Defendants' arguments challenging falsity, scienter

6    and loss causation fail because they ignore key facts alleged, are based on a mischaracterization of

7    facts alleged, and rely upon distinguishable authorities.

8              **A.     The Complaint Adequately Alleges Falsity**

9              At the pleading stage, a plaintiff need only "specify each statement alleged to have been

10   misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1).

11   Falsity is a mixed question of law and fact for the trier of fact and the Court should only dismiss

12   the case if "'reasonable minds' could not disagree that the challenged statements were not

13   misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1080-82 (9th Cir. 1995). The Complaint adequately

14   pleads falsity, alleging with particularity the who, what, when, and where of each misstatement,

15   and alleging facts demonstrating how each misstatement misled investors when made.

16                    **1.     The Complaint Adequately Alleges Falsity as to Defendants' July 26
17                              and July 31 Statements Concerning Work on an Improved MAP
                               Product**

18             In the months before the Class Period, Defendants touted an improved MAP product to

19   investors as a priority for 2019. ¶64 and n.7. MAP had been a strong source of revenue growth,

20   and Defendants promised to revamp Twitter's direct-response ad products like MAP to increase

21   revenue—a matter of undeniable importance to investors. ¶¶62-64. On July 26, 2019, the start of

22   the Class Period, Defendants represented that they were "still in the middle" of improving MAP to

23   "increase the stability, performance, and flexibility," and that any positive revenue impact would

24   be gradual. ¶104. On July 31, 2019, Dorsey and Segal repeated these false representations in

25   Twitter's 10-Q for the quarter ended June 30, 2019 ("Q2 2019 10-Q"). ¶108.

26

27   ───────────────
     [4] Plaintiffs do not oppose Defendants' Request for Judicial Notice (ECF No. 55) only to the extent
     these documents are considered for their existence, not for the truth of the matters asserted therein
28   or disputed issues. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

However, Defendants failed to disclose the privacy "bugs" and "issues" plaguing Twitter's software, primarily affecting MAP, which delayed work on an improved MAP product. ¶¶104-12. In representing their work was "continuing," "ongoing," and that they were ***still*** in the middle of that work," Defendants created the false impression that their work to improve MAP continued on schedule unhindered and would lead to increased revenue. ¶¶105, 108, 116. In truth, that work had been materially delayed because Twitter had to reallocate software engineers working on the new MAP product to work on remediating the software bugs. ¶¶10, 18, 93, 116, 138.

Because Defendants opted to speak repeatedly and comprehensively about their plans to improve MAP and the current state of MAP sales, they triggered a duty to disclose that the software bugs primarily affected MAP and caused a material delay to work on improving MAP. *See Schueneman v. Arena Pharm., Inc*., 840 F.3d 698, 707-08 (9th Cir. 2016); *In re Marsh & Mclennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). Indeed, that Defendants' representations misled the market is confirmed by research analyst statements conveying their belief that Defendants' work to improve MAP continued without delay, would grow direct-response ad revenue, and constituted a positive development for the Company. ¶106.

Ignoring facts alleged in the Complaint, and proffering a scienter argument, Defendants implausibly argue that Plaintiffs have not alleged falsity with respect to Defendants' July 26 and 31, 2019 misstatements regarding MAP because there are no facts alleged to show they had discovered the bugs by the time they issued those statements (Mot. at 8, 13). Not so. The timeline here speaks volumes. On August 6, 2019, *just 11 days after the start of the Class Period*, Defendants said that the bugs had been discovered and *already fixed*.[5] ¶113. The only plausible inference from Defendants' own statements, and the timing of those statements, is that Defendants had already discovered the bugs by the start of the Class Period—a mere week and a half prior.

---

[5] *See Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *17 (N.D. Cal. Nov. 27, 2018) (statement that company "addressed this ... problem in January and February" meant "Defendants were already aware of the problem and working to remedy it by January"); *Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 87-91 (1st Cir. 2008) (statements that company had addressed a problem raised inference it had existed some time before). Indeed, analysts' responses to Defendants' disclosures at the end of the Class Period corroborate this inference. ¶21 ("Twitter clearly knew of some of the headwinds around MAP when it guided last quarter [on July 26, 2019]").

Indeed, these are bugs the Complaint alleges take "at least 3 to 6 months to isolate and fix." ¶82. The only plausible scenario is that Defendants discovered the bugs before the start of the Class Period. The inference that Defendants knew of, or disregarded with at least deliberate recklessness, the software bugs is even stronger with respect to Defendants' representations concerning MAP in the Q2 2019 10-Q—filed with the SEC just seven days before Defendants falsely announced they had discovered and "fixed" software bugs and issues. Finally, after the Class Period, Defendant Segal admitted that Defendants discovered the bugs during the third quarter, which began on July 1, 2019, before the start of the Class Period. ¶91.[6] Thus, any suggestion that Defendants did not know of major software bugs in a key revenue source just days before announcing they had discovered and already fixed the bugs, strains credulity and contradicts the facts alleged.[7]

Defendants' arguments that certain of their MAP misrepresentations are forward-looking, accompanied by risk warnings, and thus entitled to safe harbor protection (Mot. at 9), are meritless. Defendants' statements that work on MAP is "ongoing" or "continuing" described a *current* state of affairs—not a future plan. *See In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017) (holding that statements of "current facts" are not protected even when mixed with other, forward-looking statements); *Prodanova v. H.C. Wainwright & Co., LLC*, No. LA-CV-1707926-JAK-ASX, 2018 WL 8017791, at *12-13 (C.D. Cal. Dec. 11, 2018) (PSLRA safe harbor does not apply where statement is "misleading because it omitted a disclosure of a present fact").

Defendants' argument that they hedged their statement regarding "positive revenue impact"

---

[6] Indeed, the Complaint alleges that Defendants knew of software malfunctions that caused privacy breaches before the Class Period. On May 13, 2019, just weeks before the start of the Class Period, Defendants announced that they had fixed (ostensibly limited) bugs that caused unauthorized sharing of user information with advertisers in RTB auctions, and were "working hard" on the issue of improper user data sharing caused by such bugs. ¶¶75-78. Because Defendants admitted to working to remedy software bugs in May 2019, it is a plausible inference that since at least the start of the Class Period they were aware of similar privacy bugs and issues that affected multiple products, but primarily MAP, for over a year. *See Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) (that defendants made statements minimizing likelihood of recurrence "[i]n the wake of a crisis that has the potential to repeat itself" evidenced scienter).

[7] Defendants further mischaracterize the Complaint as "admitting" that "MAP work was, in fact, continuing" and that it was only "delayed." Mot. at 8. Defendants' misstatements failed to alert investors to the material interruption in the work on improving MAP and thus any related positive revenue. Instead, Defendants described an uninterrupted "ongoing" process with not a hint that engineers and resources had been reallocated away from MAP to work on a remediation of software bugs primarily affecting MAP. ¶¶10, 87.

1  with the word "any," does not mean the representation is not misleading.  Mot. at 9.  The Complaint

2  alleges Defendants had no reasonable basis for giving the impression of positive revenue impact

3  from an improved MAP product, given the material software bugs Defendants knew about at that

4  time, which primarily affected MAP.  Moreover, statements that "any positive revenue impact will

5  be gradual" are inextricably intertwined with, and contingent on, representations regarding

6  "present" improvements to MAP and are thus not entitled to safe harbor protection.  Indeed, this is

7  precisely the type of "mixed statement" the Ninth Circuit found actionable in *In re Quality Systems*,

8  865 F.3d at 1141-42.

9       Given Defendants' awareness that issues with MAP brought the improvement work to a

10 halt as engineers switched to bug remediation and, as Segal later admitted, resources were

11 reallocated, Defendants had no reasonable basis for making any representations regarding positive

12 revenue impact.   Defendants' cases regarding the forward-looking nature of "assumptions

13 regarding *future* economic performance," are thus distinguishable.  Mot. at 9.[8]

14              **2.    The Complaint Adequately Alleges Falsity as to Defendants' Risk
                       Disclosures in Q2 2019 10-Q Signed by Defendants Dorsey and Segal**
15                     **and Filed On 7/31**

16      The Complaint alleges the falsity of Defendants' warnings that Twitter's products "***may***

17 contain undetected software errors, which could harm our business and operating results."  ¶109.

18 In fact, when issuing these boilerplate warnings, material software bugs ***had already been detected***.

19 As set forth above, the Complaint alleges facts showing Defendants knew about the software bugs

20 and issues before July 31, 2019 when the Q2 2019 10-Q was filed, which was just seven days before

21 Defendants claimed to have already fixed the software bugs and issues.  Given that the risk had

22 already materialized, Defendants were duty-bound to inform investors.  *See, e.g.*, *Matrixx*, 563 U.S.

23 at 44;  *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676, at *10-11 (C.D.

24 Cal. June 9, 2016) (finding falsity and scienter from temporal proximity of statements and events

25

---

26 [8] Defendants' sole argument regarding the falsity of Dorsey and Segal's SOX certifications is that
   the Q2 2019 10-Q did not contain any material misstatements.  Mot. at 10.  As set forth above, the
27 Complaint adequately alleges the falsity of the misstatements contained in the Q2 2019 10-Q,
   therefore the SOX certifications are also materially false and misleading.  *See Roberti v. OSI Sys.,*
28 *Inc.*, No. CV 13-9174-MWF VBKX, 2015 WL 1985562, at *10-11 (C.D. Cal. Feb. 27, 2015).

despite general warnings of possible future product contamination).  Risk warnings are actionable as material omissions when the warnings speak to "entirely … as-yet-unrealized risks and contingencies" and fail to alert "the reader that some of these risks may already have come to fruition."  *Berson*, 527 F.3d at 986.

### 3.    The Complaint Adequately Alleges the Falsity of Defendants' 8/6/19 Tweet

On August 6, 2019, Defendants caused Twitter to issue a false and misleading statement via tweet representing that "we recently discovered and fixed issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners" and linking to a help center post on Twitter's website representing "[w]e fixed these issues on August 5, 2019."  ¶113.  In reality, Defendants had not "fixed" those issues.  Further, Defendants failed to disclose that, unable to fix the issues, their decision to completely stop the sharing of user data and device settings with advertisers and measurement partners negatively affected Twitter's ability to sell targeted advertising, causing a material reduction in demand for (primarily) MAP advertising that negatively impacted the Company's revenue and revenue growth.  ¶114.  A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Berson*, 527 F.3d at 985.  When a company chooses to announce seemingly positive information, it must also "disclos[e] adverse information that cuts against the positive information."  *Schueneman*, 840 F.3d at 706.

Defendants assert that there are "no specific facts pled" supporting the allegations that the purported "fix" to Twitter's software bugs and issues had caused a material reduction in demand by August 6, 2019, and that the Complaint's theory is contradictory because the "decline in advertising demand and resulting decline in MAP revenues could not have *already* occurred at the time the fix was announced on August 6."  Mot. at 11-12.  Defendants' argument mischaracterizes the Complaint's allegations.  The Complaint alleges that Defendants had **not** fixed the bug issues by August 6, but rather, unable to fix the issues, Defendants stopped sharing user data and device settings with advertisers and measurement partners (even accepting Defendants' own statement) no

later than August 5, 2019, the day *before* the alleged false statement was made. Stopping the flow of the information to advertisers and measurement partners had "an *immediate* negative impact on Twitter's revenue, as reflected in the material decline in bidding prices in" Twitter's RTB auctions as advertisers "reduced the amount of their RTB bids for MAP ads, shifted from MAP ads to other, lower cost advertising products," "or abandoned Twitter altogether." ¶¶84-86. Defendants cannot ignore these key facts. *Tellabs*, 551 U.S. at 322.[9]

Defendants further argue that their August 6, 2019 misrepresentations were not misleading because their statements only addressed the effects of the privacy bugs on users, as opposed to investors, and did not imply "anything at all about an impact on advertiser spending," MAP or Twitter's revenues. Mot. at 11-12. Again, Defendants ignore the facts alleged in the Complaint, and essentially make arguments about what an investor would find material—an argument that is not appropriate on a motion to dismiss. *See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHX), 2008 WL 2676364, at *22 (C.D. Cal. July 1, 2008). In any event, properly considered, the August 6, 2019 misrepresentations do, in fact, concern advertising revenue. The Complaint alleges that almost all of Twitter's revenues derived from advertising, and that Defendants' ability to share user-data with advertisers directly correlates to their ability to earn that revenue. ¶¶5, 43. Thus, Defendants' August 6 representations discussing changes affecting the way Defendants "deliver personalized ads," and "share certain data with trusted measurement and advertising partners," directly relate to Twitter's ad revenue. ¶¶79, 113. These are undoubtedly facts a reasonable investor would consider important in determining whether to buy or sell securities. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *S.E.C. v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008).

Even assuming, *arguendo*, Defendants are correct that there is nothing in the August 6 misrepresentations that is misleading (which is not true), "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."

---

[9] Similarly meritless is Defendants' argument (Mot. at 12) that "Plaintiffs claim Twitter should have predicted the future." By the time of Defendants' August 6, 2019 misrepresentation, the Complaint alleges the negative impact on demand and revenue occurred no later than August 5, 2019 and was immediate.

*In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008); *In re Tesla, Inc. Sec. Litig.*, No. 18-CV-04865-EMC, 2020 WL 1873441, at *14 (N.D. Cal. Apr. 15, 2020). For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers. *Id.* Defendants' false representations that they "fixed" a user privacy bug, without disclosing that, unable to actually fix the bug, they severed the Company's advertising lifeblood, harming demand for the Company's products and revenue, were misleading because they "affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists." *Id.*[10]

### 4. The Complaint Adequately Alleges Falsity as to Defendant Segal's Representations at the 9/4 Citi Conference

During a September 4, 2019 Citi Conference, Segal represented that "our MAP work is ongoing," Twitter "continued to sell the existing MAP product," and had made improvements to MAP—but failed to disclose that, in fact, Defendants had stopped sharing the very information that made MAP valuable to advertisers, advertisers had abandoned Twitter's MAP product, and that as a result, current sales for MAP ads had been materially declining for weeks. ¶115.

Also, at the Citi Conference, Segal was asked about Twitter's international monetization, or revenue, in response to which he falsely represented that Asia was "MAP-focused" and MAP was an ad format with monetization strength in Asia. ¶118. Contrary to his representations, Defendants' MAP product, in fact, struggled in Asia at that time, particularly in Japan, as demand for advertising and revenue from MAP had been materially declining due to Defendants' decision to stop sharing certain user data with advertisers and measurement partners. ¶119. Indeed, by this time, Defendants were less than four weeks from the end of the quarter during which MAP revenue declined internationally "disproportionally" and in Japan "meaningfully" as a result of Defendants'

---

[10] Defendants' argument that "Twitter had already warned investors" that software bugs "could" result in a loss of revenue is meritless. Mot. at 12. As stated, the Complaint alleges the purported warnings in Twitter's 10-Q filing on July 31, 2019, upon which this argument relies, were materially false and misleading because those risks had already materialized. Further, Defendants' warnings did not disclose that Twitter could not fix the software malfunction, and therefore stopped sharing user data instead. Because the future material risk that Defendants purportedly warned *might* occur in the future *had already* materialized, Defendants' argument that investors were "amply warned" (Mot. at 10), is meritless. *Flynn*, 2016 WL 3360676, at *10-11.

1    decision to stop sharing user data and device settings.  ¶89.

2            Defendants' argument that Defendant Segal spoke accurately about Asia being MAP-

3    focused "historically" misses the point.  Mot. at 14.  Segal spoke about the monetization strength

4    of the Asian market in response to an analyst question about *current monetization,* thus suggesting

5    that the Asian market for MAP thrived *at the time*, which—as Defendants later disclosed—it did

6    not.  In context, Segal's representations about historical MAP revenue in Asia was incomplete and

7    misleading as his representations ignored that MAP was struggling in Asia because Defendants had

8    stopped sharing user data and device settings with advertisers and measurement partners.

9    "[S]tatements, although literally accurate, can become, through their context and manner of

10   presentation, devices which mislead investors."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th

11   Cir. 2008).  When a company chooses to make positive representations, it must also "disclos[e]

12   adverse information that cuts against the positive information."  *Schueneman*, 840 F.3d at 706.

13          Defendants further argue that the Complaint fails to allege that any negative revenue impact

14   from the MAP bugs was material by September 4, 2019.  Mot. at 14.  In support, Defendant assert

15   that the decline in revenue as a result of the MAP bugs for the quarter ending September 30, 2019

16   amounted to "a mere" "three or more points."  *Id.*  Defendants again ignore the Complaint's

17   allegations and make arguments about materiality that are inappropriate on a motion to dismiss.

18   The Complaint does, in fact, allege that the demand for advertising, and revenue, were then

19   materially declining in Asia and, specifically, in Japan.  ¶119.  Further, while Defendants downplay

20   the impact on Q3 as a "mere" "three points," that amounts to approximately $25 million in lost

21   revenue caused by a significant change to the Company's core business model—*i.e.*, no longer

22   sharing user data and device settings with advertisers and measurement partners.  These are both

23   quantitative and qualitative facts that a reasonable investor would find important in deciding

24   whether to invest in Twitter stock.  *Provenz*, 102 F.3d 1478 at 1489 (materiality should not be

25   considered on motion to dismiss as assessments of materiality are "peculiarly ones for the trier of

26   fact.").  Indeed, the stock price reaction when Defendants belatedly disclosed the truth about the

27   material software bugs—a decline of approximately 20% and a market capitalization decline of

28   billions of dollars—as well as analysts' reaction to the news (¶¶97, 121-22), demonstrate the

materiality of the revenue impact to investors. *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009).

### B.    The Complaint Adequately Alleges a Cogent and Compelling Inference of Defendants' Scienter

The relevant inquiry in assessing scienter is whether all of the facts alleged, "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323.  The inference "need not be irrefutable … or even the most plausible." *Id.* at 324.  An inference of scienter is "strong," and a motion to dismiss must be denied, where "a reasonable person would deem [it]… cogent and at least as compelling as any opposing inference." *Id.*  "[A] tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, No. CV072536PSGPLAX, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014) (quotations omitted).  While Defendants' scienter arguments focus on one section of the Complaint, labelled "*Additional* Scienter Allegations" (Mot. at 16:1-4), under *Tellabs*, the Court must consider the Complaint's allegations holistically. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  As set forth below, when considered holistically, the Complaint alleges a cogent and compelling inference of each of the Defendants' scienter for each of their misrepresentations.

### 1.    Defendants' Close Review, Evaluation and Monitoring of Key Metrics on a Daily Basis Supports an Inference of Scienter.

Defendants closely and regularly monitored the RTB auction process through CPE because of the critical importance of advertising revenue to Twitter's bottom line.  ¶¶5, 39-53, 134. Twitter's SEC filings, signed by Defendants Dorsey and Segal, identify CPE as a "Key Metric" that they "review … to evaluate our business, measure our performance, *identify trends* affecting our business, *formulate business plans and make strategic decisions*" as it "is one way to *measure demand*" and revenue.  ¶¶14, 46.  The Complaint alleges that "Key Metrics Summary" emails that included CPE metrics were sent at least daily to Dorsey and Segal and were "taken directly from data in a 'CFO dashboard.'"  ¶¶14, 88 & n.9, 124-26.  Defendants' daily review of CPE put them on notice that their decision (by Defendants' own admission, before August 6, 2019) to stop sharing

certain user data and device settings had an immediate, negative impact on demand for and revenue from Twitter's ad products, primarily MAP, as this was reflected in the immediate decline in bidding (demand) and prices (revenue) in the RTB auctions for MAP and other ad products.  Indeed, after the Class Period, Defendant Segal admitted that the decision to stop sharing user data and device settings directly and negatively impacted revenue.  *See* ¶95 ("***When we realized it***, we both tweeted about it [on August 6, 2019] and we also stopped using that setting.  ***There's some revenue impact when things like that happen***").

Because Defendants Dorsey and Segal received the real-time output of Twitter's RTB auctions daily, Defendants knew, or deliberately recklessly disregarded, that stopping the flow of user-data to advertisers caused a concomitant and material decrease in demand and revenue. *See* ¶¶13-14, 37, 45-46, 85-86, 88, 124-30.  Numerous courts in this Circuit, including this Court, have found that individual defendants' access to key reports and information, as Defendants Dorsey and Segal had here, supports an inference of scienter.[11]

Even assuming, *arguendo*, that Defendants did not *see* an immediate negative impact on revenue (which, as alleged, they did), Defendants admitted that they *knew* shutting off data "has a negative impact on revenue," "even if you're working to remediate" (¶¶91, 95-96, 98-99).  Thus, at a minimum, Defendants knew when they decided to stop sharing user data and device settings with advertisers and measurement partners that it would have a direct, material, negative effect on the Company's revenues, but failed to disclose this material risk.  ¶¶91, 103(v).  *Flynn*, 2016 WL

---

[11] *See In re Quality Sys.*, 865 F.3d at 1145 (strong inference of scienter where "funnel reports and sales forecasts through the Salesforce software" showed trends "available to executives," including "real-time access to" the reports); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005) (admissions that top managers "monitored portions of the company's database" supported scienter); *City of Miami Gen. Emps. & Sanit. Emps. Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1043-45 (N.D. Cal. 2018) (scienter established where defendants had access to inventory reports calling their statements into question); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146 (N.D. Cal. 2017) ("absurd for [defendants] not to have been aware" of adverse DAU and MAU trends that were "integral" to growth and monitored closely); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC (KESx), 2017 WL 3328543, at *16-17 (C.D. Cal. Aug. 4, 2017) (finding "access to" reports, including real-time reports, supports scienter, especially where (as here) company itself cited its monitoring of metrics); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015) (finding scienter where information to apprise defendants of key metrics could have been obtained and disclosed without extraordinary effort); *In re Zynga Inc. Sec. Litig.*, No. C 12-04407 JSW, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015) (strong inference of scienter where defendants tracked numbers).

3360676, at *12 ("That Sientra had not yet felt the *loss* resulting from Silimed's regulatory shortcomings … does not make the statements any less misleading") (emphasis in original).[12]

Defendants argue that the Complaint's allegations that Defendants Dorsey and Segal closely monitored the auction process and demand for MAP ads through CPE lack "any specificity;" fail to allege how or when Defendants monitored those metrics; and rely on an "old" source. Mot. at 16-17. This is not true. Based on Twitter's annual report filed with the SEC on February 19, 2019, signed by Defendants Dorsey and Segal, the Complaint alleges that Defendants reviewed the RTB auction process through CPE, a "Key Metric." ¶46. This allegation is consistent with and corroborated by Twitter's sworn (on May 31, 2019) interrogatory responses from another action against Twitter stating key metrics emails are disseminated "at least once daily" to Dorsey and the Company's CFO. ¶88 n.9. The Complaint alleges that "Defendants *continued*" that practice of closely following the Key Metrics via daily email during the Class Period. *Id.* Notably, Defendants do not deny—because they cannot—that given the importance of these key metrics, Defendants Dorsey and Segal continued to monitor these key metrics during the Class Period.

That Twitter's sworn responses focused on a time frame before the Class Period does not mean the Court may reject them, as Defendants assert. Numerous courts have found that pre-class period conduct and practices may support an inference of scienter during the class period. *See In*

---

[12] While Defendants claimed on August 6 they discovered the bugs "recently," their disclosures at the end of the Class Period indicate they knew about the bugs and concomitant revenue effect (from stopping user-data sharing) at least prior to the July 26 start of the Class Period. On October 24, 2019, Dorsey and Segal stated that their decision to stop the sharing of user-data was "likely to result in 4 or more points of reduced year-over-year growth for total revenue in Q4, from 3 or more points of impacting Q3, *reflecting a full quarter impact in Q4 versus only a partial quarter impact in Q3*." ¶19; *see also* ¶¶90, 95. Given that the cut-off's impact on revenues was evident in real-time over the RTB platform, the fact that the "partial" third quarter impact on year-over-year growth for total revenue was at least 3/4 of the expected full quarter impact indicates Defendants would have felt the impact on revenues at least as early as July 21, 2019 (1/4 of the way into Q3). And Defendants' statements elsewhere acknowledge they knew of these issues for virtually the entire third quarter. ¶91 ("They were things that we found out over the course of the quarter. And that when you get a full quarter's impact of them, even if you're working to remediate, there can be negative impact to revenue"). *See Azar*, 2018 WL 6182756, at *3 (defendant "effectively conceded that the brunt of the problem had occurred before February 2017" by later acknowledging company "recognized the churn issue about halfway through the [first] quarter' of 2017"); *Flynn*, 2016 WL 3360676, at *15 (court found temporal proximity of facts alleged, along with product's importance, provided strong inference of scienter; rejecting inference defendants innocently reported problems upon discovery), *recons. denied*, 2016 WL 11593854 (C.D. Cal. Aug. 12, 2016); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016).

1    *re Quality Sys.*, 865 F.3d at 1145 (crediting statements from witness who "was not at [the company]

2    during the Class Period," but "had personal knowledge of executive-level management's real-time

3    access to" relevant reports); *Rihn v. Acadia Pharm. Inc.*, No. 15CV00575 BTM(DHB), 2016 WL

4    5076147, at *9 (S.D. Cal. Sept. 19, 2016) (finding where old CEO indicated he was the "ultimate

5    report" for certain issues, "[i]t can reasonably be inferred that" new CEO "too was the 'ultimate

6    report'" for those issues); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal.

7    2005) (class period dates function to define the class, "not to restrict the universe of relevant or

8    actionable facts").[13]

9        Defendants further argue that the Complaint does not allege how Defendants Dorsey and

10   Segal would have known anything about a decline in MAP revenue based on their access to Key

11   Metrics or CPE, nor what those Key Metrics or CPE showed on a particular date.  Mot. at 17-18.

12   Defendants' argument ignores the Complaint's allegation that the Key Metrics included CPE,

13   which is an "output of [Twitter's] RTB auctions" that reflected the number and price of bids

14   advertisers placed for MAP ads (¶¶13-14, 46, 86, 126, 129); and that CPE dramatically declined

15   contemporaneously with Defendants' decision to stop sharing user data with advertisers.  ¶¶46, 83-

16   88.  The most plausible inference is that Defendants Dorsey and Segal knew their "fix" to software

17   bugs primarily affecting MAP immediately caused advertiser demand for Twitter ad products, and

18   MAP in particular, to plummet.  ¶¶3, 12, 85, 89, 96.[14]

19        Further, Defendants ignore that, while Defendants may not have publicly disclosed a "break

20   out" of MAP revenue, the Complaint alleges that Defendants internally monitored numerous MAP-

21   related metrics that tracked user engagement with MAP products—another key metric.  ¶¶59-61;

22   _____

     [13] Defendants' reliance on *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192 (N.D. Cal. 2008), and *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809 (N.D. Cal. 2019), is misplaced, because in neither

23   case were plaintiffs alleging that corporate processes maintained previously, such as daily monitoring of key metrics, continued during the class period, to support an inference of scienter.

24   _____

     [14] Defendants' authorities (Mot. at 17) are inapposite.  Here, Defendants' SEC filings admit they

25   review and evaluate key metrics.  In contrast, in *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 409, 417-18 (9th Cir. 2020), the sole source for allegations about a "stream of complaints" from Europe was

26   submitted in a declaration that disavowed such allegations, plaintiffs alleged *no* details about adverse reports as they have here, the adverse facts were previously disclosed by defendants, and

27   the court found the theory defendants knowingly pursued a doomed application implausible.  In *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999-1000 (9th Cir. 2009), the only specific

28   allegation that could be used to infer scienter was directly contradicted by other physical evidence.

ECF No. 54-4, at 43 of 98 (identifying CPE and changes in ad engagements as key metrics). This additional metric provided Dorsey and Segal with granular detail on user engagement with MAP. ¶¶59-61. The decline in user engagement with MAP further alerted Dorsey and Segal to the declining MAP revenue because Twitter does not get paid if users fail to interact with MAP ads. ¶59. Defendants' argument that the Complaint needed to allege even more details concerning the information Defendants received is baseless and contradicts Ninth Circuit law. *See In re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2014 WL 7146215, at *5 (N.D. Cal. Dec. 15, 2014) ("The Ninth Circuit does not appear to require the contents of the report to be alleged"); *Robb v. Fitbit Inc.*, No. 16-CV-00151-SI, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017) (same).[15]

### 2. Defendants Dorsey and Segal's Focus on MAP, and Similar Software Bugs, Supports Scienter

Both before and during the Class Period, Defendants Dorsey and Segal focused on MAP and repeatedly spoke about Twitter's work on an improved MAP product. ¶¶9, 64 & n.7, 74 & n.8. By the start of the Class Period, while representing that MAP work continued, Defendants failed to disclose that work on an improved MAP product had, in fact, been materially interrupted and delayed, as Defendants had to reallocate software engineers who had been working on the new MAP product, and other resources, to attempt to remediate the bugs. ¶¶10, 18, 93, 116, 138.

Given Defendants' familiarity with MAP, their repeated statements regarding MAP to analysts and investors, their focus on fixing software bugs primarily affecting MAP, and the fact that MAP provided an important source of revenue before the Class Period, Defendants Dorsey and Segal knew or had reason to know that work on an improved MAP product had been significantly interrupted. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019)

---

[15] Defendants' authorities are distinguishable. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1056, 1063 (9th Cir. 2014) (unlike here, where Defendants Dorsey and Segal signed SEC filings stating they followed CPE and key metrics, plaintiffs made conclusory allegations that individual defendants could have accessed reports on-line) (also distinguished by *In re Intuitive Surgical*, 2014 WL 7146215, at *5); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (conclusory assertion that defendants had access to internal data insufficient where no internal report or its contents were even identified and no corroborating allegations alleged, such as defendants' acknowledgments of review of such reports); *Zucco*, 552 F.3d at 1000-01 (nothing pled to indicate individual defendants had reason to know figures they were reviewing were manipulated).

("absurd" to suggest no knowledge where defendants "responded to at least one [analyst] question … suggesting they were familiar with the issues"); *see also Institut'l Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (officer's false statements in response to specific queries supported scienter); *South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009). Further, Defendants' admissions that they saw the bugs "over the course of the quarter" (¶91), falsely represented that they "fixed" them, but instead stopped sharing user data and device settings in response, indicate knowledge of the software bugs. *See In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *25-26 (N.D. Cal. June 2, 2020) ("temporal proximity" of statements, within "days of taking inconsistent actions and two months before admitting the truth," together with "admission that defendants 'saw' as 'the quarter went on' negative business indicators in China" supported strong inference of scienter); *Hatamian*, 87 F. Supp. 3d at 1163 (statement that issues were "behind" company when they allegedly were not supports scienter).

Defendants' attack on the CI 1 allegations and the sworn declaration of Michael Neirenberg (Mot. at 19), misses the point of these allegations, which show the importance of MAP revenue to Twitter in the time leading up to the Class Period. ¶¶62, 64 & n.7, 74, 104, 107. These allegations are corroborated by Defendants' own statements regarding the importance of MAP to Twitter's revenue growth just prior to the Class Period. ¶64 & n.7. While these facts concern pre-Class Period events, they provide insight on the importance of MAP and revenue therefrom. *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1223 n.6 (S.D. Cal. 2001) (statements prior to class period relevant to scienter and falsity "because they may prove insight into what the defendants knew during the class period"). Further, CI 1's allegations show how long the software bugs would have taken to fix. ¶¶63, 82. As an AdOps Specialist working with Twitter's ad customers, CI 1 was in a position to know such facts. ¶63.[16]

Likewise, before the Class Period, Twitter had claimed it was "working hard" on the issue

---

[16] Defendants' reliance on *In re Fusion-io, Inc. Securities Litigation*, No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) (Mot. at 19), is misplaced, because in that case the court found a CW's hearsay allegations unreliable as they could not support the assertion that defendants' statements were false when made. Here, as noted above, CI 1's statements show the *materiality* of MAP revenue, and the scope of work needed to identify and fix software bugs.

of bugs that had previously unauthorized sharing of user information with advertisers (¶¶75-78), making it all the more difficult to escape the inference that Twitter would not have known or recklessly disregarded similar bugs causing very similar problems that had been **ongoing for over a year, since May 2018**.  *See* note 6, *supra*.

### 3.     Defendants' Admission that Software Bugs and Issues Affected MAP and Multiple Ad Products Supports an Inference of Scienter

The undisputed facts that Twitter derives nearly all of its revenue from advertising, that the software bugs affected multiple advertising products, and that Defendants' ability to target users with relevant ads was crucial to Defendants' core business, give rise to a strong inference that Defendants knew of, or disregarded with at least deliberate recklessness, the undisclosed, material, negative problems plaguing MAP and other ad products during the Class Period.  ¶¶39-53, 89, 98, 134-37.  *See Berson*, 527 F.3d at 987 (finding effect on core operations sufficient to "infer that … high-level managers must have known" about orders cancelling major contracts worth $10-$15 million due to the devastating effect on revenue).

Defendants' argument against application of the core operations doctrine is meritless. Defendants argue that the Complaint does not allege a "devastating" revenue impact (Mot. at 18), but have admitted that the revenue impact from the bugs was $25 million in Q3, $40 million in Q4, and would continue in 2020 (¶¶19, 22, 89, 100-02).  *See Berson*, 527 F.3d at 987 ($10-$15 million revenue effect sufficient); *Shenwick*, 282 F. Supp. 3d at 1146 ("absurd" for defendants to be unaware of trends "integral" to growth).  Defendants' contention that over $65 million in lost revenue is unimportant is wrong and, in any event, raises questions of fact inappropriate to resolve at this stage.

Defendants assert that the Complaint does not specify exactly what other products the bugs affected.  However, the Complaint alleges that the software bugs and issues "primarily" affected MAP, as well as Twitter's other "pay-for-performance" or targeted ad products, *i.e.*, those that depended on the sharing of user data (including device settings).  ¶¶83, 89-91, 96, 98, 100, 134-37. Like MAP, without specific user data and device settings, these ad products became less valuable to advertisers who could no longer effectively target specific users.  *See* ¶91 (Segal citing two

examples of bugs' revenue impact, one specific to MAP, one not).

### 4. Defendant Segal's Suspicious Stock Sales Support an Inference of Scienter

Defendant Segal's suspicious stock sales of 10% of his unrestricted Twitter shares at inflated prices on August 13, 2019 (just days after the false August 6 representation that the bugs were "fixed") and October 10, 2019 (days before the disclosure of the truth), while purchasing *no* shares during the entire Class Period (¶32), support an inference of scienter. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (finding "plaintiffs have alleged significant and suspiciously timed securities sales").[17]   Defendants argue that Segal's stock sales cannot support an inference of scienter because the sales were made under a trading plan.  This argument raises questions of fact that cannot be resolved at this stage.  *Id.* at 976 (stating §10b5-1 trading plan is an affirmative defense for later stage of the litigation); *Smilovits v. First Solar, Inc.*, No. CV12-0555-PHX-DGC, 2019 WL 7282026, at *3 (D. Ariz. Dec. 27, 2019) (same) (citing cases).[18]

### 5. Defendants' Purported Commitment to User Privacy and Monitoring Requirements under the FTC Consent Decree Support Scienter

The Complaint alleges Twitter had been sharing certain personal user data and preferences for more than a year, in violation of Company policy and Twitter's settlement with the FTC.  ¶¶65-73, 75, 141-44.  Defendants' publicly stated commitment as well as legal requirements to monitor and safeguard user privacy give rise to an inference that Defendants Dorsey and Segal monitored compliance with privacy obligations and therefore should have known of the Company's privacy violations and MAP-related software issues.  *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (requirements of FTC consent decree, importance of issue, CEO's position, and discussion of product supported scienter).

---

[17] Other than a vague statement that the Complaint "is lacking in any allegations of unusual or suspicious trading" (Mot. at 16), Defendants do not challenge the allegations that Segal's sales were suspicious in timing and amount while he possessed material nonpublic information concerning the negative problems then affecting MAP revenue.  ¶32.

[18] Unlike the cases cited by Defendants (Mot. at 22), the Complaint alleges other facts supporting scienter besides Segal's suspicious sales.  Regardless, an absence of motive and suspicious stock sales would not negate an inference of scienter.  *No. 84 Employer-Teamster*, 320 F.3d at 944.

Defendants' argument that they voluntarily disclosed MAP-related bugs (on August 6, 2019) thus negating an inference of scienter, is unavailing.  Mot at 20.  Indeed, the Complaint alleges that their so-called "voluntary disclosure" is itself ***materially false and misleading***.  ¶¶113-14.  Moreover, Defendants' (false) assertion that they "fixed" the bugs misses the point.  While Defendants argue that they alerted ***users*** to software bugs, their misrepresentations failed to disclose to ***investors*** that Defendants were ***unable to fix*** the software bugs and had stopped sharing user data and device settings with advertisers, which had an immediate materially negative impact on Twitter's ad revenue.  *Id.*

### 6.     The Complaint Alleges Facts Showing Twitter's Corporate Scienter

The Individual Defendants' scienter, discussed above, is imputed to Defendant Twitter.  Corporate scienter is established through the scienter of a corporate officer or director, or principles of respondeat superior.  *In re Hienergy Techs., Inc.*, No. SACV04-1226DOC(JTLX), 2005 WL 3071250, at *8 (C.D. Cal. Oct. 25, 2005).  Accordingly, Twitter as an entity had constructive knowledge of all facts known by the Individual Defendants as well as other senior officers.[19]

### C.     The Complaint Adequately Alleges Loss Causation

Defendants argue that the Complaint "cannot establish that the price decline on October 24, 2019, was caused by the revelation of fraudulent activity" and that Twitter's share price declined because investors "were dissatisfied with the Company's technological performance."  Mot. at 3, 22.[20]  These arguments are meritless.

Indeed, the October 24, 2019 corrective disclosure revealed the very facts that Defendants knew or recklessly disregarded, and failed to disclose during the Class Period (*e.g.*, ¶103).  ¶¶89-

---

[19] Because the Complaint adequately alleges a claim under Section 10(b), Defendants' motion to dismiss the control person claims against Dorsey and Segal should also be denied.  *See Batwin*, 2008 WL 2676364, at *26 (control over a primary violator of §10(b) sufficient to plead liability under §20(a)).

[20] The Complaint need "only show a causal connection between the fraud and the loss" to adequately plead loss causation.  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 752-753 (9th Cir. 2018).  Defendants are wrong in arguing that Plaintiffs must "establish" or prove loss causation at this stage of the litigation.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) ("A plaintiff does not, of course, need to *prove* loss causation in order to avoid dismissal; but the plaintiff must properly allege it.") (internal citation omitted) (emphasis in original); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (loss causation is "a matter of proof at trial.").

97.  *See, e.g.*, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) ("[A] plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss.'") (emphasis in original); *City of Miami*, 302 F. Supp. 3d at 1046 (finding plaintiffs sufficiently alleged loss causation where the "disclosures relate[] to the same subject matter as the alleged misrepresentations") (brackets in original).  Accordingly, the Complaint's allegations provide sufficient notice to Defendants that the drop in Twitter's stock price on October 24, 2019 was causally related to their misrepresentations.  The Complaint adequately alleges loss causation. *In re Daou*, 411 F.3d at 1025-26 (loss causation adequately alleged where facts provide some indication that the stock drop was causally related to misstatement).[21]

Defendants' argument that certain analysts' reactions to the October 24, 2019 disclosure support their position, is simply wrong.  Viewed in context, the analysts' reactions show they understood that the "missteps" that negatively affected Twitter's revenue were directly caused by Defendants' "fix" to the software bugs at issue—a material, negative fact the Complaint alleges Defendants failed to disclose.  ¶122.  To the extent Defendants argue that Twitter's stock price declined for reasons other than the disclosure of the concealed adverse facts, that argument raises questions of fact that are inappropriate to resolve on this motion.  *City of Miami*, 302 F. Supp. 3d at 1046 ("Defendants' argument that the respective stock declines were due to other macroeconomic factors does not persuade.").[22]

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion should be denied in its entirety.

---

[21] Defendants' cases are distinguishable because, unlike the disclosure alleged in the Complaint, the disclosures there did not relate to the same subject matter as the alleged misrepresentations.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (disclosed results did "not reveal any information from which revenue accounting fraud might reasonably be inferred."); *Metzler*, 540 F.3d at 1062 (rejecting plaintiffs' inference that disclosure of "higher than anticipated attrition" at one of 88 campuses was understood by the market as Corinthian's "euphemism for an admission" of a company-wide scheme).  Here, the Complaint does not rely on unwarranted inferences, "undocumented assertions", or "coded message[s]," but on Defendants' October 24, 2019 disclosures and admissions.  ¶¶103; 89-97.

[22] In the event the Court dismisses some or all of the claims alleged, Plaintiffs respectfully request leave to replead.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Respectfully submitted,

DATED: August 11, 2020          **KAPLAN FOX & KILSHEIMER LLP**

By: /s/       *Laurence D. King*
              Laurence D. King

Laurence D. King (SBN 206423)
Mario M. Choi (243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (to be admitted *pro hac vice*)
Jeffrey P. Campisi (to be admitted *pro hac vice*)
Jason A. Uris (to be admitted *pro hac vice*)
850 Third Avenue; 14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714
*rkaplan@kaplanfox.com*
*jcampisi@kaplanfox.com*
*juris@kaplanfox.com*

*Counsel for the Twitter Investor Group and Co-Lead
Counsel for the Proposed Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Tamar Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
*jalieberman@pomlaw.com*
*taweinrib@pomlaw.com*

*Counsel for the Weston Family Partnership LLLP
and Co-Lead Counsel for the Proposed Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (to be admitted *pro hac vice*)
Sebastian Tornatore (to be admitted *pro hac vice*)
Michael Keating (to be admitted *pro hac vice*)
111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  (203) 992-4523
Facsimile:  (213) 363-7171
*shopkins@zlk.com*
*stornatore@zlk.com*
*mkeating@zlk.com*

*Counsel for the Twitter Investor Group and
Additional Counsel for the Proposed Class*