**Pages 1 - 24**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
                            )
IN RE TWITTER, INC. SECURITIES )
LITIGATION                     )    NO. CV 19-07149-YGR
_____)
```

Oakland, California
Tuesday, November 10, 2020

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM**

**APPEARANCES**:

For Plaintiffs:

        POMERANTZ LLP
        600 Third Avenue, 20th Floor
        New York, NY 10016
        BY:  **TAMAR WEINRIB, ESQUIRE**

        KAPLAN FOX & KILSHEIMER LLP
        1999 Harrison Street, Suite 1560
        Oakland, CA 94612
        BY:  **MARIO CHOI, ESQUIRE**

For Defendants:

        LATHAM & WATKINS LLP
        650 Town Center Drive, Suite 2000
        Costa Mesa, CA 92626
        BY:  **MICHELE JOHNSON, ESQUIRE**

        LATHAM & WATKINS LLP
        140 Scott Drive
        Menlo Park, CA 94025
        BY:  **HILARY MATTIS, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
              Official Reporter

<u>**Tuesday - November 10, 2020**</u>                                    **3:30 p.m.**

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling Civil Action 19-7149, In re Twitter, Inc. Securities Litigation.

Counsel, please state your appearances.

**MS. WEINRIB:**  Tamar Weinrib from Pomerantz LLP on behalf of Plaintiffs.

**MR. CHOI:**  Mario Choi -- Kaplan, Fox & Kilsheimer -- on behalf of Plaintiffs.

**MS. JOHNSON:**  Good afternoon.  Michele Johnson, Latham & Watkins, on behalf of Defendants.

**MS. MATTIS:**  And Hilary Mattis of Latham & Watkins on behalf of Defendants.

**THE COURT:**  Good afternoon, everyone.

So we were trying lots of different things.  Can you tell me again who is arguing the case?

**MS. WEINRIB:**  Your Honor, this is Tamar Weinrib.  I will be arguing on behalf of Plaintiffs.

**THE COURT:**  Okay.

**MS. JOHNSON:**  And I will be arguing on behalf of the Defendants.  This is Michele Johnson.

**THE COURT:**  Okay.  I am inclined to grant the Defendant's motion, so we'll go ahead and start with you, Ms. Weinrib.

1          **MS. WEINRIB:**  Thank you, Your Honor.

2          Your Honor, Twitter is a company that earns most of its

3   revenue from advertising.  In fact, in the last few years, it

4   earned approximately 86 percent of its revenue from

5   advertising, and over 90 percent of that came from

6   advertisements that targeted mobile users.

7          One significant driver of that revenue was their Mobile

8   Application Promotion product or as we refer to in shorthand,

9   MAP.  Now, the way that MAP works is it targets mobile phone

10  users and gets them to either engage with or install an app,

11  and it only works if Twitter is able to harvest and provide its

12  users' non-public data to advertisers or measurement partners

13  so that those advertisers can then in turn send targeted ads to

14  the right users.

15         Now, this use of non-public data is important because

16  Twitter has also historically touted that it provided its users

17  control over their own data, so if a user wants to opt out of

18  Twitter's sharing its data, they have the option to do so.  And

19  in fact there were privacy policies in place throughout the

20  class period stating as such, and Twitter was also beholding to

21  an FTC settlement entered in 2011 that barred Twitter for 20

22  years from misleading consumers regarding the extent to which

23  it protects their privacy and honors consumer's privacy

24  choices.

25         However, there were security -- there were software bugs

1    primarily impacting the MAP product, and due to those bugs,

2    Twitter was in fact harvesting and sharing users' confidential

3    data with advertisers even when those users had opted out of

4    having their data shared.

5        Now, Twitter couldn't fix the problem, so instead, they

6    turned off the sharing of user data altogether, which made it a

7    less valuable advertising medium to the advertisers.  Without

8    that data, they couldn't effectively target the relevant

9    Twitter users.  And this had an impact on revenue.  Again,

10   advertising accounted for almost all of Twitter's revenue.  And

11   it also caused Twitter to halt work that they had been -- that

12   they had told investors they were doing to improve MAP.

13       So what happened was that as a result of all of this,

14   Twitter's class period statements were rendered misleading.

15   There were a few different categories of misstatements.

16         **THE COURT:**  Let's look at the statements specifically

17   because in all of these security cases, good or bad, the law

18   requires that I look specifically at the statement.  So even if

19   you say everything that you say is true, it doesn't matter if I

20   can't -- if the statement itself is not something that the law

21   allows for in terms of an actionable statement under the PSLRA.

22       So we've got the statements from July 2019.  And these are

23   in your Complaint, paragraphs 104 and 107; right?  Are we all

24   on the same page?

25         **MS. WEINRIB:**  Yes.  Should I begin addressing them or

1  did you want to --

2       **THE COURT:**  I mean, as I look at these statements,

3  they seem to be what we call legally puffery.  Forward-looking,

4  they've got cautionary -- that set of statements -- I mean,

5  they're pretty generic.

6       **MS. WEINRIB:**  Your Honor, the statements were not

7  generic or forward-looking, with all due respect.  In those

8  statements, the --

9       **THE COURT:**  You know, Ms.-- I'm going to stop you

10  right there.  Just a little pointer.

11       **MS. WEINRIB:**  Sure.

12       **THE COURT:**  Never use the phrase "with all due

13  respect" in front of a judge.  Just cut it out of your

14  advocacy.  It basically -- it doesn't send the right signal.

15     Go ahead.  I'm not going to hold it against you.  I'm just

16  giving you a practice pointer.  Don't say that.  Go ahead.

17       **MS. WEINRIB:**  Apologies.

18     Twitter conveyed to investors that they were working to

19  improve MAP and conveyed in those statements in particular that

20  that work was ongoing, that they were in the middle of that

21  work, and even went so far as to talk about revenue impact, but

22  those statements were misleading because they knew at the time

23  that because of the software bugs, they had to reallocate their

24  engineers to work on fixes to the software bugs rather than

25  working to improve MAP.  So that --

1          **THE COURT:**  What words are you focused on

2     specifically?

3          **MS. WEINRIB:**  Words with regard to -- sorry,

4     Your Honor.  Let me just go to the paragraph.

5          **THE COURT:**  Let me go to Ms. Johnson.

6       What's wrong with those statements, or what's not

7     actionable about those statements?

8          **MS. JOHNSON:**  Your Honor, the statements aren't

9     actionable because there are no allegations that contradict

10    them either at the time or at the end of the class period.

11    You're focusing on the statements starting with July 26th.  We

12    are continuing our work to increase the stability, performance

13    and flexibility of our ad platforms not alleged to be false.

14       Increasing the stability, performance, and scale of our ad

15    platforms will take place over multiple quarters with a gradual

16    impact on revenue.  The third statement on July 26th is

17    similar.

18       There is no alleged fact in the Complaint that contradicts

19    any of these statements.  In fact, if you look at the end of

20    the class period, the statements made on October 24th, which is

21    the day after the end of the class period, mirror the

22    statements made at the beginning, and, in fact, revenue did

23    gradually increase.

24          **THE COURT:**  Ms. Weinrib, response.

25          **MS. WEINRIB:**  Your Honor, those statements were false

1   because they state that they were in the middle of work

2   improving MAP, "middle of work" or "continuing our work," and

3   the allegations in the Complaint are that they were not

4   continuing that work.  They were not in the middle of that

5   work.  They had halted that work altogether in order to focus

6   on the software bug that had caused that sharing of non-public

7   data that they had to deal with.

8          And so --

9                THE COURT:  Ms. Johnson.

10               MS. JOHNSON:  That is a conclusory statement.  The

11  allegations say that Twitter re-purposed engineers for sure

12  when we would like them to be working on other things and they

13  had to address this bug, but in fact addressing the bug is

14  working on MAP.  And nowhere did Twitter ever say that MAP

15  would proceed along a particular timeline, would be done at a

16  particular time.

17         It is only conclusory to say that work was halted rather

18  than engineers working on the bug fix, which is --

19               THE COURT:  All right.

20         Ms. Weinrib.

21               MS. WEINRIB:  Your Honor, the -- when they stated that

22  they were continuing their work, in the middle of their work,

23  they were talking specifically about improvements to MAP.  They

24  weren't talking about the software bugs.  And the indication of

25  that is very clear from the fact that they didn't even disclose

1   the bugs to the public until August 6th, so these statements

2   predate any talk about software bugs.

3      So read in context, when they're talking about being in

4   the middle of their work regarding MAP or continuing their

5   work, they are very specifically talking about improvements to

6   the MAP product.

7      **THE COURT:**  Let's go to the next set.  The next

8   statements from the Complaint at paragraph 109, these are the

9   Q2 2019 Form 10-Q risk statements.

10      Ms. Johnson.

11      **MS. JOHNSON:**  Here, too, Your Honor, there are no

12   specific factual allegations that support that these could be

13   false.  "We are continuing our work to increase the stability,

14   performance, and scale of our ad platforms in our mobile

15   application," etc.  "Any positive remedy impact will be gradual

16   in its impact."

17      Nothing contradicts that they were continuing the work.

18   Nothing contradicts that they were working on stability,

19   performance and scale, and nothing contradicts that there, in

20   fact, was a positive revenue impact that was gradual at the end

21   of Q3, according to Plaintiffs' own allegations.

22      **THE COURT:**  Ms. Weinrib.

23      **MS. WEINRIB:**  Your Honor, the statements that

24   Ms. Johnson referenced are misleading for the exact reasons

25   that we stated previously, but the paragraph that Your Honor is

referring to contains risk disclosures that warn investors that there may be software errors, and that statement in and of itself is misleading because they knew at the time that there were software errors.  So warning of possibilities when Defendants know that there actually are software errors at that time is misleading in and of itself.

**THE COURT:**  All right.

Ms. Johnson.

**MS. JOHNSON:**  This is an important scienter argument as well, Your Honor.  There is no allegation, absolutely nothing, that would suggest that Twitter knew on July 26th or July 31st that there was this user error.  The Complaint conflates -- sometimes it keeps them apart, sometimes it conflates them with turning off the user setting and actually solving the underlying software bugs.

It is contrary to the alleged facts in the Complaint that for some reason, the executives knew about these bugs, sat on them for days and days and days, to what end?  Only to announce them to users and to say at the same time, "We're committed to honesty.  We take responsibility.  You trust us.  We discovered these, we Tweeted about them, and we are working to fix them."  Nothing contradicts those statements.  Just an unsubstantiated conclusion that hey, they must have known about these bugs at the time they made their statements.  It's absolutely missing from the Complaint.

1    **THE COURT:**  All right.

2      Where is your -- the best articulation of knowledge,

3    Ms. Weinrib?  What part of the Complaint?

4      **MS. WEINRIB:**  Well, Your Honor, there are multiple

5    allegations in the Complaint with regard to scienter, and I

6    will address them each in turn, but the first and probably most

7    important is that Defendants closely and regularly tracked key

8    metrics, which included an output --

9      **THE COURT:**  Can you give me the paragraph number,

10   please.

11     **MS. WEINRIB:**  Yes, Your Honor.  Give me one moment.

12     There are multiple paragraphs.  I apologize if my video

13   cut out.  I'm looking at the paragraphs as we speak.

14     In paragraph 60, for an example, we talk about how Twitter

15   tracks metrics relating to its MAP advertisements.  There are

16   various other paragraphs that discuss this as well, including

17   paragraph 61 and 62, 63.

18     But just to summarize these, Your Honor, the way that

19   advertisers buy space on Twitter is through a realtime bidding

20   auction, and there is an output from those auctions called

21   "cost per engagement" which demonstrates what advertiser demand

22   is at the time.

23     Now, Defendants admitted in their SEC filings that they

24   track these metrics closely, quoting, for example, their

25   filings -- and this is in the Complaint, and I'll direct you to

1   the paragraph number momentarily -- but they state they review

2   a number of metrics, and they talk about CPE specifically, "in

3   order to evaluate our business, measure our performance,

4   identify trends and so on."

5        Moreover, we have the -- we have sworn interrogatory

6   answers from Twitter in another action, *In re Twitter, Inc.,*

7   *Securities Litigation,* and those sworn interrogatory answers

8   provide that key metrics summary emails -- and, again, CPE was

9   identified as a key metrics -- as well as --

10            **THE COURT:**  Slow down if you want your transcript to

11  have all your words.

12            **MS. WEINRIB:**  Apologies.  I do speak rather quickly.

13  I will try to slow down.

14       So the sworn interrogatory answers provide that key

15  metrics emails and other key financial information were

16  disseminated at least once a day to Twitter executives which

17  include the individual Defendants, Defendant Dorsey and the

18  company's CFO as well.

19       Moreover, as mentioned at the outset of the argument,

20  advertising revenue is a majority of Twitter's business.  It's

21  a majority of their revenue, over 86 percent.  So it's

22  something that Defendants clearly would have been focused on

23  throughout the quarter to see how the business is progressing

24  and how it's doing.

25            **THE COURT:**  Response, Ms. Johnson.

1    **MS. JOHNSON:**  This is implausible supposition upon

2   supposition, Your Honor.  The allegations about focusing on

3   advertisement, the Complaint itself says that MAP is just one

4   of many advertising products.  The Complaint itself says that

5   the CPE metrics do not break out MAP numbers individually.

6   They are unable to say that -- this is the -- this is the

7   corporate management's general awareness of day-to-day

8   workings.  It does not establish scienter.  These are

9   generalized reports that do not break out this individual

10  metric.  And for counsel to reference the interrogatory

11  responses -- there is also a declaration in the paragraph that

12  she referenced --

13    **THE COURT:**  Ms. Johnson, you are really cutting out.

14  Can you say that again?

15    **MS. JOHNSON:**  Yes.

16    The paragraph that counsel referenced talks about an

17  interrogatory and also a declaration from a different case.

18  That declaration references the year 2015.  That's before the

19  CFO was even at the company.  It is not the same time period.

20  It only talks about daily metrics within a six-month period in

21  2015 at a time when Defendant Segal was not even at the

22  company.

23    And what those allegations even say, what that declaration

24  even says, is just CPE.  The Complaint, paragraph 8/paragraph

25  137, admits that that is not specific to MAP but, rather,

1    involves all of the advertisement, and it's that generalized,

2    you know, *executives had access to reports that contained*

3    *numbers*, nothing specific, nothing particularized that could

4    even possibly contradict what the Defendants were saying.

5        **THE COURT:**  All right.  The next statement I have is

6    the generic statement from -- or the Sarbanes-Oxley

7    certifications.  I take it that that rises and falls with the

8    analysis on the more specific?  Would you agree, Ms. Weinrib?

9        **MS. WEINRIB:**  Your Honor, yes.  Our contention is that

10   the Sarbanes-Oxley certifications were false because the SEC

11   filings did contain untrue statements of material fact.

12       **THE COURT:**  Let's move to the August 6th Tweet and

13   blog post.  Where do we stand on this one, Ms. Johnson?

14       **MS. JOHNSON:**  I would invite a comparison between that

15   August 6th Tweet and paragraph 91 which is the earnings call at

16   the end -- after the end of the class period.  The CFO says,

17   "It turns out that a setting wasn't working as expected.  We

18   were using device settings even if people had asked us not to,

19   so when we discovered that, we Tweeted about it, which is what

20   we often do to be transparent with people when things aren't

21   working as expected."  And, two, "We turned off the setting so

22   that it would work as expected."

23       That true statement, according to Complaint, is the same

24   as the Tweet which said, "We discovered it, here's the Tweet,

25   we turned off the setting, and we take responsibility."  There

1    is nothing that contradicts that Tweet in anything that

2    happened after the class period.

3            **THE COURT:**  Ms. Weinrib.

4            **MS. WEINRIB:**  Your Honor, that's actually not what the

5    Tweet said.  The Tweet said that they discovered the software

6    bugs and fixed them.  They never said anything about turning

7    off the setting and stopping the sharing of user data or what

8    impact that would have on Twitter's bottom line going forward,

9    and there was certainly impact, $65 million worth of impact, in

10   2019 which continued into --

11           **THE COURT:**  Hold on.  Hold on.  Let me make sure we're

12   talking about the same thing.

13       So with -- and let me also understand, with respect to the

14   August 6th Tweet, are you proceeding on an affirmative claim or

15   on an omission claim?  The analysis is different depending on

16   each.

17           **MS. WEINRIB:**  Your Honor, it's both.  Firstly --

18           **THE COURT:**  Let's deal with the affirmative.

19       So it says, "We recently discovered and fixed issues."

20   Are you arguing that that's false?

21           **MS. WEINRIB:**  Yes, Your Honor.  We're arguing that

22   they did not fix the issues.  And that's directly related to

23   the omission, which is that --

24           **THE COURT:**  Hold on.  It says, "We fixed these issues

25   on August 5th, 2019."  That's wrong?

1    **MS. WEINRIB:**  We're saying that that's wrong and that

2    they were not able to fix the issue, and because they were not

3    able to fix the issue, they instead stopped sharing user data

4    altogether.  They gave the -- the implication of the Tweet is

5    that they were able to resolve and fix the software bugs, and

6    we allege in the Complaint that they were not able to resolve

7    the software bugs, and because of that, they have to stop

8    sharing user data with measurement partners and advertisers

9    altogether which had revenue impact because it wasn't as

10   desirable of an advertising medium any longer without the

11   ability to send targeted ads to Twitter's users.

12       **THE COURT:**  So with respect to the omission, it seems

13   to me a bit of a stretch to say that that opens the door with

14   respect to all the financial issues you're claiming.

15       **MS. WEINRIB:**  Well, Your Honor, the omission here is

16   that because they could not fix the software bugs, they have to

17   turn off that setting.  And turning off that setting is turning

18   off the life blood of the company's business.  Without being

19   able to share their non-public user data with advertisers, the

20   advertisers don't want to spend as much money with Twitter

21   advertising because they can't effectively target the market

22   that they want to target without that information.

23       In fact, at the end of the class period, Your Honor,

24   Defendant Segal even admits that when you turn off that

25   setting, there is an impact to revenue.  In fact, the quote is,

1   "There is some revenue impact when things like that happen,"

2   and he is referring to the turning off of data sharing, which

3   they had to do because of the software bugs, which also is a

4   further indication of scienter.  They would have known there

5   would have been revenue impact as soon as they had to stop

6   sharing user data with advertisers and the measurement

7   partners.

8        THE COURT:  Response.

9        MS. JOHNSON:  All of that is entirely conclusory and

10   conflates the turning off of the setting with the fixing of the

11   bugs.  The Complaint itself, paragraph 16/paragraph 114, the

12   Plaintiff claims the fundamental software bugs were not fixed,

13   and it was the user setting that was turned off.  That's what

14   the Tweet says.  "We recently discovered and fixed issues

15   related to" --

16        THE COURT:  You, too, Ms. Johnson.  Ms. Johnson, first

17   of all, you are very muted.  Second of all, you are talking too

18   fast.

19        MS. JOHNSON:  Okay.

20        THE COURT:  Try again.

21        MS. JOHNSON:  Let me start again.

22      The Tweet itself says, "We recently discovered and fixed

23   issues related to our settings choices."  Plaintiffs' argument

24   conflates the issues with the settings choices with the

25   underlying fundamental software bugs.  What Defendant Segal

1    said at the end of the class period is, "We turned off the

2    settings choices.  We're still working on the bugs."  That's

3    completely consistent what the Tweet, and there couldn't have

4    been revenue issues already.  There is no allegation that

5    suggests that all the way back on August 6th at the beginning

6    of discovering this issue, Twitter could have possibly known

7    what revenue impact, if any, this change would have had.  They

8    had just discovered it, and no allegation suggests that they

9    knew something more about either the bugs or the revenue issues

10   that ultimately happened at the end.

11       And I would just reiterate, Your Honor, that there was a

12   nine percent increase in revenue.  The statements about revenue

13   gradually increasing were true, and nothing suggests that

14   anything that the Defendants said was contradicted.

15       **THE COURT:**  Okay.  The next one I have is September 4;

16   is that right?

17       **MS. WEINRIB:**  Yes.

18       **THE COURT:**  All right.  Ms. Johnson.

19       **MS. JOHNSON:**  Here again, if you go statement by

20   statement and compare it to what is alleged in the Complaint,

21   there is nothing that contradicts them.

22       "Our MAP work is ongoing."  Nothing suggests that the MAP

23   work was not ongoing.  "We continued to sell the existing MAP

24   product, but people know that a new one is coming, and we

25   haven't really talked about a timeline around it."  Nothing

1   contradicts that Twitter continued to sell the existing MAP

2   product.  Nothing contradicts that a new one is coming or that

3   there has never been a discussion.  There, in fact, wasn't a

4   discussion about the timeline.

5          **THE COURT:**  Okay.

6      Ms. Weinrib.

7          **MS. WEINRIB:**  Your Honor, again, they state in -- on

8   September 4, just like they did on July 26th and July 31st,

9   that their work is ongoing, and they're referencing

10  improvements to MAP which were not ongoing.

11      Moreover, the September 4th statement also included

12  comments regarding the monetization strength of MAP in Asia.

13  Just a few short weeks later they admit that during the quarter

14  there was actually a precipitous decline in revenue from that.

15  And so those statements were misleading as well.

16      There is no indication there that there was any sort of

17  delay or stoppage to work on improving MAP and nothing to

18  suggest the precipitous decline that they admitted to a few

19  weeks later.

20         **MS. JOHNSON:**  Counsel jumped to Statement 7.  Perhaps

21  I should address that statement, Your Honor?

22         **THE COURT:**  Go ahead.

23         **MS. JOHNSON:**  What Statement 7 says about Asia is,

24  "But we do have some markets that have been more MAP focused.

25  Asia, for example, has tended be more MAP focused

1   historically."  The word "historically" is right in there.

2   There is nothing to contradict that.  In fact, once again, on

3   October 24th, Defendant Segal says, "Now MAP is a bigger part

4   of our business there in Japan than it is in other

5   geographies," and that statement is not alleged to be false.

6       These statements say nothing about revenue.  They say

7   nothing about an upcoming impact.  They are completely

8   historical and completely uncontradicted.

9       **MS. WEINRIB:**  Your Honor, if I might respond to that

10  point?

11      **THE COURT:**  Go ahead.

12      **MS. WEINRIB:**  So, Your Honor, Defendants make this

13  point in their brief as well about how this is talking about

14  historical strength in Japan, but what they omit to say is that

15  Defendants provided that information in response to an

16  analyst's question regarding current strength in Asia.  And

17  their response to the question regarding current strength in

18  Asia was to talk about how historically MAP has been strong in

19  Asia, when the truth is that it was no longer strong in Asia

20  and that, as mentioned when they disclosed -- when they issued

21  their corrected disclosure a few weeks later, in fact the

22  current strength in Asia did not match historical strength, and

23  there had been a precipitous decline, which there was no

24  indication of in their September 4th statement.

25      **THE COURT:**  All right.  Let's move to scienter and the

1    core operations theory.

2        Ms. Johnson.

3        **MS. JOHNSON:**  Yes.  Core operations, of course that

4    exceedingly rare category of cases.  The actual -- actual

5    revenue impact, as counsel just referenced, was allegedly

6    65 million for the full year of 2019.  That is less than 2.2

7    percent of Twitter's total revenues in 2018.  That is far -- a

8    far cry from the level that it needs to be to suggest that it's

9    absurd that the Defendants didn't know.  In fact, it is

10   miniscule, and the Complaint contains hyperbole about a massive

11   impact or a huge decline.

12       The actual impact was to revenue growth.  The statement

13   said revenue will continue to gradually grow.  Revenues grew.

14   At third quarter results that were announced on October 23rd,

15   they grew by nine percent year over year.  That is with this

16   impact.  So growing less, which is Plaintiffs' allegation, at a

17   2.2 percent alleged impact from all of these issues worldwide

18   is a far cry from that exceedingly rare category of cases where

19   it would be absurd to suggest that the Defendants didn't know.

20       **THE COURT:**  Ms. Weinrib.

21       **MS. WEINRIB:**  Your Honor, the core operations doctrine

22   does not depend on the amount of the loss.  It depends on

23   whether it is a core operation of the business.  And

24   advertising is certainly the core operation of Twitter's

25   business, as it earned 86 percent of its revenues in the last

few years from advertising alone.  So any change that affects
their advertising revenue -- and though they state at the end
of the class period that the software bugs primarily impacted
MAP, it impacted other products as well.

Whether or not this was an impact to revenue growth or
whether it caused an actual loss is beside the point.  The
point is that Defendants issued misleading statements regarding
their work on MAP, regarding their fixes to software bugs that
never happened, regarding their inability to share user data
with advertisers, the lifeblood of their business, and that
this misled investors, and that when the truth came out in
October of 2019, stock dropped.

What Defense counsel refers to is not what the definition
of the core operations theory is.

**THE COURT:**  Okay.  What else do you want to say,
Ms. Weinrib?

**MS. WEINRIB:**  Your Honor, just going back for a
moment, Defense counsel referenced the interrogatory answers
and suggested that this was outdated information, but the fact
of the matter is that during the class period itself,
Defendants stated in their SEC filing that they monitored these
same metrics that are referenced in the interrogatory answers.
So while that may have been pre-class period, there is
inter-class period information that corroborates it and
suggests that that monitoring continued.  And access to key

1    reports and information demonstrates the answer in the Ninth

2    Circuit.

3         And, again, we have Defendant Segal's admission at the end

4    of the class period that when you stop using that setting, when

5    you stop sharing non-public data with advertisers, there is

6    revenue impact when things like that happen.  The last part of

7    that statement that I just said is a direct quote from

8    Defendant Segal:  "There is some revenue impact when things

9    like that happen."  They were aware.

10        But in addition to their access to information and their

11   knowledge that turning off that setting would have revenue

12   impact, there are additional indications of scienter.  For

13   example, we have the fact that Defendants admittedly focused on

14   MAP.  They repeatedly talked about MAP both before and during

15   the class period, answering analyst questions about it,

16   conveying their knowledge about MAP.  We have Confidential

17   Informant 1, as well as the Nirenberg declaration, that

18   demonstrate the importance of MAP to Twitter overall.  We have

19   Confidential Informant 1 also providing information about how

20   software bugs like this are fundamental errors that take

21   minimum three to six months to isolate and fix.

22        And speaking of bugs, we also have Defendants' focus on

23   similar bugs.  A few months before the class period in May

24   2019, Defendants disclosed that their were similar bugs that

25   likewise caused Twitter to share non-public information -- and

1  in this case it was location information about its users --

2  with advertisers even when those users had opted out of having

3  that shared.  And they admitted that this issue had started at

4  least in May of 2018, a full year before.  And they also

5  conveyed to the public that they were focused on making sure

6  that this didn't happen again, that there would be no

7  further --

8       **THE COURT:**  Can you give me the characteristics of

9  Confidential Witness No. 1; that is, how do they have personal

10  knowledge of how long it takes to fix bugs?

11       **MS. WEINRIB:**  Your Honor, Confidential Informant 1 was

12  an ad ops specialist.

13       **THE COURT:**  Was what?

14       **MS. WEINRIB:**  An ad ops specialist, advertising

15  operations specialist.

16       **THE COURT:**  Was the person a software engineer?

17       **MS. WEINRIB:**  I'm sorry.  Excuse me, Your Honor?

18       **THE COURT:**  Was the person a software engineering?

19       **MS. WEINRIB:**  I'm not sure if the advertising ops

20  specialist description is equivalent to software engineer, but

21  he worked directly with Twitter's advertising customers and had

22  direct knowledge of the MAP product.

23       **THE COURT:**  So I take it that that person's never

24  fixed any software bugs?

25       **MS. WEINRIB:**  Your Honor, we don't have that

1    information at our disposal, but this individual worked -- was

2    an -- was an advertising operations specialist and had intimate

3    knowledge of the MAP product and understood what it would take

4    to fix software bugs that impacted that product and worked in

5    that area for Twitter for a number of years.

6            THE COURT:  All right.

7        Any response, Ms. Johnson?

8            MS. JOHNSON:  Briefly on Confidential Informant 1, ad

9    ops was never defined.  He or she worked from 2014 to 2018, and

10   thus has no basis for any knowledge about what happened.  But

11   more to the point, the series of illogical inferences that

12   Plaintiffs' argument relies on, it doesn't -- it doesn't make

13   sense.  The central theory is that somehow they knew about

14   these bugs.  Nothing tells us how.  They sat on them.  Nothing

15   tells us why.  And then they disclosed the bugs together with

16   their commitment to user privacy in a statement that the

17   Plaintiffs don't contradict.

18       So the bottom line is there were these issues.  They were

19   fixed.  And Plaintiff is trying to turn it into securities

20   fraud without the particularity required by the PSLRA.

21           THE COURT:  Okay.  I will take it under submission,

22   and I will be in touch in writing.

23           MS. JOHNSON:  Thank you, Your Honor.

24           MS. WEINRIB:  Thank you, Your Honor.

25               (Proceedings adjourned at 4:04 p.m.)

1

2

3                       <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, November 19, 2020

8

9    *Pamela Batalo Hebel*

    _____
10   Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25