1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE TWITTER, INC. SECURITIES LITIGATION** | CASE NO. 19-cv-07149-YGR<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Re: Dkt. No. 53 |

Lead plaintiffs the Weston Family Partnership LLLP and the Twitter Investor Group bring this consolidated securities class action litigation alleging false and misleading statements and omissions between July 26, 2019 and October 23, 2019 (the "Class Period") against defendants Twitter, Inc. ("Twitter" or the "Company"), chief executive officer Jack Dorsey ("Dorsey"), and chief financial officer Ned Segal ("Segal"). Specifically, plaintiffs raise two causes of action, namely, violation of (1) Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 against all defendants, and (2) Section 20(a) of the Exchange Act against the individual defendants.

All defendants move to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants challenge plaintiffs' Section 10(b) and Rule 10b-5 claim on three grounds: plaintiffs fail to (i) allege statements that are materially false or misleading, or otherwise actionable; (ii) establish a strong inference of scienter; and (iii) establish loss causation. Without a primary violation of Section 10(b), defendants argue plaintiffs' Section 20(a) claim similarly fails.

Having considered the papers submitted and the pleadings in this action, the hearing held on November 10, 2020, and for the reasons set forth below, the Court hereby **GRANTS** the motion

//

//

to dismiss **WITH LEAVE TO AMEND**.[1]

_____

[1] In connection with their motion to dismiss, defendants submitted a request for judicial notice (Dkt. No. 55) for the following documents attached as exhibits to the Declaration of Susan E. Engel dated June 12, 2019 (Dkt. No. 54): (i) Ex. 1, Twitter's Annual Report on Form 10-K for the period ended December 31, 2018 (the "2018 Form 10-K"); (ii) Ex. 2, a screenshot entitled "Twitter Support on Twitter," https://twitter.com/TwitterSupport/status/1158876245716697089 (last accessed June 10, 2019) (the "August 6 Tweet"); (iii) Ex. 3, a webpage entitled "An issue with your settings choices related to ads on Twitter," available at https://help.twitter.com/en/ads-settings (last accessed June 3, 2020) (the "August 6 Blog Post"); (iv) Ex. 4, Twitter's Quarterly Report on Form 10-Q for the period ended September 30, 2019 (the "Q3 2019 Form 10-Q"); (v) Ex. 5, Twitter's Q2 2019 Shareholder Letter dated July 26, 2019 (the "Q2 2019 Shareholder Letter"); (vi) Ex. 6, Twitter's Quarterly Report on Form 10-Q for the period ended June 30, 2019 (the "Q2 2019 Form 10-Q"); (vii) Ex. 7, the transcript of Twitter's Question and Answer Presentation at the Citi Global Technology Conference dated September 4, 2019, available for download from https://s22.q4cdn.com/826641620/files/doc_downloads/2019/Citi-2019-Transcript.pdf (downloaded on June 3, 2020) (the "CGTC Tr."); (viii) Ex. 8, Twitter's Responses and Objections to KBC Asset Management NV's Fifth Set of Interrogatories, dated May 31, 2019 and filed as Ex. 20 to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment in _In re Twitter, Inc. Sec. Litig._, Case No, 4:16-CV-5314 (JST) (N.D. Cal. filed. Sept. 16, 2016) (Dkt. No. 413-6) (the "May 2019 Discovery Responses"); (ix) Ex. 9, the Declaration of Michael Nierenberg dated September 12, 2019, filed as Exhibit 1 to Defendants' Administrative Motion to File Under Seal Defendants' Motion for Summary Judgment in _In re Twitter, Inc. Sec. Litig._, Case No, 4:16-CV-5314 (JST) (N.D. Cal. filed. Sept. 16, 2016) (Dkt. No. 340-1) ("Nierenberg Decl."); (x) Ex. 10, Statement of Changes of Beneficial Ownership of Securities on Form 4 of Twitter on behalf of Ned Segal dated August 4, 2019; (xi) Ex. 11, Statement of Changes of Beneficial Ownership of Securities on Form 4 of Twitter on behalf of Ned Segal dated September 3, 2019; (xii) Ex. 12, Statement of Changes of Beneficial Ownership of Securities on Form 4 of Twitter on behalf of Ned Segal dated September 12, 2019; and Ex. 13, Statement of Changes of Beneficial Ownership of Securities on Form 4 of Twitter on behalf of Ned Segal dated October 9, 2019 (collectively, with Exs. 10, 11, and 12, the "Form 4s").  Plaintiffs do not oppose.

Exhibits 1 through 9 are judicially noticed as documents which are incorporated into the complaint by reference.  _See, e.g., Gammel v. Hewlett-Packard Co._, 905 F. Supp. 2d 1052, 1061–62 (C.D. Cal. 2012).  Exhibits 1, 4, 5, and 6 are also appropriately noticed as documents filed with the Securities Exchange Commission ("SEC").  _See In re Silicon Graphics Inc., Sec. Litig._, 183 F.3d 970, 986 (9th Cir. 1999), _abrogated on other grounds as rec'd in S. Ferry LP, No. 2 v. Killinger_, 542 F.3d 776, 784 (9th Cir. 2008); _In re Netflix, Inc. Sec. Litig._, No. 04-CV-2978 (FMS), 2005 WL 1562858, at *5 (N.D. Cal. June 28, 2005) (finding that "SEC filings are appropriately noticed by the Court" on a motion to dismiss, even when those documents were filed with the SEC outside the class period).  Exhibits 2 through 3 are noticed in a securities fraud action as documents reflecting publicly available information about the company, _see Heliotrope Gen., Inc. v. Ford Motor Co._, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (holding that it is appropriate to take judicial notice of news articles on motion to dismiss); _SEC v. Mozilo_, No. 09-CV-3994 (JFW), 2009 WL 3807124, at *7 n.2 (C.D. Cal. Nov. 3, 2009) (taking judicial notice of "transcripts of earnings conference calls and investor forums, newspaper articles" and other documents).  Additionally, Exhibits 8 and 9, which form a basis for plaintiffs' scienter allegations,

United States District Court
Northern District of California

# I. BACKGROUND

Relevant facts based on judicially noticeable documents and allegations from plaintiffs' Consolidated Class Action Complaint ("CCAC") are set forth below:

## A. TWITTER'S ADVERTISING BUSINESS AND THE MAP PRODUCT

Twitter is a "global platform for public self-expression and conversation in real time" centered around short-form text, image, and video content.  (CCAC ¶¶ 4, 39, 41.)  Users can "tweet" their thoughts to which other users can reply, "like," or "retweet."  (*Id.* ¶ 39.)  Available in more than 40 languages, Twitter can be accessed on the Internet via twitter.com, by mobile device, and through text messages.  (*Id.*)

Twitter generates the majority of its revenue from the sale of advertisements.  (*Id.* ¶¶ 5, 43 (citing the 2018 and 2019 Form 10-K's, each reporting that the Company received approximately 86% of its revenue from advertising).)  The interactive platform enables Twitter to collect data about its users, which it shares with advertisers to target users with focused advertisements.  (*Id.* ¶¶ 5, 42.)  Twitter collects this data in two ways.  First, Twitter compiles a set of inferences about the user based on their tweets, Likes, Retweets, and accounts the user follows, which helps "determine what topics the user is interested in, the user's age, the languages the user speaks and other signals."  Second, it accesses users' data and device setting, which provides "critical insight regarding other websites that the device visits."  (*Id.* ¶¶ 48–51.)  Twitter shares this personalized information with advertisers and "measurement partners" who then tailor specific advertisements for the user.  (*Id.* ¶ 53.)[2]

To purchase an advertisement, Twitter's customers place bids on a continuous and

are noticed as court documents that are already in the public record, *see Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts."), and Exhibits 10 through 13, which are SEC Form 4s, are judicially noticed "even when not referenced in the pleading, to prove that stock sales were made pursuant to a Rule 10b5-1 trading plan." *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012).  Accordingly, the Court **GRANTS** defendants' requests and takes judicial notice of the exhibits attached to Docket Number 54.

[2] Measurement partners help advertisers plan and manage advertising campaigns.  (Compl. ¶ 52.)

United States District Court
Northern District of California

automated real-time bidding auction platform.  (*Id.* ¶ 44.)  The bidding process begins when a user logs-in to Twitter.  (*Id.* ¶ 45.)  After being provided with data about the user, advertisers who have a matching advertisement submit their bids and are entered into the auction.  (*Id.*)  The personalized advertisement of the highest bidder is then shown to the user at the exact moment that it is relevant.  (*Id.*)  This process happens in less than a second.  (*Id.*)  According to discovery produced in an unrelated litigation involving the Company, for a period in 2015, Dorsey, the then-chief financial officer (not Segal), and other senior executives at Twitter received daily reports about certain key metrics (as defined in Twitter's SEC filings), including cost per ad engagement ("CPE").  (*Id.* ¶¶ 13–14, 46, 88; May 2019 Discovery Responses (Response to Interrogatory No. 17).)  CPE measures demand for Twitter's advertising products on the auction platform.  (CCAC ¶ 46.)

One such advertising product is the Mobile Application Promotion ("MAP"), which, rather than simply generating brand awareness, prompts users to install an advertiser's mobile application on their devices, or re-engage with a mobile application that the user has already downloaded.  (*Id.* ¶¶ 8, 56–58.)  As a "direct-response" advertisement, MAP is most effective when an advertiser knows information about the user's device settings.  (*Id.* ¶ 8.)  Advertisers only pay for each click on the "install" or "open" buttons in the advertisement.  (*Id.* ¶¶ 47, 59.)  To evaluate the product's performance, Twitter tracks various MAP-specific metrics.  (*Id.* ¶¶ 60–61.)

According to the declaration of one of Twitter's sales finance managers filed in another unrelated litigation, new direct-response products like MAP were "the primary source of expected revenue growth" for Twitter in 2015.  (*Id.* ¶ 62; Nierenberg Decl. ¶ 13.)  Further, a confidential witness ("CI-1"), "a former AdOps Specialist for Twitter from 2014 through 2018[,] who worked with Twitter's advertising customers[ ] during 2014 [through] 2016," claims that MAP itself accounted for approximately 20% of the Company's global revenue.  (CCAC ¶ 63.)  At various times prior to the Class Period, defendants represented that they planned to improve the MAP product given that such direct-response advertisements were viewed as revenue drivers for the Company.  (*Id.* ¶¶ 9, 64, 74.)

Even though its ability to generate advertising revenue relies heavily on sharing user data

4

with advertisers, Twitter permits its users to opt-out of the data sharing program. (*Id.* ¶¶ 5, 7, 54–55, 65–71.) Users are also able to opt-out of receiving targeted advertising. (*Id.*)

## B. EVENTS DURING THE CLASS PERIOD

On July 26, 2019, the start of the Class Period, defendants disclosed Twitter's financial results for the quarter ended June 30, 2019 in a letter to shareholders. (*Id.* ¶¶ 10, 104.) Both in the letter and during a same-day conference call with investors, Dorsey and Segal represented that improvements to MAP's stability, performance, and scale were ongoing and would have a positive gradual impact on revenue. (*Id.*; *see also* Q2 2019 Shareholder Letter.) The Company's Q2 2019 Form 10-Q dated July 31, 2019 repeated the substance of these statements. (CCAC ¶ 107; Q2 2019 Form 10-Q.) In the Q2 2019 Form 10-Q, both Segal and Dorsey certified the following risks: "Our products and services may contain undetected software errors, which could harm our business and operating results[]"; "If new or enhanced products, product features or services fail to engage users, content partners and advertisers, we may fail to attract or retain users or to generate sufficient revenue or operating profit to justify our investments, and our business and operating results could be affected[]"; and "[C]hanges to existing products, services and initiatives could fail to attract users, content partners, advertisers and platform partners or generate revenue." (CCAC ¶¶ 109, 111; Q2 2019 Form 10-Q.)

On August 6, 2019, Twitter announced to its users that it had "recently discovered and fixed issues related to your setting choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners." (*Id.* ¶¶ 15, 113; *see also* August 6 Tweet.) More specifically, the Company explained:

> "(a) If you clicked or viewed an advertisement for a mobile application and subsequently interacted with the mobile application since May 2018, we may have shared certain data . . . with trusted measurement and advertising partners, even if you didn't give us permission to do so.
>
> (b) As part of a process we use to try and serve more relevant advertising on Twitter and other services since September 2018, we may have shown you ads based on inferences we made about

5

the devices you use, even if you did not give us permission to do so. . . ."

(CCAC ¶ 79; *see also id.* ¶¶ 72–73; August 6 Blog Post.)  Twitter stated that it had "fixed these issues on August 5, 2019," referring to the two aforementioned issues.  (CCAC ¶¶ 80–81, 113; August 6 Blog Post.)  According to CI-1, the former AdOps specialist, "these were fundamental bugs that would have taken at least 3 to 6 months to isolate and fix."  (CCAC ¶ 82.)

One month later, on September 4, 2019, Segal attended the Citi Global Technology Conference in New York City.  (*Id.* ¶¶ 17, 115.)  At the conference, when asked why it was "taking so long to roll [the improved MAP] out" and "[w]here [Twitter was then] in that initiative," Segal stated that "MAP work is "ongoing," that Twitter had made improvements to MAP, and that it "continued to sell the existing MAP product."  (*Id.*; CGTC Tr. at 7.)  In addition, when asked "why [the Company has] particular strength in monetization outside the US," Segal stated, in part, that Twitter's "strength just varies from one geography to another" and "Asia, for example, has tended to be more MAP-focused historically."  (CCAC ¶ 118; CGTC Tr. at 9.)

During the Class Period, Segal did not purchase any Twitter shares on the open market but sold approximately 10% of his holdings (excluding restricted stock).  (CCAC ¶ 32; Form 4s.)

**C.  END OF CLASS PERIOD DISCLOSURE**

On October 24, 2019, before the market opened, Dorsey and Segal conducted an investor conference call regarding Twitter's financial results for the quarter ended September 30, 2019. (CCAC ¶¶ 19, 89–91, 120, 146.)  During the call, Segal disclosed that the changes implemented to address the privacy violations—*i.e.*, turning off user data sharing—had negatively affected third quarter revenue growth by "3 or more points" and that these negative effects would continue through at least the fourth quarter of 2019 by "4 or more points."  (*Id.* ¶¶ 19, 89–91, 94.)  In addition, defendants reported that "[t]he 1% decline in Japanese revenue was due to a meaningful drop in MAP, related to bugs in our legacy product" and that CPE "was down 12%, reflecting a mix shift from MAP to video ad formats (which have lower CPEs) and like-for-like price decreases across most ad formats . . . ."  (*Id.* ¶ 89.)  When asked about the "cost from the bugs," Segal responded that "from a resourcing perspective[,] when things like this come up is that we—

6

people, we end up shifting, or people are spending their time sometimes where we work on remediation when we may have preferred to work on other things." (*Id.* ¶ 93.)

Following this news, Twitter's shares declined from a closing price of $38.83 per share on October 23, 2019, to close at $30.73 per share, a drop of $8.10 per share, or more than 20%, on heavier than average trading volume (more than 105 million shares traded). (*Id.* ¶¶ 20, 97, 121, 148.) On October 30, 2019, defendants filed Twitter's third quarter report Form 10-Q with the SEC for the quarter ended September 30, 2019. (*Id.* ¶ 98; Q3 2019 Form 10-Q.) The report repeated the disclosures made on October 24, 2019 concerning the negative impact that the changes to MAP had on the Company's reported revenue:

> In the third quarter of 2019, we discovered, and took steps to remediate, bugs that primarily affected our legacy MAP product, impacting our ability to target ads and share data with our measurement and ad partners. We also discovered that certain personalization and data settings were not operating as expected.

(*Id.*)

## II.   LEGAL FRAMEWORK

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F. 3d 1191, 1199–1200 (9th Cir. 2003). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010–11 (9th Cir. 2011). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S 544, 577 (2007)). That requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged." *Id.*

Rule 9(b) requires a party bringing a fraud claim to "state with particularity the circumstances constituting [such] fraud . . . ." Fed. R. Civ. P. 9(b). This "requires . . . an account

United States District Court
Northern District of California

of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citing Rule 9(b)) (internal quotation marks omitted).  Similarly, in pleading a cause of action for securities fraud under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b).  The PSLRA also requires particularity in pleading the required state of mind: "in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*  Thus, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation and citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); 15 U.S.C. § 78u-4(b)(1)–(2).  The Ninth Circuit has dubbed the pleading requirements under the PSLRA "formidable" for a plaintiff seeking to state a proper claim and avoid dismissal.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008).

### III. ANALYSIS

#### A. SECTION 10(B) CLAIM

A Section 10(b) claim requires a plaintiff to "show that the defendant made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). Thus, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37–38 (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  Here, defendants challenge the sufficiency of the first, second, and

8

sixth elements.  The Court examines each in turn with the majority of the analysis focused on the first.

### 1. MATERIAL MISREPRESENTATIONS OR OMISSIONS

A material misrepresentation or omission is adequately alleged "when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citing *In re Astossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794–96 (9th Cir. 2017)).  The statement must be "capable of objective verification." *Or. Pub. Emps. Ret. Fund. v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2017) (internal quotation marks omitted).  For example, "puffing"—expressing an opinion rather than a knowing false statement of fact—is not misleading. *Id.*; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016); *In re Cutera Sec. Litig.* 610 F.3d 1103, 1111 (9th Cir. 2010).  Qualitative buzzwords such as "good," "well-regarded," or other "vague statements of optimism" cannot form the basis of a false or misleading statement. *Apollo*, 774 F.3d at 606 (citing *Cutera*, 610 F.3d at 1111 ("When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers.  This mildly optimistic, subjective assessment hardly amounts to a securities violation.")).

Even if a statement is not false, it may be misleading if it omits material information. *Khoja*, 899 F.3d at 1008–09 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)).  "A statement of omission is misleading in the securities fraud context 'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).  "[A]n omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" *Matrixx*, 563 U.S. at 38.  "'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (quoting *Berson*, 527 F.3d at 987).

That said, omissions are actionable only where they "make the actual statements misleading"; it is not sufficient that an investor merely "consider[ed] the omitted information significant." *Markette v. XOMA Corp.*, No. 15-CV-3425 (HSG), 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017) (internal quotation marks omitted). Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information," but instead a duty to include all facts necessary to render a statement accurate and not misleading, once a company elects to disclose that material information. *Id.* at 44–45, 47; 17 C.F.R. § 240.10b-5(b). Thus, "[i]f the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete." *In re Immune Response*, 375 F. Supp. 2d at 1017 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002)). To provide sufficient notice, plaintiff, "in addition to alleg[ing] the 'time, place[,] and nature of the alleged fraudulent activities,' must 'plead evidentiary facts' sufficient to establish any allegedly false statement 'was untrue or misleading when made.'" *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012).

Here, plaintiffs point to seven specific statement which fall into the following categories of fraudulent statements or omissions: (a) defendants' July 2019 statements about MAP progress and revenue prediction while reporting Twitter's financial results for the quarter ending June 30, 2019 (Statements 1–4); (b) Twitter's August 2019 announcement about software bugs primarily affecting MAP (Statement 5); and (c) Segal's September 2019 statements about MAP progress and Asia's historical focus on MAP during an investor conference following the MAP bug announcement (Statements 6–7).[3] The Court begins with addressing the statements in the first category in turn.

//

//

---

[3] Although defendants, not plaintiffs, assembled the challenged statements into an appendix for the Court's ease of reference (Defendants' Motion to Dismiss the CCAC, Dkt. No. 53, Appendix A), plaintiffs rely on defendants' mode of organization in its opposition and do not oppose the identification of the statements. As such, the Court will proceed to identify the challenged statements in accordance with Appendix A.

1

2

### a-1.  July 2019 Statements About MAP Progress and Revenue Projection  (Statements 1 and 2)

3

Plaintiffs challenge Twitter's statements about its progress on improving MAP and

4

projected revenues therefrom made at the end of July in the Q2 2019 Shareholder Letter, on the

5

earnings call with investors, and in the Q2 2019 Form 10-Q.  Thus:

6

7

> *Q2 2019 Shareholder Letter (Statement 1)*
> "**We are also continuing our work to increase the stability, performance, and flexibility of our ads platform and mobile application download product**[.]"

8

9

10

11

> "**Increasing the stability, performance, and scale of our ads platform in general and our mobile application download product in particular will take place over multiple quarters, with a gradual impact on revenue.**"

12

13

14

15

16

17

> *Q2 Earnings Call (Statement 1 Continued)*
> "**We're still in the middle of that work** and as we move forward with it, there may be a point where you can see the benefit from it ramp quickly as you described because it's a direct response related product.  **But we're still at the stage where we believe that you would its impact be gradual in nature.**  And so we'll talk more about it when we get there and the gradual nature starts, but we're not there yet.  We're still working hard to make it happen."

18

19

20

21

> *Q2 2019 Form 10-Q (Statement 2)*
> "[We are] **continuing our work to increase the stability, performance and scale of our ads platform and our mobile application download product, and such work will take place over multiple quarters, and any positive revenue impact will be gradual in its impact.**"

22

23

(CCAC ¶¶ 104, 107; *see also* Q2 2019 Shareholder Letter and Q2 2019 Form 10-Q.)[4]  Allegedly,

24

these statements are materially false and misleading because at the time they were made, they

25

created the "misimpression that [d]efendants' work to improve MAP was on track[] and would

26

27

28

---

[4] The quotes are directly lifted from the CCAC, and as plaintiffs indicate therein, "[t]he statements quoted in this section in **underlined, bolded** text are materially false and misleading for the reasons set forth herein. . . . Thus, additional text is provided for context and in support of these statements' allegedly omissive nature."  (CCAC ¶ 103 n.10.)

11

1   lead to increased revenue." (CCAC ¶ 105.). Plaintiffs proffer that because software bugs were

2   causing glitches to MAP, defendants' work on an improved MAP product was, in fact, "delayed"

3   and "[d]efendants had no reasonable basis to represent that MAP revenue would increase." (*Id.*)

4          Plaintiffs' theory fail for three reasons. First, given the allegations of the CCAC, the Court

5   finds defendants' vaguely optimistic statements to fall within the category that is understood by

6   reasonable investors as puffery. *See Wozniak*, 850 F. Supp. 2d at 1036 (statements that "[w]e are

7   very pleased with the learning from our pilot launch," "so far we're getting really great feedback,"

8   and "we are very pleased with our progress to date" held not actionable as "mere puffery"); *In re*

9   *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005)

10  ("statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,'

11  and '10% to 30% growth rate over the next several years'" held not actionable as mere puffery).

12  The statements at issue here "are not measurable and not tethered to facts that 'a reasonable person

13  would deem important to a securities investment decision.'" *Cornerstone*, 355 F. Supp. 2d at

14  1087 (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 489 (6th Cir.

15  2004), *amended and superseded for other reasons by*, 499 F.3d 651 (6th Cir. 2005)).

16         Second, the PSLRA provides a safe harbor with respect to forward-looking statements, so

17  long as those statements are accompanied by "meaningful cautionary statements," or are

18  "immaterial," or were not made "with actual knowledge" of the falsity or misleading nature of the

19  statement. 15 U.S.C. § 78u–5(c)(1)(A)(i)—(B)(i). Forward-looking statements can include

20  statements (1) "containing a projection of revenues," or other financial items; (2) "of the plans and

21  objectives of management for future operations, including plans or objectives relating to the

22  products or services of the issuer;" (3) "of future economic performance;" or (4) "of the

23  assumptions underlying or relating" to the aforementioned statements. 15 U.S.C. § 78u–

24  5(i)(1)(A)—(D). Here, the alleged misstatements, which refer to projected revenue from and

25  progress on the improved MAP product, fit within the stated definition. More specifically, the

26  statements were accompanied by meaningful cautionary language—for example, "we're not there

27  //

28  //

United States District Court
Northern District of California

yet"—and therefore not actionable.  *See* 15 U.S.C. § 78u–5(c)(1)(a)(i).[5]

Third, the CCAC lacks any plausible allegation to suggest that the statements were, in fact, false or misleading.  Plaintiffs do not allege that Twitter was *not* working on improving MAP. Nor do plaintiffs allege that defendants had committed to any specific timetable for the improved MAP product.  Likewise, the fact that MAP may have been experiencing glitches does not demonstrate how the defendants' generalized statement of projected MAP revenue was false or misleading at the time of the July statements.  Regardless of any specific technological issues that may have existed at the time, it is entirely possible that Twitter was making progress towards improving its MAP product and would generate revenue therefrom at some point.  The CCAC therefore fails to allege any inconsistency created by defendants' statements.

Because these statements constitute puffery, fall within the PSLRA's safe harbor, and do not contradict any alleged facts, the Court finds these statements are not actionable.[6]

### a-2.  Q2 2019 FORM 10-Q RISK DISCLOSURES (STATEMENT 3)

With respect to the risk disclosures contained in the Q2 2019 Form 10-Q, plaintiffs attack the following:

> "Our products and services **may contain undetected software errors, which could harm our business and operating results**[.]"

> "If new or enhanced products, product features or services fail to engage users, content partners and advertisers, **we may fail** to attract or retain users or to generate sufficient revenue or operating profit to justify our investments, and our business and operating results could be adversely affected"

> "[**C**]**hanges to existing products**, services and initiatives **could fail** to attract users, content partners, advertisers and platform partners or generate revenue."

---

[5] The safe harbor also applies because plaintiffs do not sufficiently allege that the statements were made with actual knowledge.  *See infra* Section III.A.2.

[6] Plaintiffs also allege that the statements at issue were false because defendants knew about the MAP bugs at the time the statements were made.  However, contemporaneous knowledge goes toward scienter, not falsity, and therefore, such allegations will be addressed in Section III.A.2.  *See infra.*

(CCAC ¶ 109; *see also* Q2 2019 Form 10-Q at 49–50.)  Plaintiffs claim that these warnings were materially false and misleading at the time they were made because they "failed to reveal that the risks with respect to MAP had already materialized."  (CCAC ¶ 110.)

Typically, "where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." *In re Violin Memory Sec. Litig.*, No. 13-CV-5486 (YGR), 2014 WL 5525946, at *12 (N.D. Cal. Oct. 31, 2014) (quoting *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998)).  However, when the risks have already materialized, disclosing them "in the abstract" while omitting that they have "already come to fruition" is misleading.  *Siracusano v. Matrixx* Initiatives, Inc., 585 F.3d 1167, 1181 (9th Cir. 2009) (finding risk disclosures warning of product liability claims "in the abstract" were misleading when company was already facing multiple such lawsuits); *see also Berson*, 527 F.3d at 986 (finding that risk disclosure of contract cancellations did not immunize statements touting backlog orders that would be cancelled).

Given the chronology, plaintiffs cannot plausibly allege that, at the time the risk disclosure was made on July 31, 2019, defendants' decision to stop sharing user data six days later on August 5, 2019 was already affecting Twitter's revenue.  The shutdown of data sharing would not have caused demand for MAP advertising to decline until August 5 (assuming an instantaneous reaction by advertising customers).  Thus, plaintiffs do not allege how Twitter could have failed to disclose in July that which had not happened until August at the earliest.  *See Ronconi v. Larkin*, 253 F.3d 423, 430 n. 12, 432 (9th Cir. 2001) (rejecting "fraud by hindsight").  Accordingly, the risk disclosures were not misleading because the potential risks stated therein were not false according to the allegations in the CCAC.[7]

//

//

---

[7] Even if defendants were warning of a danger of the risk of undetected software bugs, plaintiffs fail to plead specific facts from which this Court can infer that defendants knew of the bugs related to MAP by July 31, 2019.  *See infra* Section III.A.2.

14

United States District Court
Northern District of California

### a-3.  Q2 2019 FORM 10-Q SOX CERTIFICATIONS (STATEMENT 4)

Plaintiffs challenge the Sarbanes-Oxley certifications contained in the Q2 2019 Form 10-Q and signed by Dorsey and Segal, that represented, in part, the following: "Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading** with respect to the period covered by this report[.]"  (CCAC ¶ 111.)

Plaintiffs claim that the certifications were materially false and misleading because the Q2 2019 10-Q itself contained materially false and misleading statements.  (*Id.*)  The basis for plaintiffs claim is the set of statements analyzed above.  Given the failure of those allegations, the parallel allegations here also fail.

### b.  THE AUGUST 6 TWEET AND BLOG POST ABOUT MAP BUGS (STATEMENT 5)

Plaintiffs complain of an August 6 Tweet: "We **recently discovered and fixed** issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted measurement and advertising partners," as well as of the linked statement on Twitter's help center that claimed "**We fixed these issues on August 5, 2019.**"  (CCAC ¶ 113; *see also* August 6 Tweet and August 6 Blog Post.)  Plaintiffs allege that "[d]efendants failed to disclose that, being unable to actually fix the software bugs, [d]efendants turned off the setting that had caused the Company to access and share user data in contravention of user preferences that Twitter not do so."  (CCAC ¶ 114.)  At the hearing, plaintiffs' counsel argued that this was an affirmative misrepresentation because Twitter had not "actually fix[ed] the software bugs."  In addition, plaintiffs claim that these statements were misleading because defendants omitted that (1) the bugs had delayed work on an improved MAP product; (2) in response to the bugs, defendants stopped sharing certain user data with advertisers and measurement partners; (3) that such action created material risk to defendant's business and operating results; and (4) that such action negatively affected defendants' ability to target advertising, causing a material reduction in demand for MAP advertising that negatively impacted the company's MAP revenue.  (*Id.*)

United States District Court
Northern District of California

Plaintiffs fail to allege an affirmative misrepresentation.  Nowhere in the August 6 Tweet and Blog Post did Twitter represent that it had resolved the software bugs.  Rather, Twitter stated that it had "fixed issues related to [users'] settings choices . . . ." and that it had "fixed these issues on August 5, 2019" immediately after describing the issues related to sharing user data with advertisers and delivering targeted advertisements to users.  Plaintiffs conflate the effect (the privacy violations) with the cause (the software bugs themselves).

Plaintiffs' theory of misrepresentation by omission also fails because, with respect to the first, third, and fourth omissions, plaintiffs fail to allege that the omitted information had plausibly occurred at the time of the challenged statements.  As discussed previously, plaintiffs fail to allege with any specificity how the work on an improved MAP product had been delayed at all, much less on August 6, 2019.  With respect to the third omission, the risk of a negative revenue impact from the change to settings choices, plaintiffs essentially argue that defendants should have anticipated this outcome sooner as the user data-driven advertising is "[t]he lifeblood of Twitter." (CCAC ¶ 5.)  However, "defendants' lack of clairvoyance [regarding the prospective impact on MAP advertising] simply does not constitute securities fraud."  *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999).  Regarding the fourth omission, the revenue impact itself, that metrics measuring advertising product performance were allegedly immediately calculable suggests that plaintiffs cannot allege, and defendants did not have, any specific objectifiable information in that regard.

Finally, as to the second alleged omission, plaintiffs claim that Twitter failed to disclose that it had stopped sharing user data.  However, in the very Tweet plaintiffs challenge, Twitter stated that it had "fixed issues related to [users'] settings choices."  In other words, Twitter had suspended data sharing to conform with users preferences.

Even if these events had occurred and defendants did not disclose them, plaintiffs fail to explain why the omissions are misleading as opposed to merely incomplete.  *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("[P]laintiffs' complaint must specify the reason or reasons why the statements made by [defendant] [are] misleading or untrue, not simply why the statements [are] incomplete.").  Here, Twitter's announcement is addressed to

users about their data and privacy settings and does not broach any of the topics in the alleged omissions.  Twitter is simply silent about them.  "[S]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic*, 485 U.S. at 239 n.17.  At most, the August 6 Tweet and Blog Post address users' interactions with MAP-based advertisements but do not address the effect that the change in data settings will have on advertising revenue from MAP.  Therefore, plaintiffs fail to link Twitter's announcement about users' privacy setting concerns with the alleged omission regarding potential effect on advertising revenue so as to make the lack of additional disclosure misleading.  *See, e.g.*, *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-CV-4883 (BLF), 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) (rejecting falsity allegations as insufficient where "the reasons [p]laintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves").[8]  Accordingly, the CCAC does not allege sufficiently that the August 6 Twitter and Blog Post are misleading.

### c-1.  SEGAL'S SEPTEMBER 4, 2019 CONFERENCE STATEMENTS ABOUT MAP PROGRESS AND SALES (STATEMENT 6)

Plaintiffs allege that on September 4, 2019, at the Citi Global Technology Conference in New York City, Segal represented to investors in attendance that "**our MAP work is ongoing**"; Twitter "**continued to sell the existing MAP product**"; and that Twitter had made improvements to MAP.  (CCAC ¶ 115; *see also* CGTC Tr. at 7.)   Plaintiffs claim that these three statements were materially false and misleading because they "created the misimpression that defendants' work on an improved MAP product progressed uninterrupted" when "MAP revenue was, in fact, lagging, Key Metrics (CPE) and advertising demand for MAP were materially declining, and defendants were reallocating engineers to stanch the bleeding . . . ."  (CCAC ¶ 116.)  Additionally, plaintiffs repeat earlier allegations regarding omissions, *i.e.*, the failure to disclose the delay in MAP work, Twitter's suspension of user data sharing, the risk of this action to revenue, and the

---

[8] In any event, defendants cautioned investors in Twitter's risk disclosures (challenged earlier) that its operating results could be impacted by "undetected software errors" and "changes to existing products."  *In re Leapfrog Enters. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (dismissing claim where company's risk disclosures "explain[ed] the risks associated with the subject matter of plaintiffs' claims").

eventual effect on revenue.  (*Id.* ¶ 117.)

The first and third statements regarding "ongoing" work and improvement on MAP challenged are not actionable here for the same reasons that the July statements about improving MAP are not actionable, namely, that they are classic forward-looking statements, constitute mere puffery, and the CCAC lacks allegations suggesting that they are objectively false or misleading.

Segal's second statement that Twitter continued to sell the existing MAP product presents a closer question.  As discussed above, companies do not have an independent duty to disclose every piece of material information.  However, once Segal made statements about the current sales of MAP advertisements, it is plausible that investors would have been interested to know that such sales were materially declining, if such were the case.

At present, the CCAC lacks any plausible allegation that MAP revenue was materially declining or that Segal knew as much at the time of his September 4 statements.  Even construed in the light most favorable to plaintiffs, the allegations of a "material risk to [d]efendants' business and operating results" and "a material reduction in demand for MAP advertising" caused by the data settings adjustment are not sufficiently specific to allow the Court to draw the inference that the alleged slowing of sales had begun by September 4.  Indeed, because the August 5 change in settings which caused the alleged drop in demand occurred only four weeks before the September 4 statements, at this juncture, it does not seem plausible that defendants would have been able to determine accurately the true amount of the decline in MAP advertising based on a single month of data.  Defendants do not have a duty to disclose matters that are merely speculative.  *See New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.,* 537 F.3d 35, 45 (1st Cir. 2008) ("A statement cannot be intentionally misleading if defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it.") (citation omitted).

Thus, Segal's challenged statement that Twitter "continued to sell the existing MAP product" is not actionable.

//

//

18

1

### c-2.  SEGAL'S SEPTEMBER 4, 2019 CONFERENCE STATEMENTS ABOUT ASIA'S HISTORICAL FOCUS ON MAP (STATEMENT 7)

Finally, plaintiffs challenge Segal's statement, in response to an analyst's question about the Company's international monetization:

> "So **our strength just varies** from one period to another and **one geography to another based on our success in doing that.**  The ad formats that have worked in the United States . . . have tended to be the ones that worked in our other parts of the world as well.  **But we do have some markets that have been more MAP-focused.  Asia, for example, has tended to be more MAP-focused historically.**  But the hope and the intent is that we're coming out with compelling ad formats that will work over the world, not just in certain geographies.

(CCAC ¶ 118; CGTC Tr. at 9.)  Plaintiffs claim that these representations were materially false and misleading because at the time they were made, "[d]efendants' MAP product was struggling in Asia, and in particular, in Japan, as demand for advertising and revenue from MAP had been materially declining . . . ."  (CCAC ¶ 119.)

Plaintiffs' allegations of falsity with respect to these statements fail for three familiar reasons.  First, as was the case with Segal's other statements at the conference, there are no allegations quantifying the decline in MAP sales in Asia, much less any allegations describing when demand for MAP advertising in Asia began to slow.  The CCAC simply does not allege with the requisite particularity that any significant decline in MAP revenue in Asia had occurred.  Second, even if MAP advertising was, in fact, "struggling" in Asia to a material degree, the CCAC lacks allegations suggesting that Twitter was under an obligation to disclose its pending financial condition at the time of these statements (assuming that they knew as much).  As detailed above, merely mentioning a topic does not require the company to disclose every tangentially related fact that might interest investors, including interim sales data prior to a quarter's end.  *See Convergent Techs.*, 948 F.2d at 516 (a company "need not detail every corporate event, current or prospective").

Lastly, plaintiffs again fail to suggest that defendants' statements directly contradicted what they plausibly knew at the time and were therefore false.  That defendants' MAP product

19

was allegedly experiencing a material decline in MAP sales does not contradict Segal's statement that Asia "has tended to be more MAP-focused historically" or that Twitter's "strength varies . . . from one geography to another." *See Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (plaintiff must show "how and why the statement was misleading when made"). Plaintiffs' argument that Segal's statement about historical information in response to a question about "current monetization" renders his answer misleading does not persuade. Segal was specifically asked to "talk a little bit about why [the Company's] particular strength in monetization outside the US[.] Is there a particular ad format, type, or advertiser category, in particular, that you have success with?" His statements about Asia's historical focus on MAP directly responded to the question.

In sum, the Court finds that plaintiffs have failed to allege adequately any misleading statements or omissions under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## 2. SCIENTER

Although the Court has determined that plaintiffs' pleading of false statements or omissions is deficient, it next reviews whether the allegations as a whole adequately plead scienter. *See, e.g.*, *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842–43 (N.D. Cal. 2000) (analyzing scienter after determining that complaint failed to plead falsity with particularity).

The PSLRA requires plaintiffs to allege facts to establish a strong inference of scienter. *Tellabs,* 551 U.S. at 324. Scienter includes knowledge of the falsity as well as "deliberate or conscious recklessness." *No. 84 Employer-Teamster Joint Council Persnion Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003). Scienter may be established "by alleging facts demonstrating an 'intent to deceive, manipulate, or defraud' or 'deliberate recklessness.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). A "'strong inference' is an inference that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Webb*, 884 F.3d at 850 (citation omitted). The inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at

United States District Court
Northern District of California

323, 324 (scienter claims "need not be . . . the most plausible" but "must be cogent and compelling").

When deciding whether a strong inference of scienter is pled, courts must consider the "totality of plaintiffs' allegations." *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005). "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010). A complaint need not plead a strong inference that defendants actually knew contradicting facts since "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10(b)-5." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care, which presents a danger of misleading buys or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb*, 884 F.3d at 851 (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017)). The Ninth Circuit has approved of a dual analysis—"first considering whether any individual allegation gives rise to scienter and then assessing the allegations in combination"—to determine scienter. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d at 702–03. Further, the CCAC must allege facts showing scienter for each alleged falsehood. Plaintiffs seek to making this showing using three avenues: (a) defendants' monitoring of key metrics; (b) the "core operations" theory (by virtue of MAP's prominence to Twitter's advertising business and Twitter's advertising business to its revenue); and (c) Twitter's privacy violations.

### a. MONITORING OF KEY METRICS

Plaintiffs allege that Dorsey and Segal "received [k]ey [m]etrics [s]ummary emails that included CPE at least once per day . . . . Thus, [d]efendants Dorsey and Segal received constant updates regarding . . . and had access to the Company's [k]ey [m]etrics, including CPE, on a daily basis throughout the Class Period that showed [] demand for MAP ads was materially declining which meant Twitter was receiving materially less MAP advertising revenue." (CCAC ¶¶ 125–26.) Twitter's SEC filings also indicate that the Company reviews key metrics such as CPE. (*Id.* ¶ 46 (quoting 2018 Form 10-K).) Plaintiffs contend that "[d]efendants' daily review of CPE put

them on notice that their decision . . . to shop sharing certain user data and device settings had an

immediate, negative impact on demand for and revenue from Twitter's ad products, primarily

MAP[] . . . ." (Opp. at 16–17.)

The Court finds that these allegations are insufficient to draw a *strong* inference of scienter

because they do not describe with particularity the specific contents of these daily summaries and

periodic reviews of key metrics.  Without more detail, plaintiffs' allegation that the reports

"showed [] demand for MAP ads was materially declining which meant Twitter was receiving

materially less MAP revenue" (CCAC ¶ 126), is not sufficiently specific for the Court to infer that

the contents of the reports were inconsistent with any of defendants' public statements.  *See*

*Wozniak*, 850 F. Supp. 2d at 1042 (concluding that a complaint failed to allege scienter because

"[a]lthough plaintiff refer[red] to the existence of sales and shipment data and ma[de] a general

assertion about what the data showed, plaintiff allege[d] no hard numbers or other specific

information" in report); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1174 (C. D. Cal.

2007) (allegations that defendants had access to real time reports allegedly showing Wet Seals'

deteriorating financial condition are insufficient because plaintiffs have not alleged any specific

data that the individual defendants learned from these reports that were inconsistent with Wet

Seal's public statements).

### b.   CORE OPERATIONS THEORY

Plaintiffs invoke the core operations theory by highlighting the "MAP product's

importance and prominence" and "Twitter's core advertising business."  (CCAC ¶¶ 133–34.)

Under the core operations theory, a plaintiff may allege corporate officers' knowledge of the core

operations of their companies in one of three ways.  *S. Ferry*, 542 F.3d at 785.  First, the

allegations "when read together" may "raise an inference of scienter that is cogent and

compelling."  *Id.*  Second, "such allegations may independently satisfy the PSLRA when they are

particular and suggest defendants had actual access to the disputed information."  *Id.* at 786.

Third, even bare-bones and non-particularized allegations may satisfy scienter "where the nature

of the relevant fact is of such prominence that it would be absurd to suggest that management was

without knowledge of the matter."  *Id.*; *see, e.g.*, *Berson*, 527 F.3d at 987-89 (finding "absurd" that

United States District Court
Northern District of California

top management would not know about stop-work orders that halted tens of millions of dollars of operation); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Hold. Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (finding evidence that Board members attended meetings sufficient to show scienter where it would be "absurd" to suggest the Board did not know about FAA investigations).  Proof under the core operations theory "is not easy."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  A complaint must produce either "specific admissions" by the executive of "detailed involvement in the minutia of a company's operations, such as data monitoring," or else "witness accounts demonstrating that executives had actual involvement in creating false reports."  *Id.* (quoting *S. Ferry LP*, 542 F.3d at 785).

Here, no such admissions or witness accounts are alleged.  Instead, plaintiffs allege that "[d]efendants' regular reporting on the progress, performance and revenue-generation of MAP creates a strong inference that they had knowledge of the declines in revenue and reasons for such declines . . . ."  (CCAC ¶ 132.)  Similarly, plaintiffs allege that "[d]efendants' ability to target users with relevant ads was so important and prominent to [d]efendants' core business," giving rise to a strong inference of scienter.  (*Id.* ¶¶ 74–78, 137.)  The Court does not agree.  It does not automatically follow from the "core" or "prominent" nature of Twitter's advertising business in general or the MAP product in particular that each individual defendant was immediately aware of the problems affecting MAP revenue for at least two reasons.  First, plaintiffs acknowledge that MAP constituted only one component of Twitter's suite of advertising products.  (*Id.* ¶ 8.)  Second, plaintiffs have "not alleged facts supporting the inference that the [privacy setting change]'s impact on the company's financials was so dramatic that it would be absurd to think that [defendants] did not know that something was wrong."  *See Webb*, 884 F.3d at 857.  Thus, Dorsey and Segal may not even have been aware of the alleged decrease in MAP advertising revenue.  Even if they were aware of the effects of suspending data sharing, "[k]nowledge of the problem . . . is insufficient to infer that [defendants] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly."  *In re NVIDIA Corp. Sec. Litig.*, No. 08-CV-4270 (RS), 2011 WL 4831192,  at *11 (N.D. Cal. Oct. 12, 2011) (complaint "includes no specific

allegations that anyone, let alone [defendant], concluded that the likely financial impact of the material set problem would exceed the company's normal reserve"). "Without [a sufficiently dramatic impact on revenue], the alleged falsity of [defendants'] statements cannot be considered 'patently obvious.'" *Id.* "As a result, the requisite scienter cannot be inferred even if, as plaintiffs contend, [Dorsey and Segal] would have had intimate knowledge of the" issues affecting MAP at the time of the statements challenged," *id.*, and especially given the fact that defendants disclosed the negative impact in their next public filing in October 2019. Accordingly, plaintiffs do not adequately plead the core operations theory.

### c. PRIVACY VIOLATIONS

Plaintiffs point to Twitter's privacy policy and an unidentified FTC Consent Decree, arguing that "[d]efendants' publicly stated commitment as well as legal requirements to monitor and safeguard user privacy give rise to an inference that [d]efendants Dorsey and Segal monitored compliance with privacy obligations and therefore should have known of the Company's privacy violations and MAP-related software issues." (Opp. at 23; *see also* CCAC ¶¶ 141–44.) However, these mandates alone are insufficient to infer scienter as plaintiffs have provided no particularized facts from which this Court can infer that defendants intended to deceive investors.

### d. OTHER ALLEGATIONS OF SCIENTER[9]

Plaintiffs allege that Segal, Twitter's chief financial officer, sold approximately 10% of his Twitter shares across at least three transactions during the Class Period. (CCAC ¶ 32; *see also* Form 4s.)[10] Plaintiffs do not, however, allege any facts to show that the amount or timing of these stock sales were "unusual" or "suspicious." *See Silicon Graphics*, 183 F.3d at 986. Defendants also point out that the sales were made pursuant to a 10b5-1 plan. In general, automatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter. *See*, *e.g.*,

---

[9] Plaintiffs scatter these other allegations in non-scienter sections of the CCAC. For the sake of completion, the Court will address these allegations to the extent that they bear on the issue of scienter.

[10] Plaintiffs bury this allegation in the CCAC's description of the parties. Defendants raise the issue proactively in their motion to demonstrate the CCAC's pleading deficiencies.

*Kovtun v. VIVUS, Inc.*, No. 10-CV-4957 (PJH), 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012).  Thus, the allegations concerning the Segal's stock sales do not support a strong inference of scienter.

In addition, plaintiffs claim that the timing of the disclosures evinces defendants' contemporaneous awareness of the bug issues.[11]  Specifically, plaintiffs argue that defendants knew in July that software bugs were already affecting MAP given how close in time those statements were to the August 6 Tweet announcing these issues less than two weeks later. Plaintiffs cite CI-1's assessment that the MAP bugs announced in the Tweet would have taken three to six months to fix.  (*Id.* at 10.)  However, despite identifying CI-1 as a former AdOps Specialist (CCAC ¶ 63), plaintiffs do not describe with particularity the informant's personal technical knowledge of Twitter's software programs (as opposed to advertising sales).  Moreover, while temporal proximity can "bolster" the inference that a misstatement was intentional, *Berson*, 527 F.3d at 988 n.5, mere proximity is insufficient to establish that defendants knowingly lied. *See Ronconi v. Larkin*, 253 F.3d at 437.  Another more plausible inference is that defendants did not discover the MAP bug issues until after the July statements, as maintained by the August 6 Tweet and Blog Post stating that Twitter had "recently discovered" and "fixed these issues on August 5" and the lack of any reason for delaying such an announcement.[12]  To the extent that plaintiffs argue defendants' post-class period statements support a strong inference that defendants knew the adverse financial condition of the Company all along, plaintiffs cannot merely speculate in hindsight that because defendants ran into a sales slowdown and reduced revenue by the end of the Class Period that earlier statements of good financial health must have been inaccurate.  *See In*

---

[11] Plaintiffs conflate allegations related to temporal proximity with allegations related to falsity, repeatedly asserting that defendants' statements were false or misleading because they knew contrary information.  (CCAC ¶¶ 105, 108, 110, 117.)  Allegations speaking to defendants' state of mind, however, are appropriately considered in the context of scienter, not falsity.

[12] Plaintiffs also offer Segal's statement about the reallocation of software engineers to remediate the software issues as an indication that the bugs existed at the time of the July statements.  (CCAC ¶¶ 10, 18, 93.)  Without specifically alleging *when* such resources were shifted, plaintiffs cannot use this statement to establish defendants' alleged knowledge of the disruption caused by the software bugs, much less an intent to deceive.

*re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 926 (9th Cir. 1996) ("[T]he fact that [a] prediction proves

to be wrong in hindsight does not render the statement untrue when made."). Accordingly,

plaintiffs' temporal-proximity arguments do not persuade.

### e.  HOLISTIC REVIEW

Even viewing the scienter allegations holistically, the Court does not find a strong

inference of scienter on these allegations. There is nothing in the totality, much less any "smoking

gun" or ulterior motive, which provides a strong inference of scienter.[13]

* * *

In light of the analysis herein, the Court need not address loss causation issues. Based on

the foregoing analysis, the Court **GRANTS** defendants' motion to dismiss plaintiffs' Section 10(b)

claims. While it is not apparent that plaintiffs can amend, out of an abundance of caution, the

Court provides leave to amend.

### B.  SECTION 20(A) CLAIM

Defendants do not contest that Dorsey and Segal are "controlling" individuals under the

statute. However, the Section 20(a) claims against the same are dependent on the survival of

plaintiffs' Section 10(b) claims. Having found plaintiffs have failed to allege adequately any

predicate violations of Section 10(b), the Court **GRANTS** defendants' motion to dismiss plaintiffs'

Section 20(a) claim again, cautiously, with leave to amend.

//

//

//

//

---

[13] Plaintiffs also allege that scienter as to Twitter can be inferred by pleading scienter as to the individual defendants. (CCAC ¶ 139.) However, "liability for fraud cannot be imputed to a corporation without evidence that an agent of the corporation who participated in making the challenged statements did so with scienter . . . ." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.,* MDL No. 2672 (CRB), 2017 WL 6041723, at *8 (N.D. Cal. Dec. 6, 2017). Because the CCAC fails to allege with sufficient particularity facts that give rise to a strong inference of scienter of Dorsey or Segal that can be imputed to Twitter, plaintiffs' allegation of imputing corporate scienter also fails.

United States District Court
Northern District of California

**IV.   CONCLUSION**

For the foregoing reasons, the Court **GRANTS** defendants' motion to dismiss **WITH LEAVE TO AMEND**.  By **January 15, 2021**, plaintiffs shall file an amended complaint or the CCAC shall be deemed dismissed.  If an amended pleading is filed, defendants shall respond within twenty-one days of filing.

This Order terminates Docket Number 53.

**IT IS SO ORDERED.**

Dated: December 10, 2020

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

27