**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

WESTON FAMILY PARTNERSHIP
LLLP; THE TWITTER INVESTOR
GROUP,
              *Plaintiffs-Appellants*,

              and

KHAN M. HASAN; KHAFRE
BARCLIFT,
                        *Plaintiffs*,

              v.

TWITTER, INC.; JACK DORSEY; NED
SEGAL,
              *Defendants-Appellees.*

No. 20-17465

D.C. No.
4:19-cv-07149-
YGR

OPINION

---

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted November 10, 2021
Pasadena, California

Filed March 23, 2022

Before:  Daniel P. Collins and Kenneth K. Lee, Circuit
Judges, and Jill A. Otake,[*] District Judge.

Opinion by Judge Lee

## SUMMARY[**]

### Securities Fraud

The panel affirmed the district court's dismissal of a securities fraud lawsuit under §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5, alleging that Twitter, Inc., misled investors by hiding the scope of software bugs that hampered its advertisement customization.

Twitter shares users' cell phone location data with companies that pay more for ads tailored to certain users, but it permits users to opt out of such data-sharing.  In May 2019, Twitter announced that it had discovered software bugs that caused sharing of cell phone location data of its users, but it told its users that it had fixed the problems.  In August 2019, Twitter announced that it had again accidentally shared user data with advertisers, even for those who had opted out, but it had "fixed these issues."  Twitter had not resolved the software bugs, but instead had stopped sharing user data altogether for its Mobile App Promotion advertising

---

[*] The Honorable Jill A. Otake, United States District Judge for the District of Hawaii, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

program, resulting in a drop in revenue.  In October 2019, Twitter disclosed the software bugs and reported a revenue shortfall, and its share price dropped.

The panel held that it had jurisdiction because plaintiffs appealed a non-final order dismissing with leave to amend, but the district court ultimately issued a final order and thus cured the premature notice of appeal under Federal Rule of Appellate Procedure 4(a)(2).

The panel held that plaintiffs' complaint failed to state a claim under § 10(b) because Twitter's statements were not false or materially misleading.  The panel held that the securities laws do not require real-time business updates or complete disclosure of all material information whenever a company speaks on a particular topic.  To the contrary, a company can speak selectively about its business so long as its statements do not paint a misleading picture.  The panel held that Twitter's statements about its advertising program were not false or misleading because they were qualified and factually true, and the company had no duty to disclose more than it did under federal securities law.  Specifically, securities laws did not require Twitter to provide real-time updates about the progress of its Mobile App Promotion program.  Further, plaintiffs did not plausibly or with particularity allege that the software bugs disclosed in August had materialized and affected revenue in July.  In addition, Twitter's July 2019 statements fell within the Exchange Act's safe harbor provision for forward-looking statements.

## COUNSEL

Tamar Weinrib (argued) and Jeremy A. Lieberman, Pomerantz LLP, New York, New York; Jeffrey P. Campisi, Robert N. Kaplan, and Jason A. Uris, Kaplan Fox & Kilsheimer LLP, New York, New York; Laurence D. King and Mario M. Choi, Kaplan Fox & Kilsheimer LLP, Oakland, California; Shannon L. Hopkins and Andrew E. Lencyk, Levi & Korinsky LLP, Stamford, Connecticut; for Plaintiffs-Appellants.

Susan E. Engel (argued), Andrew B. Clubok, and Matthew Peters, Latham & Watkins LLP, Washington, D.C.; Michele D. Johnson, Latham & Watkins LLP, Costa Mesa, California; Elizabeth L. Deeley and Nicholas Rosellini, Latham & Watkins LLP, San Francisco, California; for Defendants-Appellees.

## OPINION

LEE, Circuit Judge:

Every day, millions of people use Twitter to share and read news, offer (often horrendous) hot takes, and fire off mean tweets. Twitter, in turn, mines the personal data of its users to better target advertisements. In August 2019, Twitter revealed that it had inadvertently shared with advertisers the personal data of users who had opted out of data-sharing, but it reassured its users that it had "fixed these issues." A few months later during its quarterly earnings announcement, Twitter disclosed that software bugs had hampered its advertisement customization and that it had suffered a $25 million revenue shortfall. The plaintiffs then filed this securities fraud lawsuit, alleging that Twitter had

misled investors by hiding the scope of its software bugs when it touted its latest advertisement initiative.

Securities laws, however, do not require real-time business updates or complete disclosure of all material information whenever a company speaks on a particular topic. To the contrary, a company can speak selectively about its business so long as its statements do not paint a misleading picture. Twitter's statements about its advertising program were not false or misleading because they were qualified and factually true. The company had no duty to disclose any more than it did under federal securities law. We thus affirm the district court's dismissal of the lawsuit.

## BACKGROUND[1]

Twitter operates a social media platform that allows people to share short 280-character messages to the public. Like most social media outlets, Twitter does not charge its users but rather earns money through advertising. Twitter shares certain user data—*e.g.*, cell phone location data— with companies that pay more for ads tailored to certain users. But because of privacy concerns, Twitter has permitted users to opt out of such data-sharing since 2017.

At issue is Twitter's Mobile App Promotion ("MAP") product, which allows advertisers to prompt users to download their apps onto their phones or tablets. MAP is most effective when an advertiser knows information about the user's device settings, such as its operating system or

---

[1] These facts come from the Consolidated Class Action Complaint and are accepted as true for this appeal. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

6     WESTON FAMILY PARTNERSHIP V. TWITTER

which apps the user has already downloaded. Twitter has highlighted MAP as an important driver of Twitter's future revenue growth, and has invested in an improved, next generation MAP product.

Despite its earlier pledge to allow user opt-outs, Twitter announced in a May 13, 2019 blog post that it had discovered software bugs that caused sharing of cell phone location data of its users. Twitter, however, told its users that it had fixed the problems. Then about three months later on August 6, Twitter announced in a tweet that it had again accidentally shared user data with advertisers, even for those who had opted out. The accompanying web post stated:

> At Twitter, we want to give you control over your data, including when we share that data. . . . [W]e recently found issues where our setting choices may not have worked as intended. . . .

> We fixed these issues on August 5, 2019. We know you will want to know if you were personally affected, and how many people in total were involved. . . .

> What is there for you to do? Aside from checking your settings, we don't believe there is anything for you to do.

When Twitter said that it had "fixed these issues," it did not mean resolving the software bugs, which proved to be difficult. Rather, Twitter had stopped sharing user data for its MAP advertising program altogether. This meant no data-sharing for all users and thus also less revenue from MAP. Twitter did not disclose these facts at that time. And

according to the complaint, Jack Dorsey, Twitter's Chief Executive Officer, and Ned Segal, its Chief Financial Officer, had access to the company's key performance metrics, including Cost Per Ad Engagement, which allegedly would have flagged this brewing problem with MAP.

Finally, about 11 weeks later on October 24, Twitter in its quarterly earnings report disclosed the software bugs hampering MAP and reported a $25 million revenue shortfall. In response to this news, some analysts downgraded the stock and the share price dropped over 20%.

Within five days of this announcement, Khan Hasan, an individual investor, filed a putative class action on behalf of all persons who bought Twitter's stock between July 26, 2019 and October 23, 2019 against Twitter and its two top executives, Dorsey and Segal. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, the district court consolidated it with another similar action, and named the Weston Family Partnership, LLP and the Twitter Investor Group as co-lead plaintiffs and counsel for the class. Plaintiffs then filed a consolidated class action complaint. The complaint alleged violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. It also included a claim against Dorsey and Segal for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

Plaintiffs allege that these statements were false or materially misleading:

(1) Twitter's July 26, 2019 shareholder letter and July 31, 2019 Form 10-Q stated the company is "continuing [its] work to increase the stability,

performance, and flexibility of [its] ads platform and [MAP]," but that it is "not there yet" and that this work will "take place over multiple quarters, with a gradual impact on revenue." Segal added that the company is "still in the middle of that work" [relating to MAP improvements], and that it is "still at the state where [he] believe[s] that you would see its impact be gradual in nature." Plaintiffs allege that these statements are false because the defendants did not disclose the software bugs allegedly plaguing MAP then and suggested that MAP was on track.

(2) The Form 10-Q also contained warnings that the company's products and services "may contain undetected software errors, which could harm [its] business and operating results." Plaintiffs claim that this statement is misleading because Twitter supposedly knew by this time that "software errors" would—not just "may"—harm the bottom line.

(3) Because of the allegedly false or misleading statements in the 10-Q filing, Twitter's Sarbanes-Oxley (SOX) certifications signed by Dorsey and Segal were also false or misleading.

(4) On August 6, 2019, the company issued a tweet that stated: "We recently discovered and fixed issues related to your settings choices for the way we deliver personalized ads, and when we share certain data with trusted management and advertising partners," and Twitter's Help Center claimed that it "fixed these issues on August 5, 2019." Plaintiffs assert that this statement misleadingly suggested Twitter had solved the software bugs, not just the privacy leak.

(5) On September 4, 2019 at an investor conference, Segal stated that the company's "MAP work is ongoing" and that Twitter "continued to sell the existing MAP product." Plaintiffs again claim that Twitter failed to disclose the scope of the software bugs hindering MAP.

(6) At the same conference, Segal stated that "Asia . . . has tended to be more MAP-focused historically." This statement, according to Plaintiffs, glossed over MAP's software bugs.

The defendants filed a Rule 12(b)(6) motion to dismiss, arguing that Plaintiffs failed to (1) allege statements that are materially false or misleading, or are otherwise actionable; (2) establish a strong inference of scienter; and (3) establish loss causation. The district court granted the motion on the first two grounds, but it did not address loss causation. And because the Section 20(a) control liability claim relies on the same allegations as the Section 10(b) claim, the district court also dismissed it. The district court granted leave to amend, but Plaintiffs did not file an amended complaint and instead filed the notice of appeal. Then several days later, the district court sua sponte considered the claims dismissed and closed the case.

## STANDARD OF REVIEW

We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014). The court may consider all materials incorporated into the complaint by reference, as well as evidence properly subject to judicial notice. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citation omitted). When assessing the adequacy of a complaint, we

accept all factual allegations as true and view them in the light most favorable to the plaintiff. *Id.* (citation omitted). We can affirm the dismissal of a complaint on any grounds supported by the record. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1129 (9th Cir. 2013).

Under Rule 12(b)(6), a complaint should be dismissed if it fails to include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint's claims are plausible when the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Actions for securities fraud brought under the Exchange Act face "more demanding pleading requirements" set out in Rule 9(b) and the PSLRA, which are detailed below. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).

## ANALYSIS

### I.  We Have Appellate Jurisdiction Because the District Court Ultimately Issued a Final Order.

To start, the defendants argue that this court lacks jurisdiction to hear this appeal because Plaintiffs appealed a non-final order.

28 U.S.C. § 1291 provides that the "courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." A decision is "final" under § 1291 if it "(1) is a full adjudication of the issues, and (2) clearly evidences the judge's intention that it be the court's final act in the matter." *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 870 (9th Cir. 2004) (citation omitted). So typically, orders dismissing claims

with leave to amend are considered not final and thus not appealable as of right. *See WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

But that does not end our analysis. Citing Rule 4(a)(2) of the Federal Rules of Appellate Procedure,[2] we have recognized that "[w]hether Plaintiffs' notice of appeal was premature or not, the final disposition of the case by the district court cures any timeliness defects of their appeal." *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1032 (9th Cir. 2020). In *Floyd*, the district court filed its final order of dismissal two weeks after the plaintiff's notice of appeal and six weeks after the order dismissing the claims. *Id.* at 1031. Stating that there is "no penalty for filing a premature notice of appeal," the court held that it had jurisdiction to review the appeal because the district court effectively cured the premature notice of appeal when it later issued a final order. *Id.* at 1032 (quoting *Orr v. Plumb*, 884 F.3d 923, 931 (9th Cir. 2018)); *accord Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 686 (9th Cir. 2007) (considering a premature appeal to have been taken from the judgment entered subsequent to a notice to appeal). *See also* Fed. R. App. P. 4(a)(2) advisory committee's note to 1979 amendments (explaining that it was "designed to avoid the loss of the right to appeal by filing the notice of appeal prematurely").

This case is analogous to *Floyd* and *Hall*. Plaintiffs filed a premature notice of appeal because the district court had given leave to amend when it dismissed the complaint. If we heard the case just after the notice of appeal had been filed, we would not have had appellate jurisdiction because the

---

[2] "A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry." Fed. R. App. P. 4(a)(2).

order was not final. But the district court within a few days issued a final order, thus vesting this court with appellate jurisdiction.

The defendants rest their argument on *WMX Techs. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). In that case, WMX sought appellate review of an order in which the district court dismissed some of its claims with leave to amend. *Id.* at 1134. We dismissed for lack of appellate jurisdiction because "a plaintiff, who has been given leave to amend, may not file a notice of appeal simply because he does not choose to file an amended complaint. A further district court determination must be obtained." *Id.* at 1136. That last sentence is key: unlike here, the district court in that case had not received a "further district court determination"—a final order dismissing the case—by the time we heard the appeal. So the district court never cured the premature appeal under Rule 4(a)(2). In our case, the district court issued a final order dismissing the case, giving us jurisdiction to hear the appeal. *Id.* at 1136–37 ("[W]hen a district court expressly grants leave to amend, it is plain that the order is not final. . . . [and] [a] final judgment must be obtained before the case becomes appealable.").

## II. The Complaint Fails to State a Claim Under Section 10(b) Because Twitter's Statements Are Not False or Materially Misleading.

Section 10(b) of the Exchange Act makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe

as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC, in turn, issued Rule 10b-5, which declares it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, the complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted).

For a statement to be false or misleading, it must "directly contradict what the defendant knew at that time" or

"omit[] material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018); *see also* 15 U.S.C. § 78u-4(b)(1)(A)–(B).

Plaintiffs must also overcome several hurdles to successfully plead a claim under Section 10(b). First, under the PSLRA's particularity requirements and Federal Rule of Civil Procedure 9(b), allegations of "fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up); *see also* 15 U.S.C. § 78u-4(b)(1). Second, an allegedly misleading statement must be "capable of objective verification." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). For example, "puffing"—expressing an opinion rather than a knowingly false statement of fact—is not misleading. *Id.*; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016). Third, a statement is not actionable just because it is incomplete. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002). Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information. Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Finally, even if a statement is objectively false or misleading, the PSLRA provides a "safe harbor" for forward-looking statements if such statements are either identified as forward-looking and accompanied by a meaningful cautionary statement, or if the plaintiff fails to show that the statement was made with actual knowledge that it was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

### A. Securities laws do not require Twitter to provide real-time updates about the progress of its MAP program.

Plaintiffs suggest that Twitter—when faced with a setback in dealing with software bugs plaguing its MAP program—had a legal duty to disclose it to the investing public. Not so. While society may have become accustomed to being instantly in the loop about the latest news (thanks in part to Twitter), our securities laws do not impose a similar requirement. Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44.

Put another way, companies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development. *See Vantive*, 283 F.3d at 1085 ("If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete."). Indeed, to do so would inject instability into the securities market, as stocks may wildly gyrate based on even fleeting developments. A company must disclose a negative internal development only if its omission would make other statements materially misleading. *Matrixx*, 563 U.S. at 45 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.").

Plaintiffs argue that Twitter's failure to disclose the software bugs' impact on MAP in July 2019 was materially misleading because its prior statements had allegedly left a "misimpression" that the work to improve MAP was "on track." But a closer examination of the statements reveals a much more qualified and less definitive characterization of

the MAP program. For example, the July 2019 shareholder letter and 10-Q stated that Twitter is "continuing [its] work to increase the stability, performance, and flexibility of [its] ads platform and [MAP] . . . but we're not there yet." Similarly, the CFO explained that the company is "still in the middle of that work" relating to MAP. And later in September of that same year, the CFO again reiterated that the "MAP work is ongoing."

None of these statements suggests that Twitter's MAP program was "on track." Rather, they suggest a vaguely optimistic assessment that MAP, like almost all product developments, has had its ups and downs, even as the company continues to make progress.[3] Perhaps if Twitter had set a specific deadline or revenue impact for MAP, its somewhat optimistic statements could seem like an implied affirmation of that target.[4] But Twitter never made such specific or unqualified guidance. And with no such guidance, Twitter's statements are so imprecise and noncommittal that they are incapable of objective verification. *See Apollo*, 774 F.3d at 606 (distinguishing non-actionable vague puffery from statements capable of objective verification); *In re Cutera Sec. Litig.*, 610 F.3d

---

[3] Even in everyday conversation, such phrases do not reflect that everything is on track without a hitch. Suppose someone is building an item of IKEA furniture and a spouse asks about its status. A response such as "I'm in the middle of it but I'm not there yet," "I'm continuing it," or "It's ongoing" does not misleadingly suggest that the person has not suffered setbacks (*e.g.*, finding a mysterious extra screw) in building that piece of furniture.

[4] Even then, an express statement of the company being "on track" to meet a target would likely be protected as a forward-looking statement under the safe harbor provision of the PSLRA. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021).

at 1111 ("[M]ildly optimistic, subjective assessment hardly amounts to a securities violation."). Nor can it be said that the company "tout[ed] positive information to the market" such that it "[became] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009.

In short, Twitter had no legal duty to disclose immediately the software bugs in its MAP program, especially given that its earlier statements about MAP's progress were qualified and vague.

**B. Plaintiffs have not plausibly or with particularity alleged that the software bugs disclosed in August had materialized and affected revenue in July.**

Because Twitter disclosed "issues" about its legacy MAP product on August 6, 2019, the defendants must have known about those issues in July, according to Plaintiffs. Plaintiffs thus argue that it is reasonable to infer that the defendants must have taken steps to address those issues in July (which decreased revenue in July), and that the defendants' challenged statements were therefore false and misleading. But it is simply not enough to assume or implausibly infer that the defendants must have known about these issues in July based on later facts or developments. Yet Plaintiffs repeatedly rely on future statements to leap to that conclusion.

For example, the complaint alleges that the defendants misled investors in their July 2019 shareholder letter and 10-Q filing when they asserted that they are "continuing [their] work to increase the stability, performance and scale of [their] ads platform and [MAP] . . . . but we're not there yet." According to Plaintiffs, these statements created the

"misimpression that [d]efendants' work to improve MAP was on track[] and would lead to increased revenue," even as the company struggled to fix the software bugs in the MAP program. They similarly allege that Twitter's risk warning in its July 2019 10-Q filing that its "product and services may contain undetected software errors, which could harm our business and operating results," was misleading because the risk had materialized by then.

Plaintiffs' falsity allegations thus presume that the defendants knew (i) in July 2019 about the software bugs in its legacy MAP product and (ii) that those bugs have caused a delay the development of the next generation MAP. But the complaint does not plausibly allege either.

First, Plaintiffs do not adequately allege that the defendants knew of the software bugs as of July 2019 when they discussed MAP's progress. Plaintiffs hitch their wagon on Twitter's *August 6, 2019* statement that it "recently discovered" the issues to leap to the conclusion that it knew about them in July 2019. But nothing in the complaint suggests that the company knew of the bugs in July 2019. And this court has held that, without more, temporal proximity alone does not satisfy the particularity requirements of Rule 9(b). *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999). So Plaintiffs have not adequately alleged that Twitter even knew about these software bugs when it discussed MAP's progress in July 2019.

Plaintiffs argue that "the only plausible inference" from the timeline is that Twitter must have discovered the software bugs in July 2019 because these types of bugs, according to their confidential informant, take three to six months to fix. Put differently, Plaintiffs assume that Twitter's August 6, 2019 tweet and blog post—which

announced the discovery and the fix of the data-sharing privacy issues—was referring to the fix of the software bugs, and not just a halt to the data-sharing.

But Twitter's August 6 Help Center blog post said no such thing. The context makes clear that Twitter had "fixed" the inadvertent data-sharing; there is no mention of software bugs, let alone ridding of them. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) ("[A] duty to provide information exists only where statements were made which were misleading *in light of the context* surrounding the statements." (emphasis added)). The blog post starts off by noting that Twitter wants "to give you control over your data" but that it had "recently found issues" of inadvertent data-sharing. The post then states: "We fixed these issues on August 5, 2019. We know you will want to know if you were personally affected . . . . What is there to do?  Aside from checking your settings, we don't believe there is anything for you to do."   These statements address Twitter users' concerns about their privacy, and thus the "fix" related to privacy leaks, not software bugs that are not even mentioned in the blog post. In short, an ordinary investor would not read Twitter's Help Center blog post as saying that Twitter had remediated the software issues.

Second, even if Twitter knew of the software bugs in July 2019, Plaintiffs' theory of deception makes sense only if those software bugs in the legacy MAP program delayed the new version of MAP. In support of that assumption, Plaintiffs can marshal only Segal's statement that "[t]he biggest impact from a resourcing perspective when things like [the software bugs] come up is that we—people, we end shifting, or people are spending their time sometimes where we work on remediation when we may have preferred to

work on other things." But that statement says nothing about the software bugs supposedly delaying the next generation MAP. To the contrary, the complaint acknowledges that as of February 2020—after Twitter disclosed the bugs in legacy MAP and continued to work on them—the company made progress on the next generation MAP. At one point in their brief, Plaintiffs veer from their allegations in their complaint, and make the new bold claim that Twitter's efforts on the next generation MAP "stopped cold" because of the privacy bugs in legacy MAP. But the complaint contains no such allegations, let alone provides sufficient particularity to support them.[5]

In sum, Plaintiffs have failed to plausibly allege falsity based on their theory that the software issues had materialized and impacted revenue in July.

## C. Twitter's July 2019 statements fall within the safe harbor provision.

Plaintiffs' challenge of Twitter's July 2019 statements in its shareholder letter and 10-Q fails for another reason: They were identified as forward-looking statements and fall

---

[5] For similar reasons, Segal's September 4, 2019 statement that Twitter "continued to sell the existing MAP product" is not actionable. In context, Segal was explaining that the company continued to sell the legacy product while working on the next generation product. Segal was not touting the sales of the legacy MAP product or characterizing how the legacy MAP was performing. Thus, omitting information about the effect of the bug did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Plaintiffs also argue Segal misled investors when he said that "Asia . . . has tended to be more MAP-focused historically," even though MAP was struggling in Asia. But this is a statement about historical patterns that is uncontradicted by any of the plaintiffs' allegations.

within the safe harbor of the Exchange Act. 15 U.S.C. § 78u-5(c)(1); *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("[C]lassic growth and revenue projections[] . . . are forward-looking on their face."). These forward-looking statements in the shareholder letter and 10-Q were accompanied by very detailed meaningful cautionary language that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A)(i).[6]

### III.   The District Court Properly Dismissed the Section 20(a) Claims.

Under Section 20(a) of the Exchange Act, "certain 'controlling' individuals [are] also liable for violations of section 10(b) and its underlying regulations." *Zucco Partners*, 552 F.3d at 990 (citing 15 U.S.C. § 78t(a)). Because a Section 20(a) claim is derivative, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Id.* (citation omitted). But, as shown above, Plaintiffs did not adequately plead a primary violation of Section 10(b) or

---

[6] Because Twitter's statements made in the Form 10-Q and the risk warnings were not misleading or were protected under the safe harbor provision, the SOX certifications likewise cannot be actionable. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009).

Rule 10b-5 by any defendant. Thus, control person liability under Section 20(a) cannot survive.[7]

## CONCLUSION

The district court's order granting the defendants' motion to dismiss is **AFFIRMED.**

---

[7] Because we hold that the complaint did not adequately allege falsity, we need not address scienter or loss causation.